424 U.S. 1 (1976)
BUCKLEY ET AL.
v.
VALEO, SECRETARY OF THE UNITED STATES SENATE, ET AL.
No. 75-436.
Supreme Court of United States.
Argued November 10, 1975.
Decided January 30, 1976.[*]
APPEAL FROM THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT.
*5 Ralph K. Winter, Jr., pro hac vice, Joel M. Gora, and *6 Brice M. Clagett argued the cause for appellants. With them on the briefs was Melvin L. Wulf.
Deputy Solicitor General Friedman, Archibald Cox, Lloyd N. Cutler, and Ralph S. Spritzer argued the cause for appellees. With Mr. Friedman on the brief for appellees Levi and the Federal Election Commission were Attorney General Levi, pro se, Solicitor General Bork, and Louis F. Claiborne. With Mr. Cutler on the brief for appellees Center for Public Financing of Elections et al. were Paul J. Mode, Jr., William T. Lake, Kenneth J. Guido, Jr., and Fred Wertheimer. With Mr. Spritzer on the brief for appellee Federal Election Commission was Paul Bender. Attorney General Levi, pro se, Solicitor General Bork, and Deputy Solicitor General Randolph filed a brief for appellee Levi and for the United States as amicus curiae.[]
PER CURIAM.
These appeals present constitutional challenges to the key provisions of the Federal Election Campaign Act of 1971 (Act), and related provisions of the Internal Revenue Code of 1954, all as amended in 1974.[1]
*7 The Court of Appeals, in sustaining the legislation in large part against various constitutional challenges,[2] viewed it as "by far the most comprehensive reform legislation [ever] passed by Congress concerning the election of the President, Vice-President, and members of Congress." 171 U. S. App. D. C. 172, 182, 519 F. 2d 821, 831 (1975). The statutes at issue summarized in broad terms, contain the following provisions: (a) individual political contributions are limited to $1,000 to any single candidate per election, with an overall annual limitation of $25,000 by any contributor; independent expenditures by individuals and groups "relative to a clearly identified candidate" are limited to $1,000 a year; campaign spending by candidates for various federal offices and spending for national conventions by political parties are subject to prescribed limits; (b) contributions and expenditures above certain threshold levels must be reported and publicly disclosed; (c) a system for public funding of Presidential campaign activities is established by Subtitle H of the Internal Revenue Code;[3] and (d) a Federal Election Commission is established to administer and enforce the legislation.
This suit was originally filed by appellants in the United States District Court for the District of Columbia. Plaintiffs included a candidate for the Presidency of the United States, a United States Senator who is a candidate for re-election, a potential contributor, the *8 Committee for a Constitutional PresidencyMcCarthy '76, the Conservative Party of the State of New York, the Mississippi Republican Party, the Libertarian Party, the New York Civil Liberties Union, Inc., the American Conservative Union, the Conservative Victory Fund, and Human Events, Inc. The defendants included the Secretary of the United States Senate and the Clerk of the United States House of Representatives, both in their official capacities and as ex officio members of the Federal Election Commission. The Commission itself was named as a defendant. Also named were the Attorney General of the United States and the Comptroller General of the United States.
Jurisdiction was asserted under 28 U. S. C. §§ 1331, 2201, and 2202, and § 315 (a) of the Act, 2 U. S. C. § 437h (a) (1970 ed., Supp. IV).[4] The complaint sought both a *9 declaratory judgment that the major provisions of the Act were unconstitutional and an injunction against enforcement of those provisions. Appellants requested the convocation of a three-judge District Court as to all matters and also requested certification of constitutional questions to the Court of Appeals, pursuant to the terms of § 315 (a). The District Judge denied the application for a three-judge court and directed that the case be transmitted to the Court of Appeals. That court entered an order stating that the case was "preliminarily deemed" to be properly certified under § 315 (a). Leave to intervene was granted to various groups and individuals.[5] After considering matters regarding factfinding procedures, the Court of Appeals entered an order en banc remanding the case to the District Court to (1) identify the constitutional issues in the complaint; (2) take whatever evidence was found necessary in addition to the submissions suitably dealt with by way of judicial notice; (3) make findings of fact with reference to those issues; and (4) certify the constitutional questions arising from the foregoing steps to the Court of Appeals.[6] On remand, the District *10 Judge entered a memorandum order adopting extensive findings of fact and transmitting the augmented record back to the Court of Appeals.
On plenary review, a majority of the Court of Appeals rejected, for the most part, appellants' constitutional attacks. The court found "a clear and compelling interest," 171 U. S. App. D. C., at 192, 519 F. 2d, at 841, in preserving the integrity of the electoral process. On that basis, the court upheld, with one exception,[7] the substantive provisions of the Act with respect to contributions, expenditures, and disclosure. It also sustained the constitutionality of the newly established Federal Election Commission. The court concluded that, notwithstanding the manner of selection of its members and the breadth of its powers, which included nonlegislative functions, the Commission is a constitutionally authorized agency created to perform primarily legislative functions.[8] *11 The provisions for public funding of the three stages of the Presidential selection process were upheld as a valid exercise of congressional power under the General Welfare Clause of the Constitution, Art. I, § 8.
In this Court, appellants argue that the Court of Appeals failed to give this legislation the critical scrutiny demanded under accepted First Amendment and equal protection principles. In appellants' view, limiting the use of money for political purposes constitutes a restriction on communication violative of the First Amendment, since virtually all meaningful political communications in the modern setting involve the expenditure of money. Further, they argue that the reporting and disclosure provisions of the Act unconstitutionally impinge on their right to freedom of association. Appellants also view the federal subsidy provisions of Subtitle H as violative of the General Welfare Clause, and as inconsistent with the First and Fifth Amendments. Finally, appellants renew their attack on the Commission's composition and powers.
At the outset we must determine whether the case before us presents a "case or controversy" within the meaning of Art. III of the Constitution. Congress may not, of course, require this Court to render opinions in matters which are not "cases or controversies." Aetna Life Ins. Co. v. Haworth, 300 U. S. 227, 240-241 (1937). We must therefore decide whether appellants have the "personal stake in the outcome of the controversy" necessary to meet the requirements of Art. III. Baker v. Carr, 369 U. S. 186, 204 (1962). It is clear that Congress, in enacting *12 2 U. S. C. § 437h (1970 ed., Supp. IV),[9] intended to provide judicial review to the extent permitted by Art. III. In our view, the complaint in this case demonstrates that at least some of the appellants have a sufficient "personal stake"[10] in a determination of the constitutional validity of each of the challenged provisions to present "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." Aetna Life Ins. Co. v. Haworth, supra, at 241.[11]

I. CONTRIBUTION AND EXPENDITURE LIMITATIONS
The intricate statutory scheme adopted by Congress to regulate federal election campaigns includes restrictions *13 on political contributions and expenditures that apply broadly to all phases of and all participants in the election process. The major contribution and expenditure limitations in the Act prohibit individuals from contributing more than $25,000 in a single year or more than $1,000 to any single candidate for an election campaign[12] and from spending more than $1,000 a year "relative to a clearly identified candidate."[13] Other provisions restrict a candidate's use of personal and family resources in his campaign[14] and limit the overall amount that can be spent by a candidate in campaigning for federal office.[15]
The constitutional power of Congress to regulate federal elections is well established and is not questioned by any of the parties in this case.[16] Thus, the critical constitutional *14 questions presented here go not to the basic power of Congress to legislate in this area, but to whether the specific legislation that Congress has enacted interferes with First Amendment freedoms or invidiously discriminates against nonincumbent candidates and minor parties in contravention of the Fifth Amendment.

A. General Principles
The Act's contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Roth v. United States, 354 U. S. 476, 484 (1957). Although First Amendment protections are not confined to "the exposition of ideas," Winters v. New York, 333 U. S. 507, 510 (1948), "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs, . . . of course includ[ing] discussions of candidates. . . ." Mills v. Alabama, 384 U. S. 214, 218 (1966). This no more than reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," New York Times Co. v. Sullivan, 376 U. S. 254, 270 (1964). In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates *15 for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. As the Court observed in Monitor Patriot Co. v. Roy, 401 U. S. 265, 272 (1971), "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."
The First Amendment protects political association as well as political expression. The constitutional right of association explicated in NAACP v. Alabama, 357 U. S. 449, 460 (1958), stemmed from the Court's recognition that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." Subsequent decisions have made clear that the First and Fourteenth Amendments guarantee " `freedom to associate with others for the common advancement of political beliefs and ideas,' " a freedom that encompasses " `[t]he right to associate with the political party of one's choice.' " Kusper v. Pontikes, 414 U. S. 51, 56, 57 (1973), quoted in Cousins v. Wigoda, 419 U. S. 477, 487 (1975).
It is with these principles in mind that we consider the primary contentions of the parties with respect to the Act's limitations upon the giving and spending of money in political campaigns. Those conflicting contentions could not more sharply define the basic issues before us. Appellees contend that what the Act regulates is conduct, and that its effect on speech and association is incidental at most. Appellants respond that contributions and expenditures are at the very core of political speech, and that the Act's limitations thus constitute restraints on First Amendment liberty that are both gross and direct.
In upholding the constitutional validity of the Act's contribution and expenditure provisions on the ground *16 that those provisions should be viewed as regulating conduct, not speech, the Court of Appeals relied upon United States v. O'Brien, 391 U. S. 367 (1968). See 171 U. S. App. D. C., at 191, 519 F. 2d, at 840. The O'Brien case involved a defendant's claim that the First Amendment prohibited his prosecution for burning his draft card because his act was " `symbolic speech' " engaged in as a " `demonstration against the war and against the draft.' " 391 U. S., at 376. On the assumption that "the alleged communicative element in O'Brien's conduct [was] sufficient to bring into play the First Amendment," the Court sustained the conviction because it found "a sufficiently important governmental interest in regulating the non-speech element" that was "unrelated to the suppression of free expression" and that had an "incidental restriction on alleged First Amendment freedoms . . . no greater than [was] essential to the furtherance of that interest." Id., at 376-377. The Court expressly emphasized that O'Brien was not a case "where the alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful." Id., at 382.
We cannot share the view that the present Act's contribution and expenditure limitations are comparable to the restrictions on conduct upheld in O'Brien. The expenditure of money simply cannot be equated with such conduct as destruction of a draft card. Some forms of communication made possible by the giving and spending of money involve speech alone, some involve conduct primarily, and some involve a combination of the two. Yet this Court has never suggested that the dependence of a communication on the expenditure of money operates itself to introduce a non speech element or to reduce the exacting scrutiny required by the First Amendment. See Bigelow v. Virginia, 421 U. S. 809, *17 820 (1975); New York Times Co. v. Sullivan, supra, at 266. For example, in Cox v. Louisiana, 379 U. S. 559 (1965), the Court contrasted picketing and parading with a newspaper comment and a telegram by a citizen to a public official. The parading and picketing activities were said to constitute conduct "intertwined with expression and association," whereas the newspaper comment and the telegram were described as a "pure form of expression" involving "free speech alone" rather than "expression mixed with particular conduct." Id., at 563-564.
Even if the categorization of the expenditure of money as conduct were accepted, the limitations challenged here would not meet the O'Brien test because the governmental interests advanced in support of the Act involve "suppressing communication." The interests served by the Act include restricting the voices of people and interest groups who have money to spend and reducing the overall scope of federal election campaigns. Although the Act does not focus on the ideas expressed by persons or groups subject to its regulations, it is aimed in part at equalizing the relative ability of all voters to affect electoral outcomes by placing a ceiling on expenditures for political expression by citizens and groups. Unlike O'Brien, where the Selective Service System's administrative interest in the preservation of draft cards was wholly unrelated to their use as a means of communication, it is beyond dispute that the interest in regulating the alleged "conduct" of giving or spending money "arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful." 391 U. S., at 382.
Nor can the Act's contribution and expenditure limitations be sustained, as some of the parties suggest, by reference to the constitutional principles reflected in such *18 decisions as Cox v. Louisiana, supra; Adderley v. Florida, 385 U. S. 39 (1966); and Kovacs v. Cooper, 336 U. S. 77 (1949). Those cases stand for the proposition that the government may adopt reasonable time, place, and manner regulations, which do not discriminate among speakers or ideas, in order to further an important governmental interest unrelated to the restriction of communication. See Erznoznik v. City of Jacksonville, 422 U. S. 205, 209 (1975). In contrast to O'Brien, where the method of expression was held to be subject to prohibition, Cox, Adderley, and Kovacs involved place or manner restrictions on legitimate modes of expressionpicketing, parading, demonstrating, and using a soundtruck. The critical difference between this case and those time, place, and manner cases is that the present Act's contribution and expenditure limitations impose direct quantity restrictions on political communication and association by persons, groups, candidates, and political parties in addition to any reasonable time, place, and manner regulations otherwise imposed.[17]
*19 A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.[18] This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event. The electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech.
The expenditure limitations contained in the Act represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech. The $1,000 ceiling on spending "relative to a clearly identified candidate," 18 U. S. C. § 608 (e) (1) (1970 ed., Supp. IV), would appear to exclude all citizens and groups except candidates, political parties, and the institutional press[19] from any significant use of the most *20 effective modes of communication.[20] Although the Act's limitations on expenditures by campaign organizations and political parties provide substantially greater room for discussion and debate, they would have required restrictions in the scope of a number of past congressional and Presidential campaigns[21] and would operate to constrain campaigning by candidates who raise sums in excess of the spending ceiling.
By contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication. *21 A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing. At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate.[22] A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues. While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor.
Given the important role of contributions in financing political campaigns, contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy. There is no indication, however, that the contribution limitations imposed by the Act would have any dramatic adverse effect on the funding of campaigns and political associations.[23] The overall effect of the Act's contribution *22 ceilings is merely to require candidates and political committees to raise funds from a greater number of persons and to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression, rather than to reduce the total amount of money potentially available to promote political expression.
The Act's contribution and expenditure limitations also impinge on protected associational freedoms. Making a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources in furtherance of common political goals. The Act's contribution ceilings thus limit one important means of associating with a candidate or committee, but leave the contributor free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates. And the Act's contribution limitations permit associations and candidates to aggregate large sums of money to promote effective advocacy. By contrast, the Act's $1,000 limitation on independent expenditures "relative to a clearly identified candidate" precludes most associations from effectively amplifying the voice of their adherents, the original basis for the recognition of First Amendment protection of the freedom of association. See NAACP v. Alabama, 357 U. S., at 460. The Act's constraints on the ability of independent associations and candidate campaign organizations to expend resources on political expression "is simultaneously an interference with the freedom of [their] adherents," Sweezy v. New Hampshire, 354 U. S. 234, 250 (1957) (plurality opinion). See Cousins v. *23 Wigoda, 419 U. S., at 487-488; NAACP v. Button, 371 U. S. 415, 431 (1963).
In sum, although the Act's contribution and expenditure limitations both implicate fundamental First Amendment interests, its expenditure ceilings impose significantly more severe restrictions on protected freedoms of political expression and association than do its limitations on financial contributions.

B. Contribution Limitations
1. The $1,000 Limitation on Contributions by Individuals and Groups to Candidates and Authorized Campaign Committees
Section 608 (b) provides, with certain limited exceptions, that "no person shall make contributions to any candidate with respect to any election for Federal office which, in the aggregate, exceed $1,000." The statute defines "person" broadly to include "an individual, partnership, committee, association, corporation or any other organization or group of persons." § 591 (g). The limitation reaches a gift, subscription, loan, advance, deposit of anything of value, or promise to give a contribution, made for the purpose of influencing a primary election, a Presidential preference primary, or a general election for any federal office.[24] §§ 591 (e) (1), (2). The *24 $1,000 ceiling applies regardless of whether the contribution is given to the candidate, to a committee authorized in writing by the candidate to accept contributions on his behalf, or indirectly via earmarked gifts passed through an intermediary to the candidate. §§ 608 (b) (4), (6).[25] The restriction applies to aggregate amounts contributed to the candidate for each electionwith primaries, runoff elections, and general elections counted separately, and all Presidential primaries held in any calendar year treated together as a single election campaign. § 608 (b) (5).
Appellants contend that the $1,000 contribution ceiling unjustifiably burdens First Amendment freedoms, employs overbroad dollar limits, and discriminates against candidates opposing incumbent officeholders and against minor-party candidates in violation of the Fifth Amendment. We address each of these claims of invalidity in turn.

(a)
As the general discussion in Part I-A, supra, indicated, the primary First Amendment problem raised by the Act's contribution limitations is their restriction of one aspect of the contributor's freedom of political association. *25 The Court's decisions involving associational freedoms establish that the right of association is a "basic constitutional freedom," Kusper v. Pontikes, 414 U. S., at 57, that is "closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society." Shelton v. Tucker, 364 U. S. 479, 486 (1960). See, e. g., Bates v. Little Rock, 361 U. S. 516, 522-523 (1960); NAACP v. Alabama, supra, at 460-461; NAACP v. Button, supra, at 452 (Harlan, J., dissenting). In view of the fundamental nature of the right to associate, governmental "action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." NAACP v. Alabama, supra, at 460-461. Yet, it is clear that "[n]either the right to associate nor the right to participate in political activities is absolute." CSC v. Letter Carriers, 413 U. S. 548, 567 (1973). Even a " `significant interference' with protected rights of political association" may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms. Cousins v. Wigoda, supra, at 488; NAACP v. Button, supra, at 438; Shelton v. Tucker, supra, at 488.
Appellees argue that the Act's restrictions on large campaign contributions are justified by three governmental interests. According to the parties and amici, the primary interest served by the limitations and, indeed, by the Act as a whole, is the prevention of corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office. Two "ancillary" interests underlying the Act are also allegedly furthered by the $1,000 limits on contributions. First, the limits serve to mute the voices of affluent persons and groups in the election *26 process and thereby to equalize the relative ability of all citizens to affect the outcome of elections.[26] Second, it is argued, the ceilings may to some extent act as a brake on the skyrocketing cost of political campaigns and thereby serve to open the political system more widely to candidates without access to sources of large amounts of money.[27]
It is unnecessary to look beyond the Act's primary purposeto limit the actuality and appearance of corruption resulting from large individual financial contributions in order to find a constitutionally sufficient justification for the $1,000 contribution limitation. Under a system of private financing of elections, a candidate lacking immense personal or family wealth must depend on financial contributions from others to provide the resources necessary to conduct a successful campaign. The increasing importance of the communications media and sophisticated mass-mailing and polling operations to effective campaigning make the raising of large sums of money an ever more essential ingredient of an effective candidacy. To the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of *27 representative democracy is undermined. Although the scope of such pernicious practices can never be reliably ascertained, the deeply disturbing examples surfacing after the 1972 election demonstrate that the problem is not an illusory one.[28]
Of almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions. In CSC v. Letter Carriers, supra, the Court found that the danger to "fair and effective government" posed by partisan political conduct on the part of federal employees charged with administering the law was a sufficiently important concern to justify broad restrictions on the employees' right of partisan political association. Here, as there, Congress could legitimately conclude that the avoidance of the appearance of improper influence "is also critical . . . if confidence in the system of representative Government is not to be eroded to a disastrous extent." 413 U. S., at 565.[29]
Appellants contend that the contribution limitations must be invalidated because bribery laws and narrowly drawn disclosure requirements constitute a less restrictive means of dealing with "proven and suspected quid pro quo arrangements." But laws making criminal *28 the giving and taking of bribes deal with only the most blatant and specific attempts of those with money to influence governmental action. And while disclosure requirements serve the many salutary purposes discussed elsewhere in this opinion,[30] Congress was surely entitled to conclude that disclosure was only a partial measure, and that contribution ceilings were a necessary legislative concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions, even when the identities of the contributors and the amounts of their contributions are fully disclosed.
The Act's $1,000 contribution limitation focuses precisely on the problem of large campaign contributions the narrow aspect of political association where the actuality and potential for corruption have been identified while leaving persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources.[31] Significantly, the *29 Act's contribution limitations in themselves do not undermine to any material degree the potential for robust and effective discussion of candidates and campaign issues by individual citizens, associations, the institutional press, candidates, and political parties.
We find that, under the rigorous standard of review established by our prior decisions, the weighty interests served by restricting the size of financial contributions to political candidates are sufficient to justify the limited effect upon First Amendment freedoms caused by the $1,000 contribution ceiling.

(b)
Appellants' first overbreadth challenge to the contribution ceilings rests on the proposition that most large contributors do not seek improper influence over a candidate's position or an officeholder's action. Although the truth of that proposition may be assumed, it does not *30 undercut the validity of the $1,000 contribution limitation. Not only is it difficult to isolate suspect contributions but, more importantly, Congress was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated.
A second, related overbreadth claim is that the $1,000 restriction is unrealistically low because much more than that amount would still not be enough to enable an unscrupulous contributor to exercise improper influence over a candidate or officeholder, especially in campaigns for statewide or national office. While the contribution limitation provisions might well have been structured to take account of the graduated expenditure limitations for congressional and Presidential campaigns,[32] Congress' failure to engage in such fine tuning does not invalidate the legislation. As the Court of Appeals observed, "[i]f it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000." 171 U. S. App. D. C., at 193, 519 F. 2d, at 842. Such distinctions in degree become significant only when they can be said to amount to differences in kind. Compare Kusper v. Pontikes, 414 U. S. 51 (1973), with Rosario v. Rockefeller, 410 U. S. 752 (1973).

(c)
Apart from these First Amendment concerns, appellants argue that the contribution limitations work such an invidious discrimination between incumbents *31 and challengers that the statutory provisions must be declared unconstitutional on their face.[33] In considering this contention, it is important at the outset to note that the Act applies the same limitations on contributions to all candidates regardless of their present occupations, ideological views, or party affiliations. Absent record evidence of invidious discrimination against challengers as a class, a court should generally be hesitant to invalidate legislation which on its face imposes evenhanded restrictions. Cf. James v. Valtierra, 402 U. S. 137 (1971).
*32 There is no such evidence to support the claim that the contribution limitations in themselves discriminate against major-party challengers to incumbents. Challengers can and often do defeat incumbents in federal elections.[34] Major-party challengers in federal elections are usually men and women who are well known and influential in their community or State. Often such challengers are themselves incumbents in important local, state, or federal offices. Statistics in the record indicate that major-party challengers as well as incumbents are capable of raising large sums for campaigning.[35] Indeed, a small but nonetheless significant number of challengers have in recent elections outspent their incumbent rivals.[36] And, to the extent that incumbents generally are more likely than challengers to attract very large contributions, the Act's $1,000 ceiling has the practical effect of benefiting challengers as a class.[37] Contrary to the broad generalization *33 drawn by the appellants, the practical impact of the contribution ceilings in any given election will clearly depend upon the amounts in excess of the ceilings that, for various reasons, the candidates in that election would otherwise have received and the utility of these additional amounts to the candidates. To be sure, the limitations may have a significant effect on particular challengers or incumbents, but the record provides no basis for predicting that such adventitious factors will invariably and invidiously benefit incumbents as a class.[38] Since the danger of corruption and the appearance of corruption apply with equal force to challengers and to incumbents, Congress had ample justification for imposing the same fundraising constraints upon both.
The charge of discrimination against minor-party and independent candidates is more troubling, but the record provides no basis for concluding that the Act invidiously disadvantages such candidates. As noted above, the Act on its face treats all candidates equally with regard to contribution limitations. And the restriction would appear to benefit minor-party and independent candidates relative to their major-party opponents because major-party candidates receive far more money in large contributions.[39] Although there is some *34 force to appellants' response that minor-party candidates are primarily concerned with their ability to amass the resources necessary to reach the electorate rather than with their funding position relative to their major-party opponents, the record is virtually devoid of support for the claim that the $1,000 contribution limitation will have a serious effect on the initiation and scope of minor-party and independent candidacies.[40] Moreover, any attempt *35 to exclude minor parties and independents en masse from the Act's contribution limitations overlooks the fact that minor-party candidates may win elective office or have a substantial impact on the outcome of an election.[41]
In view of these considerations, we conclude that the impact of the Act's $1,000 contribution limitation on major-party challengers and on minor-party candidates does not render the provision unconstitutional on its face.
2. The $5,000 Limitation on Contributions by Political Committees
Section 608 (b) (2) permits certain committees, designated as "political committees," to contribute up to $5,000 to any candidate with respect to any election for federal office. In order to qualify for the higher contribution ceiling, a group must have been registered with the Commission as a political committee under 2 U. S. C. § 433 (1970 ed., Supp. IV) for not less than six months, have received contributions from more than 50 persons, and, except for state political party organizations, have contributed to five or more candidates for federal office. Appellants argue that these qualifications unconstitutionally discriminate against ad hoc organizations in favor of established interest groups and impermissibly burden free association. The argument is without merit. Rather than undermining freedom of association, the basic provision enhances the opportunity of bona fide groups to participate in the election process, and the registration, contribution, and candidate conditions serve the permissible purpose of preventing individuals *36 from evading the applicable contribution limitations by labeling themselves committees.
3. Limitations on Volunteers' Incidental Expenses
The Act excludes from the definition of contribution "the value of services provided without compensation by individuals who volunteer a portion or all of their time on behalf of a candidate or political committee." § 591 (e) (5) (A). Certain expenses incurred by persons in providing volunteer services to a candidate are exempt from the $1,000 ceiling only to the extent that they do not exceed $500. These expenses are expressly limited to (1) "the use of real or personal property and the cost of invitations, food, and beverages, voluntarily provided by an individual to a candidate in rendering voluntary personal services on the individual's residential premises for candidate-related activities." § 591 (e) (5) (B); (2) "the sale of any food or beverage by a vendor for use in a candidate's campaign at a charge [at least equal to cost but] less than the normal comparable charge," § 591 (e) (5) (C); and (3) "any unreimbursed payment for travel expenses made by an individual who on his own behalf volunteers his personal services to a candidate," § 591 (e) (5) (D).
If, as we have held, the basic contribution limitations are constitutionally valid, then surely these provisions are a constitutionally acceptable accommodation of Congress' valid interest in encouraging citizen participation in political campaigns while continuing to guard against the corrupting potential of large financial contributions to candidates. The expenditure of resources at the candidate's direction for a fundraising event at a volunteer's residence or the provision of in-kind assistance in the form of food or beverages to be resold to raise funds or consumed by the participants in such an event provides material financial assistance to a candidate. The ultimate *37 effect is the same as if the person had contributed the dollar amount to the candidate and the candidate had then used the contribution to pay for the fundraising event or the food. Similarly, travel undertaken as a volunteer at the direction of the candidate or his staff is an expense of the campaign and may properly be viewed as a contribution if the volunteer absorbs the fare. Treating these expenses as contributions when made to the candidate's campaign or at the direction of the candidate or his staff forecloses an avenue of abuse[42] without limiting actions voluntarily undertaken by citizens independently of a candidate's campaign.[43]
*38 4. The $25,000 Limitation on Total Contributions During any Calendar Year
In addition to the $1,000 limitation on the nonexempt contributions that an individual may make to a particular candidate for any single election, the Act contains an overall $25,000 limitation on total contributions by an individual during any calendar year. § 608 (b) (3). A contribution made in connection with an election is considered, for purposes of this subsection, to be made in the year the election is held. Although the constitutionality of this provision was drawn into question by appellants, it has not been separately addressed at length by the parties. The overall $25,000 ceiling does impose an ultimate restriction upon the number of candidates and committees with which an individual may associate himself by means of financial support. But this quite modest restraint upon protected political activity serves to prevent evasion of the $1,000 contribution limitation by a person who might otherwise contribute massive amounts of money to a particular candidate through the use of unearmarked contributions to political committees likely to contribute to that candidate, or huge contributions to the candidate's political party. The limited, additional restriction on associational freedom imposed by the overall ceiling is thus no more than a corollary of the basic individual contribution limitation that we have found to be constitutionally valid.

*39 C. Expenditure Limitations
The Act's expenditure ceilings impose direct and substantial restraints on the quantity of political speech. The most drastic of the limitations restricts individuals and groups, including political parties that fail to place a candidate on the ballot,[44] to an expenditure of $1,000 "relative to a clearly identified candidate during a calendar year." § 608 (e) (1). Other expenditure ceilings limit spending by candidates, § 608 (a), their campaigns, § 608 (c), and political parties in connection with election campaigns, § 608 (f). It is clear that a primary effect of these expenditure limitations is to restrict the quantity of campaign speech by individuals, groups, and candidates. The restrictions, while neutral as to the ideas expressed, limit political expression "at the core of our electoral process and of the First Amendment freedoms." Williams v. Rhodes, 393 U. S. 23, 32 (1968).
1. The $1,000 Limitation on Expenditures "Relative to a Clearly Identified Candidate"
Section 608 (e) (1) provides that "[n]o person may make any expenditure . . . relative to a clearly identified candidate during a calendar year which, when added to all other expenditures made by such person during the year advocating the election or defeat of such candidate, exceeds $1,000."[45] The plain effect of § 608 (e) (1) is to *40 prohibit all individuals, who are neither candidates nor owners of institutional press facilities, and all groups, except political parties and campaign organizations, from voicing their views "relative to a clearly identified candidate" through means that entail aggregate expenditures of more than $1,000 during a calendar year. The provision, for example, would make it a federal criminal offense for a person or association to place a single one-quarter page advertisement "relative to a clearly identified candidate" in a major metropolitan newspaper.[46]
Before examining the interests advanced in support of § 608 (e) (1)'s expenditure ceiling, consideration must be given to appellants' contention that the provision is unconstitutionally vague.[47] Close examination of the *41 specificity of the statutory limitation is required where, as here, the legislation imposes criminal penalties in an area permeated by First Amendment interests. See Smith v. Goguen, 415 U. S. 566, 573 (1974); Cramp v. Board of Public Instruction, 368 U. S. 278, 287-288 (1961); Smith v. California, 361 U. S. 147, 151 (1959).[48] The test is whether the language of § 608 (e) (1) affords the "[p]recision of regulation [that] must be the touchstone in an area so closely touching our most precious freedoms." NAACP v. Button, 371 U. S., at 438.
The key operative language of the provision limits "any expenditure . . . relative to a clearly identified candidate." Although "expenditure," "clearly identified," and "candidate" are defined in the Act, there is no definition clarifying what expenditures are "relative to" a candidate. The use of so indefinite a phrase as "relative to" a candidate fails to clearly mark the boundary between permissible and impermissible speech, unless other portions of § 608 (e) (1) make sufficiently explicit the range of expenditures *42 covered by the limitation. The section prohibits "any expenditure . . . relative to a clearly identified candidate during a calendar year which, when added to all other expenditures . . . advocating the election or defeat of such candidate, exceeds $1,000." (Emphasis added.) This context clearly permits, if indeed it does not require, the phrase "relative to" a candidate to be read to mean "advocating the election or defeat of" a candidate.[49]
But while such a construction of § 608 (e) (1) refocuses the vagueness question, the Court of Appeals was mistaken in thinking that this construction eliminates the problem of unconstitutional vagueness altogether. 171 U. S. App. D. C., at 204, 519 F. 2d, at 853. For the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest.[50] In an analogous *43 context, this Court in Thomas v. Collins, 323 U. S. 516 (1945), observed:
"[W]hether words intended and designed to fall short of invitation would miss that mark is a question both of intent and of effect. No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation. In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.
"Such a distinction offers no security for free discussion. In these conditions it blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim." Id., at 535.
See also United States v. Auto. Workers, 352 U. S. 567, 595-596 (1957) (Douglas, J., dissenting); Gitlow v. New York, 268 U. S. 652, 673 (1925) (Holmes, J., dissenting).
The constitutional deficiencies described in Thomas v. Collins can be avoided only by reading § 608 (e) (1) as limited to communications that include explicit words of advocacy of election or defeat of a candidate, much as the definition of "clearly identified" in § 608 (e) (2) requires that an explicit and unambiguous reference to the candidate appear as part of the communication.[51] This *44 is the reading of the provision suggested by the non-governmental appellees in arguing that "[f]unds spent to propagate one's views on issues without expressly calling for a candidate's election or defeat are thus not covered." We agree that in order to preserve the provision against invalidation on vagueness grounds, § 608 (e) (1) must be construed to apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office.[52]
We turn then to the basic First Amendment question whether § 608 (e) (1), even as thus narrowly and explicitly construed, impermissibly burdens the constitutional right of free expression. The Court of Appeals summarily held the provision constitutionally valid on the ground that "section 608 (e) is a loophole-closing provision only" that is necessary to prevent circumvention of the contribution limitations. 171 U. S. App. D. C., at 204, 519 F. 2d, at 853. We cannot agree.
The discussion in Part I-A, supra, explains why the Act's expenditure limitations impose far greater restraints on the freedom of speech and association than do its contribution limitations. The markedly greater burden on basic freedoms caused by § 608 (e) (1) thus cannot be sustained simply by invoking the interest in maximizing the effectiveness of the less intrusive contribution limitations. Rather, the constitutionality of § 608 (e) (1) turns on whether the governmental interests advanced in its support satisfy the exacting scrutiny applicable to limitations *45 on core First Amendment rights of political expression.
We find that the governmental interest in preventing corruption and the appearance of corruption is inadequate to justify § 608 (e) (1)'s ceiling on independent expenditures. First, assuming, arguendo, that large independent expenditures pose the same dangers of actual or apparent quid pro quo arrangements as do large contributions, § 608 (e) (1) does not provide an answer that sufficiently relates to the elimination of those dangers. Unlike the contribution limitations' total ban on the giving of large amounts of money to candidates, § 608 (e) (1) prevents only some large expenditures. So long as persons and groups eschew expenditures that in express terms advocate the election or defeat of a clearly identified candidate, they are free to spend as much as they want to promote the candidate and his views. The exacting interpretation of the statutory language necessary to avoid unconstitutional vagueness thus undermines the limitation's effectiveness as a loophole-closing provision by facilitating circumvention by those seeking to exert improper influence upon a candidate or office-holder. It would naively underestimate the ingenuity and resourcefulness of persons and groups desiring to buy influence to believe that they would have much difficulty devising expenditures that skirted the restriction on express advocacy of election or defeat but nevertheless benefited the candidate's campaign. Yet no substantial societal interest would be served by a loophole-closing provision designed to check corruption that permitted unscrupulous persons and organizations to expend unlimited sums of money in order to obtain improper influence over candidates for elective office. Cf. Mills v. Alabama, 384 U. S., at 220.
Second, quite apart from the shortcomings of § 608 (e) *46 (1) in preventing any abuses generated by large independent expenditures, the independent advocacy restricted by the provision does not presently appear to pose dangers of real or apparent corruption comparable to those identified with large campaign contributions. The parties defending § 608 (e) (1) contend that it is necessary to prevent would-be contributors from avoiding the contribution limitations by the simple expedient of paying directly for media advertisements or for other portions of the candidate's campaign activities. They argue that expenditures controlled by or coordinated with the candidate and his campaign might well have virtually the same value to the candidate as a contribution and would pose similar dangers of abuse. Yet such controlled or coordinated expenditures are treated as contributions rather than expenditures under the Act.[53] Section 608 (b)'s *47 contribution ceilings rather than § 608 (e) (1)'s independent expenditure limitation prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions. By contrast, § 608 (e) (1) limits expenditures for express advocacy of candidates made totally independently of the candidate and his campaign. Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate. Rather than preventing circumvention of the contribution limitations, § 608 (e) (1) severely restricts all independent advocacy despite its substantially diminished potential for abuse.
While the independent expenditure ceiling thus fails to serve any substantial governmental interest in stemming *48 the reality or appearance of corruption in the electoral process, it heavily burdens core First Amendment expression. For the First Amendment right to " `speak one's mind . . . on all public institutions' " includes the right to engage in " `vigorous advocacy' no less than `abstract discussion.' " New York Times Co. v. Sullivan, 376 U. S., at 269, quoting Bridges v. California, 314 U. S. 252, 270 (1941), and NAACP v. Button, 371 U. S., at 429. Advocacy of the election or defeat of candidates for federal office is no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy of the passage or defeat of legislation.[54]
It is argued, however, that the ancillary governmental interest in equalizing the relative ability of individuals and groups to influence the outcome of elections serves to justify the limitation on express advocacy of the election or defeat of candidates imposed by § 608 (e) (1)'s expenditure ceiling. But the concept that government may restrict the speech of some elements of our society in *49 order to enhance the relative voice of others is wholly foreign to the First Amendment, which was designed "to secure `the widest possible dissemination of information from diverse and antagonistic sources,' " and " `to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' " New York Times Co. v. Sullivan, supra, at 266, 269, quoting Associated Press v. United States, 326 U. S. 1, 20 (1945), and Roth v. United States, 354 U. S., at 484. The First Amendment's protection against governmental abridgment of free expression cannot properly be made to depend on a person's financial ability to engage in public discussion. Cf. Eastern R. Conf. v. Noerr Motors, 365 U. S. 127, 139 (1961).[55]
*50 The Court's decisions in Mills v. Alabama, 384 U. S. 214 (1966), and Miami Herald Publishing Co. v. Tornillo, 418 U. S. 241 (1974), held that legislative restrictions on advocacy of the election or defeat of political candidates are wholly at odds with the guarantees of the First Amendment. In Mills, the Court addressed the question whether "a State, consistently with the United States Constitution, can make it a crime for the editor of a daily newspaper to write and publish an editorial on election day urging people to vote a certain way on issues submitted to them." 384 U. S., at 215 (emphasis in original). We held that "no test of reasonableness can save [such] a state law from invalidation as a violation of the First Amendment." Id., at 220. Yet the prohibition of election-day editorials invalidated in Mills is clearly a lesser intrusion on constitutional freedom than a $1,000 limitation on the amount of money any person or association can spend during an entire election year in advocating the election or defeat of a candidate for public office. More recently in Tornillo, the Court held that Florida could not constitutionally require a newspaper *51 to make space available for a political candidate to reply to its criticism. Yet under the Florida statute, every newspaper was free to criticize any candidate as much as it pleased so long as it undertook the modest burden of printing his reply. See 418 U. S., at 256-257. The legislative restraint involved in Tornillo thus also pales in comparison to the limitations imposed by § 608 (e) (1).[56]
For the reasons stated, we conclude that § 608 (e) (1)'s independent expenditure limitation is unconstitutional under the First Amendment.
2. Limitation on Expenditures by Candidates from Personal or Family Resources
The Act also sets limits on expenditures by a candidate "from his personal funds, or the personal funds of his immediate family, in connection with his campaigns during any calendar year." § 608 (a) (1). These ceilings vary from $50,000 for Presidential or Vice Presidential candidates to $35,000 for senatorial candidates, and $25,000 for most candidates for the House of Representatives.[57]
*52 The ceiling on personal expenditures by candidates on their own behalf, like the limitations on independent expenditures contained in § 608 (e) (1), imposes a substantial restraint on the ability of persons to engage in protected First Amendment expression.[58] The candidate, no less than any other person, has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election and the election of other candidates. Indeed, it is of particular importance that candidates have the unfettered *53 opportunity to make their views known so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day. Mr. Justice Brandeis' observation that in our country "public discussion is a political duty," Whitney v. California, 274 U. S. 357, 375 (1927) (concurring opinion), applies with special force to candidates for public office. Section 608 (a)'s ceiling on personal expenditures by a candidate in furtherance of his own candidacy thus clearly and directly interferes with constitutionally protected freedoms.
The primary governmental interest served by the Act the prevention of actual and apparent corruption of the political processdoes not support the limitation on the candidate's expenditure of his own personal funds. As the Court of Appeals concluded: "Manifestly, the core problem of avoiding undisclosed and undue influence on candidates from outside interests has lesser application when the monies involved come from the candidate himself or from his immediate family." 171 U. S. App. D. C., at 206, 519 F. 2d, at 855. Indeed, the use of personal funds reduces the candidate's dependence on outside contributions and thereby counteracts the coercive pressures and attendant risks of abuse to which the Act's contribution limitations are directed.[59]
*54 The ancillary interest in equalizing the relative financial resources of candidates competing for elective office, therefore, provides the sole relevant rationale for § 608 (a)'s expenditure ceiling. That interest is clearly not sufficient to justify the provision's infringement of fundamental First Amendment rights. First, the limitation may fail to promote financial equality among candidates. A candidate who spends less of his personal resources on his campaign may nonetheless outspend his rival as a result of more successful fundraising efforts. Indeed, a candidate's personal wealth may impede his efforts to persuade others that he needs their financial contributions or volunteer efforts to conduct an effective campaign. Second, and more fundamentally, the First Amendment simply cannot tolerate § 608 (a)'s restriction upon the freedom of a candidate to speak without legislative limit on behalf of his own candidacy. We therefore hold that § 608 (a)'s restriction on a candidate's personal expenditures is unconstitutional.
3. Limitations on Campaign Expenditures
Section 608 (c) places limitations on overall campaign expenditures by candidates seeking nomination for election and election to federal office.[60] Presidential candidates may spend $10,000,000 in seeking nomination for office and an additional $20,000,000 in the general election campaign. §§ 608 (c) (1) (A), (B).[61] *55 The ceiling on senatorial campaigns is pegged to the size of the voting-age population of the State with minimum dollar amounts applicable to campaigns in States with small populations. In senatorial primary elections, the limit is the greater of eight cents multiplied by the voting-age population or $100,000, and in the general election the limit is increased to 12 cents multiplied by the voting-age population or $150,000. §§ 608 (c) (1) (C), (D). The Act imposes blanket $70,000 limitations on both primary campaigns and general election campaigns for the House of Representatives with the exception that the senatorial ceiling applies to campaigns in States entitled to only one Representative. §§ 608 (c) (1) (C)-(E). These ceilings are to be adjusted upwards at the beginning of each calendar year by the average percentage rise in the consumer price index for the 12 preceding months. § 608 (d).[62]
No governmental interest that has been suggested is sufficient to justify the restriction on the quantity of political expression imposed by § 608 (c)'s campaign expenditure limitations. The major evil associated with rapidly increasing campaign expenditures is the danger of candidate dependence on large contributions. The interest in alleviating the corrupting influence of large contributions is served by the Act's contribution limitations and disclosure provisions rather than by § 608 (c)'s campaign expenditure ceilings. The Court of Appeals' assertion that the expenditure restrictions are necessary to reduce the incentive to circumvent direct contribution limits is not persuasive. See 171 U. S. *56 App. D. C., at 210, 519 F. 2d, at 859. There is no indication that the substantial criminal penalties for violating the contribution ceilings combined with the political repercussion of such violations will be insufficient to police the contribution provisions. Extensive reporting, auditing, and disclosure requirements applicable to both contributions and expenditures by political campaigns are designed to facilitate the detection of illegal contributions. Moreover, as the Court of Appeals noted, the Act permits an officeholder or successful candidate to retain contributions in excess of the expenditure ceiling and to use these funds for "any other lawful purpose." 2 U. S. C. § 439a (1970 ed., Supp. IV). This provision undercuts whatever marginal role the expenditure limitations might otherwise play in enforcing the contribution ceilings.
The interest in equalizing the financial resources of candidates competing for federal office is no more convincing a justification for restricting the scope of federal election campaigns. Given the limitation on the size of outside contributions, the financial resources available to a candidate's campaign, like the number of volunteers recruited, will normally vary with the size and intensity of the candidate's support.[63] There is nothing invidious, improper, or unhealthy in permitting such funds to be spent to carry the candidate's message to the electorate.[64] Moreover, the equalization of permissible campaign expenditures *57 might serve not to equalize the opportunities of all candidates, but to handicap a candidate who lacked substantial name recognition or exposure of his views before the start of the campaign.
The campaign expenditure ceilings appear to be designed primarily to serve the governmental interests in reducing the allegedly skyrocketing costs of political campaigns. Appellees and the Court of Appeals stressed statistics indicating that spending for federal election campaigns increased almost 300% between 1952 and 1972 in comparison with a 57.6% rise in the consumer price index during the same period. Appellants respond that during these years the rise in campaign spending lagged behind the percentage increase in total expenditures for commercial advertising and the size of the gross national product. In any event, the mere growth in the cost of federal election campaigns in and of itself provides no basis for governmental restrictions on the quantity of campaign spending and the resulting limitation on the scope of federal campaigns. The First Amendment denies government the power to determine that spending to promote one's political views is wasteful, excessive, or unwise. In the free society ordained by our Constitution it is not the government, but the peopleindividually as citizens and candidates and collectively as associations and political committeeswho must retain control over the quantity and range of debate on public issues in a political campaign.[65]
*58 For these reasons we hold that § 608 (c) is constitutionally invalid.[66]
In sum, the provisions of the Act that impose a $1,000 limitation on contributions to a single candidate, § 608 (b) (1), a $5,000 limitation on contributions by a political committee to a single candidate, § 608 (b) (2), and a $25,000 limitation on total contributions by an individual during any calendar year, § 608 (b) (3), are constitutionally valid. These limitations, along with the disclosure provisions, constitute the Act's primary weapons against the reality or appearance of improper influence stemming from the dependence of candidates on large campaign contributions. The contribution ceilings thus serve the basic governmental interest in safeguarding the integrity of the electoral process without directly impinging upon the rights of individual citizens and candidates to engage in political debate and discussion. By contrast, the First Amendment requires the invalidation of the Act's independent expenditure ceiling, § 608 (e) (1), its limitation on a candidate's expenditures from his own personal funds, § 608 (a), and its ceilings on overall campaign expenditures, § 608 (c). These provisions place substantial and direct restrictions *59 on the ability of candidates, citizens, and associations to engage in protected political expression, restrictions that the First Amendment cannot tolerate.[67]

*60 II. REPORTING AND DISCLOSURE REQUIREMENTS
Unlike the limitations on contributions and expenditures imposed by 18 U. S. C. § 608 (1970 ed., Supp. IV), the disclosure requirements of the Act, 2 U. S. C. § 431 et seq. (1970 ed., Supp. IV),[68] are not challenged by appellants as per se unconstitutional restrictions on the exercise of First Amendment freedoms of speech and association.[69] Indeed, appellants argue that "narrowly drawn disclosure requirements are the proper solution to virtually all of the evils Congress sought to remedy." Brief for Appellants 171. The particular requirements *61 embodied in the Act are attacked as overbroadboth in their application to minor-party and independent candidates and in their extension to contributions as small as $11 or $101. Appellants also challenge the provision for disclosure by those who make independent contributions and expenditures, § 434 (e). The Court of Appeals found no constitutional infirmities in the provisions challenged here.[70] We affirm the determination on overbreadth and hold that § 434 (e), if narrowly construed, also is within constitutional bounds.
The first federal disclosure law was enacted in 1910. Act of June 25, 1910, c. 392, 36 Stat. 822. It required political committees, defined as national committees and national congressional campaign committees of parties, and organizations operating to influence congressional elections in two or more States, to disclose names of all contributors of $100 or more; identification of recipients of expenditures of $10 or more was also required. §§ 1, 5-6, 36 Stat. 822 824. Annual expenditures of $50 or more "for the purpose of influencing or controlling, in two or more States, the result of" a congressional election had to be reported independently if they were not made through a political committee. § 7, 36 Stat. 824. In 1911 the Act was revised to include prenomination transactions such as those involved in conventions and primary campaigns. Act of Aug. 19, 1911, § 2, 37 Stat. 26. See United States v. Auto. Workers, 352 U. S., at 575-576.
Disclosure requirements were broadened in the Federal Corrupt Practices Act of 1925 (Title III of the Act of Feb. 28, 1925), 43 Stat. 1070. That Act required political committees, defined as organizations that accept contributions or make expenditures "for the purpose of *62 influencing or attempting to influence" the Presidential or Vice Presidential elections (a) in two or more States or (b) as a subsidiary of a national committee, § 302 (c), 43 Stat. 1070, to report total contributions and expenditures, including the names and addresses of contributors of $100 or more and recipients of $10 or more in a calendar year. § 305 (a), 43 Stat. 1071. The Act was upheld against a challenge that it infringed upon the prerogatives of the States in Burroughs v. United States, 290 U. S. 534 (1934). The Court held that it was within the power of Congress "to pass appropriate legislation to safeguard [a Presidential] election from the improper use of money to influence the result." Id., at 545. Although the disclosure requirements were widely circumvented,[71] no further attempts were made to tighten them until 1960, when the Senate passed a bill that would have closed some existing loopholes. S. 2436, 106 Cong. Rec. 1193. The attempt aborted because no similar effort was made in the House.
The Act presently under review replaced all prior disclosure laws. Its primary disclosure provisions impose reporting obligations on "political committees" and candidates. "Political committee" is defined in § 431 (d) as a group of persons that receives "contributions" or makes "expenditures" of over $1,000 in a calendar year. "Contributions" and "expenditures" are defined in lengthy parallel provisions similar to those in Title 18, discussed *63 above.[72] Both definitions focus on the use of money or other objects of value "for the purpose of . . . influencing" the nomination or election of any person to federal office. §§ 431 (e) (1), (f) (1).
Each political committee is required to register with the Commission, § 433, and to keep detailed records of both contributions and expenditures, §§ 432 (c), (d). These records must include the name and address of everyone making a contribution in excess of $10, along with the date and amount of the contribution. If a person's contributions aggregate more than $100, his occupation and principal place of business are also to be included. § 432 (c) (2). These files are subject to periodic audits and field investigations by the Commission. § 438 (a) (8).
Each committee and each candidate also is required to file quarterly reports. § 434 (a). The reports are to contain detailed financial information, including the full name, mailing address, occupation, and principal place of business of each person who has contributed over $100 in a calendar year, as well as the amount and date of the contributions. § 434 (b). They are to be made available by the Commission "for public inspection and copying." § 438 (a) (4). Every candidate for federal office is required to designate a "principal campaign committee," which is to receive reports of contributions and expenditures made on the candidate's behalf from other political committees and to compile and file these reports, together with its own statements, with the Commission. § 432 (f).
Every individual or group, other than a political committee or candidate, who makes "contributions" or "expenditures" of over $100 in a calendar year "other than *64 by contribution to a political committee or candidate" is required to file a statement with the Commission. § 434 (e). Any violation of these recordkeeping and reporting provisions is punishable by a fine of not more than $1,000 or a prison term of not more than a year, or both. § 441 (a).

A. General Principles
Unlike the overall limitations on contributions and expenditures, the disclosure requirements impose no ceiling on campaign-related activities. But we have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment. E. g., Gibson v. Florida Legislative Comm., 372 U. S. 539 (1963); NAACP v. Button, 371 U. S. 415 (1963); Shelton v. Tucker, 364 U. S. 479 (1960); Bates v. Little Rock, 361 U. S. 516 (1960); NAACP v. Alabama, 357 U. S. 449 (1958).
We long have recognized that significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest. Since NAACP v. Alabama we have required that the subordinating interests of the State must survive exacting scrutiny.[73] We also have insisted that there be a "relevant correlation"[74] or "substantial relation"[75] between the governmental interest and the information required to be disclosed. See Pollard v. Roberts, 283 F. Supp. 248, 257 (ED Ark.) (three-judge court), aff'd, 393 U. S. 14 (1968) *65 (per curiam). This type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct in requiring disclosure. NAACP v. Alabama, supra, at 461. Cf. Kusper v. Pontikes, 414 U. S., at 57-58.
Appellees argue that the disclosure requirements of the Act differ significantly from those at issue in NAACP v. Alabama and its progeny because the Act only requires disclosure of the names of contributors and does not compel political organizations to submit the names of their members.[76]
As we have seen, group association is protected because it enhances "[e]ffective advocacy." NAACP v. Alabama, supra, at 460. The right to join together "for the advancement of beliefs and ideas," ibid., is diluted if it does not include the right to pool money through contributions, for funds are often essential if "advocacy" is *66 to be truly or optimally "effective." Moreover, the invasion of privacy of belief may be as great when the information sought concerns the giving and spending of money as when it concerns the joining of organizations, for "[f]inancial transactions can reveal much about a person's activities, associations, and beliefs." California Bankers Assn. v. Shultz, 416 U. S. 21, 78-79 (1974) (POWELL, J., concurring). Our past decisions have not drawn fine lines between contributors and members but have treated them interchangeably. In Bates, for example, we applied the principles of NAACP v. Alabama and reversed convictions for failure to comply with a city ordinance that required the disclosure of "dues, assessments, and contributions paid, by whom and when paid." 361 U. S., at 518. See also United States v. Rumely, 345 U. S. 41 (1953) (setting aside a contempt conviction of an organization official who refused to disclose names of those who made bulk purchases of books sold by the organization).
The strict test established by NAACP v. Alabama is necessary because compelled disclosure has the potential for substantially infringing the exercise of First Amendment rights. But we have acknowledged that there are governmental interests sufficiently important to outweigh the possibility of infringement, particularly when the "free functioning of our national institutions" is involved. Communist Party v. Subversive Activities Control Bd., 367 U. S. 1, 97 (1961).
The governmental interests sought to be vindicated by the disclosure requirements are of this magnitude. They fall into three categories. First, disclosure provides the electorate with information "as to where political campaign money comes from and how it is spent by the candidate"[77] in order to aid the voters in evaluating those *67 who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office.
Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity.[78] This exposure may discourage those who would use money for improper purposes either before or after the election. A public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return.[79] And, as we recognized in Burroughs v. United States, 290 U. S., at 548, Congress could reasonably conclude that full disclosure during an election campaign tends "to prevent the corrupt use of money to affect elections." In enacting these requirements it may have been mindful of Mr. Justice Brandeis' advice:
"Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman."[80]
Third, and not least significant, recordkeeping, reporting, *68 and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations described above.
The disclosure requirements, as a general matter, directly serve substantial governmental interests. In determining whether these interests are sufficient to justify the requirements we must look to the extent of the burden that they place on individual rights.
It is undoubtedly true that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute. In some instances, disclosure may even expose contributors to harassment or retaliation. These are not insignificant burdens on individual rights, and they must be weighed carefully against the interests which Congress has sought to promote by this legislation. In this process, we note and agree with appellants' concession[81] that disclosure requirementscertainly in most applicationsappear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist.[82] Appellants argue, however, that the balance tips against disclosure when it is required of contributors to certain parties and candidates. We turn now to this contention.
B. Application to Minor Parties and Independents
Appellants contend that the Act's requirements are overbroad insofar as they apply to contributions to minor *69 parties and independent candidates because the governmental interest in this information is minimal and the danger of significant infringement on First Amendment rights is greatly increased.
1. Requisite Factual Showing
In NAACP v. Alabama the organization had "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members [had] exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility," 357 U. S., at 462, and the State was unable to show that the disclosure it sought had a "substantial bearing" on the issues it sought to clarify, id., at 464. Under those circumstances, the Court held that "whatever interest the State may have in [disclosure] has not been shown to be sufficient to overcome petitioner's constitutional objections." Id., at 465.
The Court of Appeals rejected appellants' suggestion that this case fits into the NAACP v. Alabama mold. It concluded that substantial governmental interests in "informing the electorate and preventing the corruption of the political process" were furthered by requiring disclosure of minor parties and independent candidates, 171 U. S. App. D. C., at 218, 519 F. 2d, at 867, and therefore found no "tenable rationale for assuming that the public interest in minority party disclosure of contributions above a reasonable cutoff point is uniformly outweighed by potential contributors' associational rights," id., at 219, 519 F. 2d, at 868. The court left open the question of the application of the disclosure requirements to candidates (and parties) who could demonstrate injury of the sort at stake in NAACP v. Alabama. No record of harassment on a similar scale was found in this case.[83] We agree with *70 the Court of Appeals' conclusion that NAACP v. Alabama is inapposite where, as here, any serious infringement on First Amendment rights brought about by the compelled disclosure of contributors is highly speculative.
It is true that the governmental interest in disclosure is diminished when the contribution in question is made to a minor party with little chance of winning an election. As minor parties usually represent definite and publicized viewpoints, there may be less need to inform the voters of the interests that specific candidates represent. Major parties encompass candidates of greater diversity. In many situations the label "Republican" or "Democrat" tells a voter little. The candidate who bears it may be supported by funds from the far right, the far left, or any place in between on the political spectrum. It is less likely that a candidate of, say, the Socialist Labor Party will represent interests that cannot be discerned from the party's ideological position.
The Government's interest in deterring the "buying" of elections and the undue influence of large contributors on officeholders also may be reduced where contributions to a minor party or an independent candidate are concerned, for it is less likely that the candidate will be victorious. But a minor party sometimes can play a significant role in an election. Even when a minor-party candidate has little or no chance of winning, he may be encouraged by major-party interests in order to divert votes from other major-party contenders.[84]
*71 We are not unmindful that the damage done by disclosure to the associational interests of the minor parties and their members and to supporters of independents could be significant. These movements are less likely to have a sound financial base and thus are more vulnerable to falloffs in contributions. In some instances fears of reprisal may deter contributions to the point where the movement cannot survive. The public interest also suffers if that result comes to pass, for there is a consequent reduction in the free circulation of ideas both within[85] and without[86] the political arena.
There could well be a case, similar to those before the Court in NAACP v. Alabama and Bates, where the threat to the exercise of First Amendment rights is so serious and the state interest furthered by disclosure so insubstantial that the Act's requirements cannot be constitutionally applied.[87] But no appellant in this case has tendered record evidence of the sort proffered in NAACP v. Alabama. Instead, appellants primarily rely on "the clearly articulated fears of individuals, well experienced in the political process." Brief for Appellants 173. At *72 best they offer the testimony of several minor-party officials that one or two persons refused to make contributions because of the possibility of disclosure.[88] On this record, the substantial public interest in disclosure identified by the legislative history of this Act outweighs the harm generally alleged.
2. Blanket Exemption
Appellants agree that "the record here does not reflect the kind of focused and insistent harassment of contributors and members that existed in the NAACP cases." Ibid. They argue, however, that a blanket exemption for minor parties is necessary lest irreparable injury be done before the required evidence can be gathered.
Those parties that would be sufficiently "minor" to be exempted from the requirements of § 434 could be defined, appellants suggest, along the lines used for public-financing purposes, see Part III-A, infra, as those who received less than 25% of the vote in past elections. Appellants do not argue that this line is constitutionally required. They suggest as an alternative defining "minor parties" as those that do not qualify for automatic ballot access under state law. Presumably, other criteria, such as current political strength (measured by polls or petition), age, or degree of organization, could also be used.[89]
The difficulty with these suggestions is that they reflect only a party's past or present political strength and *73 that is only one of the factors that must be considered. Some of the criteria are not precisely indicative of even that factor. Age,[90] or past political success, for instance, may typically be associated with parties that have a high probability of success. But not all long-established parties are winnerssome are consistent losersand a new party may garner a great deal of support if it can associate itself with an issue that has captured the public's imagination. None of the criteria suggested is precisely related to the other critical factor that must be considered, the possibility that disclosure will impinge upon protected associational activity.
An opinion dissenting in part from the Court of Appeals' decision concedes that no one line is "constitutionally required."[91] It argues, however, that a flat exemption for minor parties must be carved out, even along arbitrary lines, if groups that would suffer impermissibly from disclosure are to be given any real protection. An approach that requires minor parties to submit evidence that the disclosure requirements cannot constitutionally be applied to them offers only an illusory safeguard, the argument goes, because the "evils" of "chill and harassment . . . are largely incapable of formal proof."[92] This dissent expressed its concern that a minor party, particularly a *74 new party, may never be able to prove a substantial threat of harassment, however real that threat may be, because it would be required to come forward with witnesses who are too fearful to contribute but not too fearful to testify about their fear. A strict requirement that chill and harassment be directly attributable to the specific disclosure from which the exemption is sought would make the task even more difficult.
We recognize that unduly strict requirements of proof could impose a heavy burden, but it does not follow that a blanket exemption for minor parties is necessary. Minor parties must be allowed sufficient flexibility in the proof of injury to assure a fair consideration of their claim. The evidence offered need show only a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties. The proof may include, for example, specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself. A pattern of threats or specific manifestations of public hostility may be sufficient. New parties that have no history upon which to draw may be able to offer evidence of reprisals and threats directed against individuals or organizations holding similar views.
Where it exists the type of chill and harassment identified in NAACP v. Alabama can be shown. We cannot assume that courts will be insensitive to similar showings when made in future cases. We therefore conclude that a blanket exemption is not required.

C. Section 434 (e)
Section 434 (e) requires "[e]very person (other than a political committee or candidate) who makes contributions *75 or expenditures" aggregating over $100 in a calendar year "other than by contribution to a political committee or candidate" to file a statement with the Commission.[93] Unlike the other disclosure provisions, this section does not seek the contribution list of any association. Instead, it requires direct disclosure of what an individual or group contributes or spends.
In considering this provision we must apply the same strict standard of scrutiny, for the right of associational privacy developed in NAACP v. Alabama derives from the rights of the organization's members to advocate their personal points of view in the most effective way. 357 U. S., at 458, 460. See also NAACP v. Button, 371 U. S., at 429-431; Sweezy v. New Hampshire, 354 U. S., at 250.
Appellants attack § 434 (e) as a direct intrusion on privacy of belief, in violation of Talley v. California, 362 U. S. 60 (1960), and as imposing "very real, practical burdens . . . certain to deter individuals from making expenditures for their independent political speech" analogous to those held to be impermissible in Thomas v. Collins, 323 U. S. 516 (1945).
1. The Role of § 434 (e)
The Court of Appeals upheld § 434 (e) as necessary to enforce the independent-expenditure ceiling imposed by 18 U. S. C. § 608 (e) (1) (1970 ed., Supp. IV). It said:
"If . . . Congress has both the authority and a compelling interest to regulate independent expenditures under section 608 (e), surely it can require that there be disclosure to prevent misuse of the spending channel." 171 U. S. App. D. C., at 220 519 F. 2d, at 869.
We have found that § 608 (e) (1) unconstitutionally infringes *76 upon First Amendment rights.[94] If the sole function of § 434 (e) were to aid in the enforcement of that provision, it would no longer serve any governmental purpose.
But the two provisions are not so intimately tied. The legislative history on the function of § 434 (e) is bare, but it was clearly intended to stand independently of § 608 (e) (1). It was enacted with the general disclosure provisions in 1971 as part of the original Act,[95] while § 608 (e) (1) was part of the 1974 amendments.[96] Like the other disclosure provisions, § 434 (e) could play a role in the enforcement of the expanded contribution and expenditure limitations included in the 1974 amendments, but it also has independent functions. Section 434 (e) is part of Congress' effort to achieve "total disclosure" by reaching "every kind of political activity"[97] in order to insure that the voters are fully informed and to achieve through publicity the maximum deterrence to corruption and undue influence possible. The provision is responsive to the legitimate fear that efforts would be made, as they had been in the past,[98] to avoid the disclosure requirements by routing financial support of candidates through avenues not explicitly covered by the general provisions of the Act.
2. Vagueness Problems
In its effort to be all-inclusive, however, the provision raises serious problems of vagueness, particularly treacherous where, as here, the violation of its terms carries criminal penalties[99] and fear of incurring these sanctions *77 may deter those who seek to exercise protected First Amendment rights.
Section 434 (e) applies to "[e]very person . . . who makes contributions or expenditures." "Contributions" and "expenditures" are defined in parallel provisions in terms of the use of money or other valuable assets "for the purpose of . . . influencing" the nomination or election of candidates for federal office.[100] It is the ambiguity of this phrase that poses constitutional problems.
Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal, for "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." United States v. Harriss, 347 U. S. 612, 617 (1954). See also Papachristou v. City of Jacksonville, 405 U. S. 156 (1972). Where First Amendment rights are involved, an even "greater degree of specificity" is required. Smith v. Goguen, 415 U. S., at 573. See Grayned v. City of Rockford, 408 U. S. 104, 109 (1972); Kunz v. New York, 340 U. S. 290 (1951).
There is no legislative history to guide us in determining the scope of the critical phrase "for the purpose of . . . influencing." It appears to have been adopted without comment from earlier disclosure Acts.[101] Congress "has voiced its wishes in [most] muted strains," leaving us to draw upon "those common-sense assumptions that must be made in determining direction without a compass." Rosado v. Wyman, 397 U. S. 397, 412 (1970). Where the constitutional requirement of definiteness is at stake, we have the further obligation to construe the statute, *78 if that can be done consistent with the legislature's purpose, to avoid the shoals of vagueness. United States v. Harriss, supra, at 618; United States v. Rumely, 345 U. S., at 45.
In enacting the legislation under review Congress addressed broadly the problem of political campaign financing. It wished to promote full disclosure of campaign-oriented spending to insure both the reality and the appearance of the purity and openness of the federal election process.[102] Our task is to construe "for the purpose of . . . influencing," incorporated in § 434 (e) through the definitions of "contributions" and "expenditures," in a manner that precisely furthers this goal.
In Part I we discussed what constituted a "contribution" for purposes of the contribution limitations set forth in 18 U. S. C. § 608 (b) (1970 ed., Supp. IV).[103] We construed that term to include not only contributions made directly or indirectly to a candidate, political party, or campaign committee, and contributions made to other organizations or individuals but earmarked for political purposes, but also all expenditures placed in cooperation with or with the consent of a candidate, his agents, or an authorized committee of the candidate. The definition of "contribution" in § 431 (e) for disclosure purposes parallels the definition in Title 18 almost word for word, and we construe the former provision as we have the latter. So defined, "contributions" have a sufficiently close relationship to the goals of the Act, for they are connected with a candidate or his campaign.
When we attempt to define "expenditure" in a similarly narrow way we encounter line-drawing problems *79 of the sort we faced in 18 U. S. C. § 608 (e) (1) (1970 ed., Supp. IV). Although the phrase, "for the purpose of . . . influencing" an election or nomination, differs from the language used in § 608 (e) (1), it shares the same potential for encompassing both issue discussion and advocacy of a political result.[104] The general requirement that "political committees" and candidates disclose their expenditures could raise similar vagueness problems, for "political committee" is defined only in terms of amount of annual "contributions" and "expenditures,"[105] and could be interpreted to reach groups engaged purely in issue discussion. The lower courts have construed the words "political committee" more narrowly.[106] To fulfill the purposes of the Act they need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate. Expenditures of candidates and of "political committees" so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related.
But when the maker of the expenditure is not within these categorieswhen it is an individual other than a candidate or a group other than a "political committee"[107] *80 the relation of the information sought to the purposes of the Act may be too remote. To insure that the reach of § 434 (e) is not impermissibly broad, we construe "expenditure" for purposes of that section in the same way we construed the terms of § 608 (e)to reach only funds used for communications that expressly advocate[108] the election or defeat of a clearly identified candidate. This reading is directed precisely to that spending that is unambiguously related to the campaign of a particular federal candidate.
In summary, § 434 (e), as construed, imposes independent reporting requirements on individuals and groups that are not candidates or political committees only in the following circumstances: (1) when they make contributions earmarked for political purposes or authorized or requested by a candidate or his agent, to some person other than a candidate or political committee, and (2) when they make expenditures for communications that expressly advocate the election or defeat of a clearly identified candidate.
Unlike 18 U. S. C. § 608 (e) (1) (1970 ed., Supp. IV), § 434 (e), as construed, bears a sufficient relationship to a substantial governmental interest. As narrowed, § 434 (e), like § 608 (e) (1), does not reach all partisan discussion for it only requires disclosure of those expenditures that expressly advocate a particular election result. This might have been fatal if the only purpose of § 434 (e) *81 were to stem corruption or its appearance by closing a loophole in the general disclosure requirements. But the disclosure provisions, including § 434 (e), serve another, informational interest, and even as construed § 434 (e) increases the fund of information concerning those who support the candidates. It goes beyond the general disclosure requirements to shed the light of publicity on spending that is unambiguously campaign related but would not otherwise be reported because it takes the form of independent expenditures or of contributions to an individual or group not itself required to report the names of its contributors. By the same token, it is not fatal that § 434 (e) encompasses purely independent expenditures uncoordinated with a particular candidate or his agent. The corruption potential of these expenditures may be significantly different, but the informational interest can be as strong as it is in coordinated spending, for disclosure helps voters to define more of the candidates' constituencies.
Section 434 (e), as we have construed it, does not contain the infirmities of the provisions before the Court in Talley v. California, 362 U. S. 60 (1960), and Thomas v. Collins, 323 U. S. 516 (1945). The ordinance found wanting in Talley forbade all distribution of handbills that did not contain the name of the printer, author, or manufacturer, and the name of the distributor. The city urged that the ordinance was aimed at identifying those responsible for fraud, false advertising, and libel, but the Court found that it was "in no manner so limited." 362 U. S., at 64. Here, as we have seen, the disclosure requirement is narrowly limited to those situations where the information sought has a substantial connection with the governmental interests sought to be advanced. Thomas held unconstitutional a prior restraint in the form of a registration requirement for labor organizers. *82 The Court found the State's interest insufficient to justify the restrictive effect of the statute. The burden imposed by § 434 (e) is no prior restraint, but a reasonable and minimally restrictive method of furthering First Amendment values by opening the basic processes of our federal election system to public view.[109]

D. Thresholds
Appellants' third contention, based on alleged overbreadth, is that the monetary thresholds in the recordkeeping and reporting provisions lack a substantial nexus with the claimed governmental interests, for the amounts involved are too low even to attract the attention of the candidate, much less have a corrupting influence.
The provisions contain two thresholds. Records are to be kept by political committees of the names and addresses of those who make contributions in excess of $10, § 432 (c) (2), and these records are subject to Commission audit, § 438 (a) (8). If a person's contributions to a committee or candidate aggregate more than $100, his name and address, as well as his occupation and principal place of business, are to be included in reports filed by committees and candidates with the Commission, § 434 (b) (2), and made available for public inspection, § 438 (a) (4).
The Court of Appeals rejected appellants' contention that these thresholds are unconstitutional. It found the challenge on First Amendment grounds to the $10 threshold to be premature, for it could "discern no basis in the statute for authorizing disclosure outside the Commission *83 . . . , and hence no substantial `inhibitory effect' operating upon" appellants. 171 U. S. App. D. C., at 216, 519 F. 2d, at 865. The $100 threshold was found to be within the "reasonable latitude" given the legislature "as to where to draw the line." Ibid. We agree.
The $10 and $100 thresholds are indeed low. Contributors of relatively small amounts are likely to be especially sensitive to recording or disclosure of their political preferences. These strict requirements may well discourage participation by some citizens in the political process, a result that Congress hardly could have intended. Indeed, there is little in the legislative history to indicate that Congress focused carefully on the appropriate level at which to require recording and disclosure. Rather, it seems merely to have adopted the thresholds existing in similar disclosure laws since 1910.[110] But we cannot require Congress to establish that it has chosen the highest reasonable threshold. The line is necessarily a judgmental decision, best left in the context of this complex legislation to congressional discretion. We cannot say, on this bare record, that the limits designated are wholly without rationality.[111]
We are mindful that disclosure serves informational functions, as well as the prevention of corruption and the enforcement of the contribution limitations. Congress is not required to set a threshold that is tailored only to the latter goals. In addition, the enforcement *84 goal can never be well served if the threshold is so high that disclosure becomes equivalent to admitting violation of the contribution limitations.
The $10 recordkeeping threshold, in a somewhat similar fashion, facilitates the enforcement of the disclosure provisions by making it relatively difficult to aggregate secret contributions in amounts that surpass the $100 limit. We agree with the Court of Appeals that there is no warrant for assuming that public disclosure of contributions between $10 and $100 is authorized by the Act. Accordingly, we do not reach the question whether information concerning gifts of this size can be made available to the public without trespassing impermissibly on First Amendment rights. Cf. California Bankers Assn. v. Shultz, 416 U. S., at 56-57.[112]
In summary, we find no constitutional infirmities in the recordkeeping, reporting, and disclosure provisions of the Act.[113]

*85 III. PUBLIC FINANCING OF PRESIDENTIAL ELECTION CAMPAIGNS
A series of statutes[114] for the public financing of Presidential election campaigns produced the scheme now found in § 6096 and Subtitle H of the Internal Revenue *86 Code of 1954, 26 U. S. C. §§ 6096, 9001-9012, 9031-9042 (1970 ed., Supp. IV).[115] Both the District Court, 401 F. Supp. 1235, and the Court of Appeals, 171 U. S. App. D. C., at 229-238, 519 F. 2d, at 878-887, sustained Subtitle H against a constitutional attack.[116] Appellants renew their challenge here, contending that the legislation violates the First and Fifth Amendments. We find no merit in their claims and affirm.

A. Summary of Subtitle H
Section 9006 establishes a Presidential Election Campaign Fund (Fund), financed from general revenues in the aggregate amount designated by individual taxpayers, under § 6096, who on their income tax returns may authorize payment to the Fund of one dollar of their tax liability in the case of an individual return or two dollars in the case of a joint return. The Fund consists of three separate accounts to finance (1) party nominating conventions, § 9008 (a), (2) general election campaigns, § 9006 (a), and (3) primary campaigns, § 9037 (a).[117]
*87 Chapter 95 of Title 26, which concerns financing of party nominating conventions and general election campaigns, distinguishes among "major," "minor," and "new" parties. A major party is defined as a party whose candidate for President in the most recent election received 25% or more of the popular vote. § 9002 (6). A minor party is defined as a party whose candidate received at least 5% but less than 25% of the vote at the most recent election. § 9002 (7). All other parties are new parties, § 9002 (8), including both newly created parties and those receiving less than 5% of the vote in the last election.[118]
Major parties are entitled to $2,000,000 to defray their national committee Presidential nominating convention expenses, must limit total expenditures to that amount, § 9008 (d),[119] and may not use any of this money to benefit a particular candidate or delegate, § 9008 (c). *88 A minor party receives a portion of the major-party entitlement determined by the ratio of the votes received by the party's candidate in the last election to the average of the votes received by the major parties' candidates. § 9008 (b) (2). The amounts given to the parties and the expenditure limit are adjusted for inflation, using 1974 as the base year. § 9008 (b) (5). No financing is provided for new parties, nor is there any express provision for financing independent candidates or parties not holding a convention.
For expenses in the general election campaign, § 9004 (a) (1) entitles each major-party candidate to $20,000,000.[120] This amount is also adjusted for inflation. See § 9004 (a) (1). To be eligible for funds the candidate[121] must pledge not to incur expenses in excess of the entitlement under § 9004 (a) (1) and not to accept private contributions except to the extent that the fund is insufficient to provide the full entitlement. § 9003 (b) Minor-party candidates are also entitled to funding, again based on the ratio of the vote received by the party's candidate in the preceding election to the average of the major-party candidates. § 9004 (a) (2) (A). Minor-party candidates must certify that they will not incur campaign expenses in excess of the major-party entitlement and *89 that they will accept private contributions only to the extent needed to make up the difference between that amount and the public funding grant. § 9003 (c). New-party candidates receive no money prior to the general election, but any candidate receiving 5% or more of the popular vote in the election is entitled to post-election payments according to the formula applicable to minor-party candidates. § 9004 (a) (3). Similarly, minor-party candidates are entitled to post-election funds if they receive a greater percentage of the average major-party vote than their party's candidate did in the preceding election; the amount of such payments is the difference between the entitlement based on the preceding election and that based on the actual vote in the current election. § 9004 (a) (3). A further eligibility requirement for minor-and new-party candidates is that the candidate's name must appear on the ballot, or electors pledged to the candidate must be on the ballot, in at least 10 States. § 9002 (2) (B).
Chapter 96 establishes a third account in the Fund, the Presidential Primary Matching Payment Account. § 9037 (a). This funding is intended to aid campaigns by candidates seeking Presidential nomination "by a political party," § 9033 (b) (2), in "primary elections," § 9032 (7).[122] The threshold eligibility requirement is that the candidate raise at least $5,000 in each of 20 States, counting only the first $250 from each person contributing to the candidate. §§ 9033 (b) (3), (4). In addition, the candidate must agree to abide by the spending limits in § 9035. See § 9033 (b) (1).[123] Funding is *90 provided according to a matching formula: each qualified candidate is entitled to a sum equal to the total private contributions received, disregarding contributions from any person to the extent that total contributions to the candidate by that person exceed $250. § 9034 (a). Payments to any candidate under Chapter 96 may not exceed 50% of the overall expenditure ceiling accepted by the candidate. § 9034 (b).

B. Constitutionality of Subtitle H
Appellants argue that Subtitle H is invalid (1) as "contrary to the `general welfare,' " Art. I, § 8, (2) because any scheme of public financing of election campaigns is inconsistent with the First Amendment, and (3) because Subtitle H invidiously discriminates against certain interests in violation of the Due Process Clause of the Fifth Amendment. We find no merit in these contentions.
Appellants' "general welfare" contention erroneously treats the General Welfare Clause as a limitation upon congressional power. It is rather a grant of power, the scope of which is quite expansive, particularly in view of the enlargement of power by the Necessary and Proper Clause. M`Culloch v. Maryland, 4 Wheat. 316, 420 (1819). Congress has power to regulate Presidential elections and primaries, United States v. Classic, 313 U. S. 299 (1941); Burroughs v. United States, 290 U. S. 534 (1934); and public financing of Presidential elections as a means to reform the electoral process was clearly a choice within the granted power. It is for Congress to decide which expenditures will promote the general welfare: "[T]he power of Congress to authorize expenditure of public moneys for public purposes is not *91 limited by the direct grants of legislative power found in the Constitution." United States v. Butler, 297 U. S. 1, 66 (1936). See Helvering v. Davis, 301 U. S. 619, 640-641 (1937). Any limitations upon the exercise of that granted power must be found elsewhere in the Constitution. In this case, Congress was legislating for the "general welfare"to reduce the deleterious influence of large contributions on our political process, to facilitate communication by candidates with the electorate, and to free candidates from the rigors of fundraising. See S. Rep. No. 93-689, Pp. 1-10 (1974). Whether the chosen means appear "bad," "unwise," or "unworkable" to us is irrelevant; Congress has concluded that the means are "necessary and proper" to promote the general welfare, and we thus decline to find this legislation without the grant of power in Art. I, § 8.
Appellants' challenge to the dollar check-off provision (§ 6096) fails for the same reason. They maintain that Congress is required to permit taxpayers to designate particular candidates or parties as recipients of their money. But the appropriation to the Fund in § 9006 is like any other appropriation from the general revenue except that its amount is determined by reference to the aggregate of the one-and two-dollar authorization on taxpayers' income tax returns. This detail does not constitute the appropriation any less an appropriation by Congress.[124] The fallacy of appellants' argument is therefore apparent; *92 every appropriation made by Congress uses public money in a manner to which some taxpayers object.[125]
Appellants next argue that "by analogy" to the Religion Clauses of the First Amendment public financing of election campaigns, however meritorious, violates the First Amendment. We have, of course, held that the Religion Clauses"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof"require Congress, and the States through the Fourteenth Amendment, to remain neutral in matters of religion. E. g., Abington School Dist. v. Schempp, 374 U. S. 203, 222-226 (1963). The government may not aid one religion to the detriment of others or impose a burden on one religion that is not imposed on others, and may not even aid all religions. E. g., Everson v. Board of Education, 330 U. S. 1, 15-16 (1947). See Kurland, Of Church and State and the Supreme Court, 29 U. Chi. L. Rev. 1, 96 (1961). But the analogy is patently inapplicable to our issue here. Although "Congress shall make no law . . . abridging the freedom of speech, or the press," Subtitle H is a congressional effort, not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge public *93 discussion and participation in the electoral process, goals vital to a self-governing people.[126] Thus, Subtitle H furthers, not abridges, pertinent First Amendment values.[127] Appellants argue, however, that as constructed public financing invidiously discriminates in violation of the Fifth Amendment. We turn therefore to that argument.
Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment. Weinberger v. Wiesenfeld, 420 U. S. 636, 638 n. 2 (1975), and cases cited. In several situations concerning the electoral process, the principle has been *94 developed that restrictions on access to the electoral process must survive exacting scrutiny. The restriction can be sustained only if it furthers a "vital" governmental interest, American Party of Texas v. White, 415 U. S. 767, 780-781 (1974), that is "achieved by a means that does not unfairly or unnecessarily burden either a minority party's or an individual candidate's equally important interest in the continued availability of political opportunity." Lubin v. Panish, 415 U. S. 709, 716 (1974). See American Party of Texas v. White, supra, at 780; Storer v. Brown, 415 U. S. 724, 729-730 (1974). These cases, however, dealt primarily with state laws requiring a candidate to satisfy certain requirements in order to have his name appear on the ballot. These were, of course, direct burdens not only on the candidate's ability to run for office but also on the voter's ability to voice preferences regarding representative government and contemporary issues. In contrast, the denial of public financing to some Presidential candidates is not restrictive of voters' rights and less restrictive of candidates'.[128] Subtitle H does not prevent any candidate from getting on the ballot or any voter from casting a vote for the candidate of his choice; the inability, if any, of minor-party candidates to wage effective campaigns will derive not from lack of public funding but from their inability to *95 raise private contributions. Any disadvantage suffered by operation of the eligibility formulae under Subtitle H is thus limited to the claimed denial of the enhancement of opportunity to communicate with the electorate that the formulae afford eligible candidates. But eligible candidates suffer a countervailing denial. As we more fully develop later, acceptance of public financing entails voluntary acceptance of an expenditure ceiling. Non-eligible candidates are not subject to that limitation.[129] Accordingly, we conclude that public financing is generally less restrictive of access to the electoral process than the ballot-access regulations dealt with in prior cases.[130] In any event, Congress enacted Subtitle H in furtherance of sufficiently important governmental interests and has *96 not unfairly or unnecessarily burdened the political opportunity of any party or candidate.
It cannot be gainsaid that public financing as a means of eliminating the improper influence of large private contributions furthers a significant governmental interest. S. Rep. No. 93-689, pp. 4-5 (1974). In addition, the limits on contributions necessarily increase the burden of fundraising, and Congress properly regarded public financing as an appropriate means of relieving major-party Presidential candidates from the rigors of soliciting private contributions. See id., at 5. The States have also been held to have important interests in limiting places on the ballot to those candidates who demonstrate substantial popular support. E. g., Storer v. Brown, supra, at 736; Lubin v. Panish, supra, at 718-719; Jenness v. Fortson, 403 U. S. 431, 442 (1971); Williams v. Rhodes, 393 U. S., at 31-33. Congress' interest in not funding hopeless candidacies with large sums of public money, S. Rep. No. 93-689, supra, at 7, necessarily justifies the withholding of public assistance from candidates without significant public support. Thus, Congress may legitimately require "some preliminary showing of a significant modicum of support," Jenness v. Fortson, supra, at 442, as an eligibility requirement for public funds. This requirement also serves the important public interest against providing artificial incentives to "splintered parties and unrestrained factionalism." Storer v. Brown, supra, at 736; S. Rep. No. 93-689, supra, at 8; H. R. Rep. No. 93-1239, p. 13 (1974). Cf. Bullock v. Carter, 405 U. S. 134, 145 (1972).
At the same time Congress recognized the constitutional restraints against inhibition of the present opportunity of minor parties to become major political entities if they obtain widespread support. S. Rep. No. 93-689, supra, at 8-10; H. R. Rep. No. 93-1239, supra, at 13. As *97 the Court of Appeals said, "provisions for public funding of Presidential campaigns . . . could operate to give an unfair advantage to established parties, thus reducing, to the nation's detriment. . . . the `potential fluidity of American political life.' " 171 U. S. App. D. C., at 231, 519 F. 2d, at 880, quoting from Jenness v. Fortson, supra, at 439.
1. General Election Campaign Financing
Appellants insist that Chapter 95 falls short of the constitutional requirement in that its provisions supply larger, and equal, sums to candidates of major parties, use prior vote levels as the sole criterion for pre-election funding, limit new-party candidates to post-election funds, and deny any funds to candidates of parties receiving less than 5% of the vote. These provisions, it is argued, are fatal to the validity of the scheme, because they work invidious discrimination against minor and new parties in violation of the Fifth Amendment. We disagree.[131]
As conceded by appellants, the Constitution does not require Congress to treat all declared candidates the same for public financing purposes. As we said in Jenness v. Fortson, "there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other. . . . Sometimes the grossest discrimination can lie in treating *98 things that are different as though they were exactly alike, a truism well illustrated in Williams v. Rhodes, supra." 403 U. S., at 441-442. Since the Presidential elections of 1856 and 1860, when the Whigs were replaced as a major party by the Republicans, no third party has posed a credible threat to the two major parties in Presidential elections.[132] Third parties have been completely incapable of matching the major parties' ability to raise money and win elections. Congress was, of course, aware of this fact of American life, and thus was justified in providing both major parties full funding and all other parties only a percentage of the major-party entitlement.[133] Identical treatment of all parties, on the other hand, "would not only make it easy to raid the United States Treasury, it would also artificially foster the proliferation of splinter parties." 171 U. S. App. D. C., at 231, 519 F. 2d, at 881. The Constitution does not require the Government to "finance the efforts of every nascent political group," American Party of Texas v. White, 415 U. S., at 794, merely because Congress chose to finance the efforts of the major parties.
Furthermore, appellants have made no showing that *99 the election funding plan disadvantages nonmajor parties by operating to reduce their strength below that attained without any public financing. First, such parties are free to raise money from private sources,[134] and by our holding today new parties are freed from any expenditure limits, although admittedly those limits may be a largely academic matter to them. But since any major-party candidate accepting public financing of a campaign voluntarily assents to a spending ceiling, other candidates will be able to spend more in relation to the major-party candidates. The relative position of minor parties that do qualify to receive some public funds because they received 5% of the vote in the previous Presidential election is also enhanced. Public funding for candidates of major parties is intended as a substitute for private contributions; but for minor-party candidates[135] such assistance may be viewed as a supplement to private contributions since these candidates may continue to solicit private funds up to the applicable spending limit. Thus, we conclude that the general election funding system does not work an invidious discrimination against candidates of nonmajor parties.
Appellants challenge reliance on the vote in past elections as the basis for determining eligibility. That challenge is foreclosed, however, by our holding in Jenness v. Fortson, 403 U. S., at 439-440, that popular vote totals in the last election are a proper measure of public support. *100 And Congress was not obliged to select instead from among appellants' suggested alternatives. Congress could properly regard the means chosen as preferable, since the alternative of petition drives presents cost and administrative problems in validating signatures, and the alternative of opinion polls might be thought inappropriate since it would involve a Government agency in the business of certifying polls or conducting its own investigation of support for various candidates, in addition to serious problems with reliability.[136]
Appellants next argue, relying on the ballot-access decisions of this Court, that the absence of any alternative means of obtaining pre-election funding renders the scheme unjustifiably restrictive of minority political interests. Appellants' reliance on the ballot-access decisions is misplaced. To be sure, the regulation sustained in Jenness v. Fortson, for example, incorporated alternative means of qualifying for the ballot, 403 U. S., at 440, and the lack of an alternative was a defect in the scheme struck down in Lubin v. Panish, 415 U. S., at 718. To *101 suggest, however, that the constitutionality of Subtitle H therefore hinges solely on whether some alternative is afforded overlooks the rationale of the operative constitutional principles. Our decisions finding a need for an alternative means turn on the nature and extent of the burden imposed in the absence of available alternatives. We have earlier stated our view that Chapter 95 is far less burdensome upon and restrictive of constitutional rights than the regulations involved in the ballot-access cases. See supra, at 94-95. Moreover, expenditure limits for major parties and candidates may well improve the chances of nonmajor parties and their candidates to receive funds and increase their spending. Any risk of harm to minority interests is speculative due to our present lack of knowledge of the practical effects of public financing and cannot overcome the force of the governmental interests against use of public money to foster frivolous candidacies, create a system of splintered parties, and encourage unrestrained factionalism.
Appellants' reliance on the alternative-means analyses of the ballot-access cases generally fails to recognize a significant distinction from the instant case. The primary goal of all candidates is to carry on a successful campaign by communicating to the voters persuasive reasons for electing them. In some of the ballot-access cases the States afforded candidates alternative means for qualifying for the ballot, a step in any campaign that, with rare exceptions, is essential to successful effort. Chapter 95 concededly provides only one method of obtaining pre-election financing; such funding is, however, not as necessary as being on the ballot. See n. 128, supra. Plainly, campaigns can be successfully carried out by means other than public financing; they have been up to this date, and this avenue is still open to all candidates. And, after all, the important achievements of minority *102 political groups in furthering the development of American democracy[137] were accomplished without the help of public funds. Thus, the limited participation or nonparticipation of nonmajor parties or candidates in public funding does not unconstitutionally disadvantage them.
Of course, nonmajor parties and their candidates may qualify for post-election participation in public funding and in that sense the claimed discrimination is not total. Appellants contend, however, that the benefit of any such participation is illusory due to § 9004 (c), which bars the use of the money for any purpose other than paying campaign expenses or repaying loans that had been used to defray such expenses. The only meaningful use for post-election funds is thus to repay loans; but loans, except from national banks, are "contributions" subject to the general limitations on contributions, 18 U. S. C. § 591 (e) (1970 ed., Supp. IV). Further, they argue, loans are not readily available to nonmajor parties or candidates before elections to finance their campaigns. Availability of post-election funds therefore assertedly gives them nothing. But in the nature of things the willingness of lenders to make loans will depend upon the pre-election probability that the candidate and his party will attract 5% or more of the voters. When a reasonable prospect of such support appears, the party and candidate may be an acceptable loan risk since the prospect of post-election participation in public funding will be good.[138]
*103 Finally, appellants challenge the validity of the 5% threshold requirement for general election funding. They argue that, since most state regulations governing ballot access have threshold requirements well below 5%, and because in their view the 5% requirement here is actually stricter than that upheld in Jenness v. Fortson, 403 U. S. 431 (1971),[139] the requirement is unreasonable. We have already concluded that the restriction under Chapter 95 is generally less burdensome than ballot-access regulations. Supra, at 94-95. Further, the Georgia provision sustained in Jenness required the candidate to obtain the signatures of 5% of all eligible voters, without regard to party. To be sure, the public funding formula does not permit anyone who voted for another party in the last election to be part of a candidate's 5%. But under Chapter 95 a Presidential candidate needs only 5% or more of the actual vote, not the larger universe of eligible voters. As a result, we cannot say that Chapter 95 is numerically more, or less, restrictive than the regulation in Jenness. In any event, the choice of the percentage requirement that best accommodates the competing interests involved was for Congress to make. See Louisville Gas Co. v. Coleman, 277 U. S. 32, 41 (1928) (Holmes, J., dissenting); n. 111, supra. Without any doubt a range of formulations would sufficiently protect the public fisc and not foster factionalism, and would also recognize the public interest in the fluidity of our political *104 affairs. We cannot say that Congress' choice falls without the permissible range.[140]
2. Nominating Convention Financing
The foregoing analysis and reasoning sustaining general election funding apply in large part to convention funding under Chapter 95 and suffice to support our rejection of appellants' challenge to these provisions. Funding of party conventions has increasingly been derived from large private contributions, see H. R. Rep. No. 93-1239, p. 14 (1974), and the governmental interest in eliminating this reliance is as vital as in the case of private contributions to individual candidates. The expenditure limitations on major parties participating in public financing enhance the ability of nonmajor parties to increase their spending relative to the major parties; further, in soliciting private contributions to finance conventions, parties are not subject to the $1,000 contribution limit pertaining to candidates.[141] We therefore conclude that appellants' constitutional challenge to the *105 provisions for funding nominating conventions must also be rejected.
3. Primary Election Campaign Financing
Appellants' final challenge is to the constitutionality of Chapter 96, which provides funding of primary campaigns. They contend that these provisions are constitutionally invalid (1) because they do not provide funds for candidates not running in party primaries[142] and (2) because the eligibility formula actually increases the influence of money on the electoral process. In not providing assistance to candidates who do not enter party primaries, Congress has merely chosen to limit at this time the reach of the reforms encompassed in Chapter 96. This Congress could do without constituting the reforms a constitutionally invidious discrimination. The governing principle was stated in Katzenbach v. Morgan, 384 U. S. 641, 657 (1966):
"[I]n deciding the constitutional propriety of the limitations in such a reform measure we are guided by the familiar principles that a `statute is not invalid under the Constitution because it might have gone farther than it did,' Roschen v. Ward, 279 U. S. 337, 339, that a legislature need not `strike at all evils at the same time,' Semler v. Dental Examiners, 294 U. S. 608, 610, and that `reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind,' Williamson v. Lee Optical Co., 348 U. S. 483, 489."[143]
*106 The choice to limit matching funds to candidates running in primaries may reflect that concern about large private contributions to candidates centered on primary races and that there is no historical evidence of similar abuses involving contributions to candidates who engage in petition drives to qualify for state ballots. Moreover, assistance to candidates and nonmajor parties forced to resort to petition drives to gain ballot access implicates the policies against fostering frivolous candidacies, creating a system of splintered parties, and encouraging unrestrained factionalism.
The eligibility requirements in Chapter 96 are surely not an unreasonable way to measure popular support for a candidate, accomplishing the objective of limiting subsidization to those candidates with a substantial chance of being nominated. Counting only the first $250 of each contribution for eligibility purposes requires candidates to solicit smaller contributions from numerous people. Requiring the money to come from citizens of a minimum number of States eliminates candidates whose appeal is limited geographically; a President is elected not by popular vote, but by winning the popular vote in enough States to have a majority in the Electoral College.[144]
*107 We also reject as without merit appellants' argument that the matching formula favors wealthy voters and candidates. The thrust of the legislation is to reduce financial barriers[145] and to enhance the importance of smaller contributions.[146] Some candidates undoubtedly could raise large sums of money and thus have little need for public funds, but candidates with lesser fundraising capabilities will gain substantial benefits from matching funds. In addition, one eligibility requirement for *108 matching funds is acceptance of an expenditure ceiling, and candidates with little fundraising ability will be able to increase their spending relative to candidates capable of raising large amounts in private funds.
For the reasons stated, we reject appellants' claims that Subtitle H is facially unconstitutional.[147]

C. Severability
The only remaining issue is whether our holdings invalidating 18 U. S. C. §§ 608 (a), (c), and (e) (1) (1970 ed., Supp. IV) require the conclusion that Subtitle H is unconstitutional. There is, of course, a relationship between the spending limits in § 608 (c) and the public financing provisions; the expenditure limits accepted by a candidate to be eligible for public funding are identical to the limits in § 608 (c). But we have no difficulty in concluding that Subtitle H is severable. "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." Champlin *109 Refining Co. v. Corporation Commission, 286 U. S. 210, 234 (1932). Our discussion of "what is left" leaves no doubt that the value of public financing is not dependent on the existence of a generally applicable expenditure limit. We therefore hold Subtitle H severable from those portions of the legislation today held constitutionally infirm.

IV. THE FEDERAL ELECTION COMMISSION
The 1974 amendments to the Act create an eight-member Federal Election Commission (Commission) and vest in it primary and substantial responsibility for administering and enforcing the Act. The question that we address in this portion of the opinion is whether, in view of the manner in which a majority of its members are appointed, the Commission may under the Constitution exercise the powers conferred upon it. We find it unnecessary to parse the complex statutory provisions in order to sketch the full sweep of the Commission's authority. It will suffice for present purposes to describe what appear to be representative examples of its various powers.
Chapter 14 of Title 2[148] makes the Commission the principal repository of the numerous reports and statements which are required by that chapter to be filed by those engaging in the regulated political activities. Its duties under § 438 (a) with respect to these reports and statements include filing and indexing, making them available for public inspection, preservation, and auditing and field investigations. It is directed to "serve as a national clearinghouse for information in respect to the administration of elections." § 438 (b).
*110 Beyond these recordkeeping, disclosure, and investigative functions, however, the Commission is given extensive rulemaking and adjudicative powers. Its duty under § 438 (a) (10) is "to prescribe suitable rules and regulations to carry out the provisions of . . . chapter [14]." Under § 437d (a) (8) the Commission is empowered to make such rules "as are necessary to carry out the provisions of this Act."[149] Section 437d (a) (9) authorizes it to "formulate general policy with respect to the administration of this Act" and enumerated sections of Title 18's Criminal Code,[150] as to all of which provisions the Commission "has primary jurisdiction with respect to [their] civil enforcement." § 437c (b).[151] The Commission is authorized under § 437f (a) to render advisory opinions with respect to activities possibly violating the Act, the Title 18 sections, or the campaign funding provisions of Title 26,[152] the effect of which is that "[n]otwithstanding *111 any other provision of law, any person with respect to whom an advisory opinion is rendered . . . who acts in good faith in accordance with the provisions and findings [thereof] shall be presumed to be in compliance with the [statutory provision] with respect to which such advisory opinion is rendered." § 437f (b). In the course of administering the provisions for Presidential campaign financing, the Commission may authorize convention expenditures which exceed the statutory limits. 26 U. S. C. § 9008 (d) (3) (1970 ed., Supp. IV).
The Commission's enforcement power is both direct and wide ranging. It may institute a civil action for (i) injunctive or other relief against "any acts or practices which constitute or will constitute a violation of this Act," § 437g (a) (5); (ii) declaratory or injunctive relief "as may be appropriate to implement or con[s]true any provisions" of Chapter 95 of Title 26, governing administration of funds for Presidential election campaigns and national party conventions, 26 U. S. C. § 9011 (b) (1) (1970 ed., Supp. IV); and (iii) "such injunctive relief as is appropriate to implement any provision" of Chapter 96 of Title 26, governing the payment of matching funds for Presidential primary campaigns, 26 U. S. C. § 9040 (c) (1970 ed., Supp. IV). If after the Commission's post-disbursement audit of candidates receiving payments under Chapter 95 or 96 it finds an overpayment, it is empowered to seek repayment of all funds due the Secretary of the Treasury. 26 U. S. C. §§ 9010 (b), 9040 (b) (1970 ed., Supp. IV). In no respect do the foregoing civil actions require the concurrence of or participation by the Attorney General; conversely, the decision not to seek judicial relief in the above respects would appear to rest solely with the Commission.[153] With respect to the *112 referenced Title 18 sections, § 437g (a) (7) provides that if, after notice and opportunity for a hearing before it, the Commission finds an actual or threatened criminal violation, the Attorney General "upon request by the Commission. . . shall institute a civil action for relief." Finally, as "[a]dditional enforcement authority," § 456 (a) authorizes the Commission, after notice and opportunity for hearing, to make "a finding that a person . . . while a candidate for Federal office, failed to file" a required report of contributions or expenditures. If that finding is made within the applicable limitations period *113 for prosecutions, the candidate is thereby "disqualified from becoming a candidate in any future election for Federal office for a period of time beginning on the date of such finding and ending one year after the expiration of the term of the Federal office for which such person was a candidate."[154]
The body in which this authority is reposed consists of eight members.[155] The Secretary of the Senate and the Clerk of the House of Representatives are ex officio members of the Commission without the right to vote. Two members are appointed by the President pro tempore of the Senate "upon the recommendations of the majority leader of the Senate and the minority leader of the Senate."[156] Two more are to be appointed by the Speaker of the House of Representatives, likewise upon the recommendations of its respective majority and minority leaders. The remaining two members are appointed by the President. Each of the six voting members of the Commission must be confirmed by the majority of both Houses of Congress, and each of the three appointing authorities is forbidden to choose both of their appointees from the same political party.

A. Ripeness
Appellants argue that given the Commission's extensive powers the method of choosing its members under § 437c (a) (1) runs afoul of the separation of powers embedded in the Constitution, and urge that as presently constituted the Commission's "existence be held unconstitutional by this Court." Before embarking on this or any *114 related inquiry, however, we must decide whether these issues are properly before us. Because of the Court of Appeals' emphasis on lack of "ripeness" of the issue relating to the method of appointment of the members of the Commission, we find it necessary to focus particularly on that consideration in this section of our opinion.
We have recently recognized the distinction between jurisdictional limitations imposed by Art. III and "[p]roblems of prematurity and abstractness" that may prevent adjudication in all but the exceptional case. Socialist Labor Party v. Gilligan, 406 U. S. 583, 588 (1972). In Regional Rail Reorganization Act Cases, 419 U. S. 102, 140 (1974), we stated that "ripeness is peculiarly a question of timing," and therefore the passage of months between the time of the decision of the Court of Appeals and our present ruling is of itself significant. We likewise observed in the Reorganization Act Cases:
"Thus, occurrence of the conveyance allegedly violative of Fifth Amendment rights is in no way hypothetical or speculative. Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." Id., at 143.
The Court of Appeals held that of the five specific certified questions directed at the Commission's authority, only its powers to render advisory opinions and to authorize excessive convention expenditures were ripe for adjudication. The court held that the remaining aspects of the Commission's authority could not be adjudicated because "[in] its present stance, this litigation does not present the court with the concrete facts that are necessary *115 to an informed decision."[157] 171 U. S. App. D. C., at 244, 519 F. 2d, at 893.
Since the entry of judgment by the Court of Appeals, *116 the Commission has undertaken to issue rules and regulations under the authority of § 438 (a) (10). While many of its other functions remain as yet unexercised, the date of their all but certain exercise is now closer *117 by several months than it was at the time the Court of Appeals ruled. Congress was understandably most concerned with obtaining a final adjudication of as many issues as possible litigated pursuant to the provisions of § 437h. Thus, in order to decide the basic question whether the Act's provision for appointment of the members of the Commission violates the Constitution, we believe we are warranted in considering all of those aspects of the Commission's authority which have been presented by the certified questions.[158]
Party litigants with sufficient concrete interests at stake may have standing to raise constitutional questions of separation of powers with respect to an agency designated to adjudicate their rights. Palmore v. United States, 411 U. S. 389 (1973); Glidden Co. v. Zdanok, 370 U. S. 530 (1962); Coleman v. Miller, 307 U. S. 433 (1939). In Glidden, of course, the challenged adjudication had already taken place, whereas in this case appellants' claim is of impending future rulings and determinations by the Commission. But this is a question of ripeness, rather than lack of case or controversy under Art. III, and for the reasons to which we have previously *118 adverted we hold that appellants' claims as they bear upon the method of appointment of the Commission's members may be presently adjudicated.

B. The Merits
Appellants urge that since Congress has given the Commission wide-ranging rulemaking and enforcement powers with respect to the substantive provisions of the Act, Congress is precluded under the principle of separation of powers from vesting in itself the authority to appoint those who will exercise such authority. Their argument is based on the language of Art. II, § 2, cl. 2, of the Constitution, which provides in pertinent part as follows:
"[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint. . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."
Appellants' argument is that this provision is the exclusive method by which those charged with executing the laws of the United States may be chosen. Congress, they assert, cannot have it both ways. If the Legislature wishes the Commission to exercise all of the conferred powers, then its members are in fact "Officers of the United States" and must be appointed under the Appointments Clause. But if Congress insists upon retaining the power to appoint, then the members of the Commission may not discharge those many functions of the Commission which can be performed only by "Officers of *119 the United States," as that term must be construed within the doctrine of separation of powers.
Appellee Commission and amici in support of the Commission urge that the Framers of the Constitution, while mindful of the need for checks and balances among the three branches of the National Government, had no intention of denying to the Legislative Branch authority to appoint its own officers. Congress, either under the Appointments Clause or under its grants of substantive legislative authority and the Necessary and Proper Clause in Art. I, is in their view empowered to provide for the appointment to the Commission in the manner which it did because the Commission is performing "appropriate legislative functions."
The majority of the Court of Appeals recognized the importance of the doctrine of separation of powers which is at the heart of our Constitution, and also recognized the principle enunciated in Springer v. Philippine Islands, 277 U. S. 189 (1928), that the Legislative Branch may not exercise executive authority by retaining the power to appoint those who will execute its laws. But it described appellants' argument based upon Art. II, § 2, cl. 2, as "strikingly syllogistic," and concluded that Congress had sufficient authority under the Necessary and Proper Clause of Art. I of the Constitution not only to establish the Commission but to appoint the Commission's members. As we have earlier noted, it upheld the constitutional validity of congressional vesting of certain authority in the Commission, and concluded that the question of the constitutional validity of the vesting of its remaining functions was not yet ripe for review. The three dissenting judges in the Court of Appeals concluded that the method of appointment for the Commission did violate the doctrine of separation of powers.
*120 1. Separation of Powers
We do not think appellants' arguments based upon Art. II, § 2, cl. 2, of the Constitution may be so easily dismissed as did the majority of the Court of Appeals. Our inquiry of necessity touches upon the fundamental principles of the Government established by the Framers of the Constitution, and all litigants and all of the courts which have addressed themselves to the matter start on common ground in the recognition of the intent of the Framers that the powers of the three great branches of the National Government be largely separate from one another.
James Madison, writing in the Federalist No. 47,[159] defended the work of the Framers against the charge that these three governmental powers were not entirely separate from one another in the proposed Constitution. He asserted that while there was some admixture, the Constitution was nonetheless true to Montesquieu's well-known maxim that the legislative, executive, and judicial departments ought to be separate and distinct:
"The reasons on which Montesquieu grounds his maxim are a further demonstration of his meaning. `When the legislative and executive powers are united in the same person or body,' says he, `there can be no liberty, because apprehensions may arise lest the same monarch or senate should enact tyrannical laws to execute them in a tyrannical manner.' Again: `Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislator. Were it joined to the executive power, the judge might behave with all the violence of an oppressor.' Some of these reasons *121 are more fully explained in other passages; but briefly stated as they are here, they sufficiently establish the meaning which we have put on this celebrated maxim of this celebrated author."[160]
Yet it is also clear from the provisions of the Constitution itself, and from the Federalist Papers, that the Constitution by no means contemplates total separation of each of these three essential branches of Government. The President is a participant in the lawmaking process by virtue of his authority to veto bills enacted by Congress. The Senate is a participant in the appointive process by virtue of its authority to refuse to confirm persons nominated to office by the President. The men who met in Philadelphia in the summer of 1787 were practical statesmen, experienced in politics, who viewed the principle of separation of powers as a vital check against tyranny. But they likewise saw that a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively.
Mr. Chief Justice Taft, writing for the Court in Hampton & Co. v. United States, 276 U. S. 394 (1928), after stating the general principle of separation of powers found in the United States Constitution, went on to observe:
"[T]he rule is that in the actual administration of the government Congress or the Legislature should exercise the legislative power, the President or the State executive, the Governor, the executive power, and the Courts or the judiciary the judicial power, and in carrying out that constitutional division into three branches it is a breach of the National fundamental law if Congress gives up its legislative power *122 and transfers it to the President, or to the Judicial branch, or if by law it attempts to invest itself or its members with either executive power or judicial power. This is not to say that the three branches are not co-ordinate parts of one government and that each in the field of its duties may not invoke the action of the two other branches in so far as the action invoked shall not be an assumption of the constitutional field of action of another branch. In determining what it may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination." Id., at 406.
More recently, Mr. Justice Jackson, concurring in the opinion and the judgment of the Court in Youngstown Sheet & Tube Co. v. Sawyer, 343 U. S. 579, 635 (1952), succinctly characterized this understanding:
"While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity."
The Framers regarded the checks and balances that they had built into the tripartite Federal Government as a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other. As Madison put it in Federalist No. 51:
"This policy of supplying, by opposite and rival interests, the defect of better motives, might be traced through the whole system of human affairs, private as well as public. We see it particularly displayed in all the subordinate distributions of power, where the constant aim is to divide and arrange the *123 several offices in such a manner as that each may be a check on the otherthat the private interest of every individual may be a sentinel over the public rights. These inventions of prudence cannot be less requisite in the distribution of the supreme powers of the State."[161]
This Court has not hesitated to enforce the principle of separation of powers embodied in the Constitution when its application has proved necessary for the decisions of cases or controversies properly before it. The Court has held that executive or administrative duties of a nonjudicial nature may not be imposed on judges holding office under Art. III of the Constitution. United States v. Ferreira, 13 How. 40 (1852); Hayburn's Case, 2 Dall. 409 (1792). The Court has held that the President may not execute and exercise legislative authority belonging only to Congress. Youngstown Sheet & Tube Co. v. Sawyer, supra. In the course of its opinion in that case, the Court said:
"In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a law-maker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad. And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute. The first section of the first article says that `All legislative Powers herein granted shall be vested in a Congress of the United States . . . .' " 343 U. S., at 587-588.
*124 More closely in point to the facts of the present case is this Court's decision in Springer v. Philippine Islands, 277 U. S. 189 (1928), where the Court held that the legislature of the Philippine Islands could not provide for legislative appointment to executive agencies.
2. The Appointments Clause
The principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into the document that they drafted in Philadelphia in the summer of 1787. Article I, § 1, declares: "All legislative Powers herein granted shall be vested in a Congress of the United States." Article II, § 1, vests the executive power "in a President of the United States of America," and Art. III, § 1, declares that "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." The further concern of the Framers of the Constitution with maintenance of the separation of powers is found in the so-called "Ineligibility" and "Incompatibility" Clauses contained in Art. I, § 6:
"No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office."
It is in the context of these cognate provisions of the document that we must examine the language of Art. II. § 2, cl. 2, which appellants contend provides the only authorization for appointment of those to whom substantial executive or administrative authority is given *125 by statute. Because of the importance of its language, we again set out the provision:
"[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."
The Appointments Clause could, of course, be read as merely dealing with etiquette or protocol in describing "Officers of the United States," but the drafters had a less frivolous purpose in mind. This conclusion is supported by language from United States v. Germaine, 99 U. S. 508, 509-510 (1879):
"The Constitution for purposes of appointment very clearly divides all its officers into two classes. The primary class requires a nomination by the President and confirmation by the Senate. But foreseeing that when offices became numerous, and sudden removals necessary, this mode might be inconvenient, it was provided that, in regard to officers inferior to those specially mentioned, Congress might by law vest their appointment in the President alone, in the courts of law, or in the heads of departments. That all persons who can be said to hold an office under the government about to be established under the Constitution were intended to be included within one or the other of these modes of appointment there can be but little doubt." (Emphasis supplied.)
We think that the term "Officers of the United States" *126 as used in Art. II, defined to include "all persons who can be said to hold an office under the government" in United States v. Germaine, supra, is a term intended to have substantive meaning. We think its fair import is that any appointee exercising significant authority pursuant to the laws of the United States is an "Officer of the United States," and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of that Article.
If "all persons who can be said to hold an office under the government about to be established under the Constitution were intended to be included within one or the other of these modes of appointment," United States v. Germaine, supra, it is difficult to see how the members of the Commission may escape inclusion. If a postmaster first class, Myers v. United States, 272 U. S. 52 (1926), and the clerk of a district court, Ex parte Hennen, 13 Pet. 230 (1839), are inferior officers of the United States within the meaning of the Appointments Clause, as they are, surely the Commissioners before us are at the very least such "inferior Officers" within the meaning of that Clause.[162]
Although two members of the Commission are initially selected by the President, his nominations are subject to confirmation not merely by the Senate, but by the House of Representatives as well. The remaining four voting members of the Commission are appointed by the President pro tempore of the Senate and by the Speaker of the House. While the second part of the Clause *127 authorizes Congress to vest the appointment of the officers described in that part in "the Courts of Law, or in the Heads of Departments," neither the Speaker of the House nor the President pro tempore of the Senate comes within this language.
The phrase "Heads of Departments," used as it is in conjunction with the phrase "Courts of Law," suggests that the Departments referred to are themselves in the Executive Branch or at least have some connection with that branch. While the Clause expressly authorizes Congress to vest the appointment of certain officers in the "Courts of Law," the absence of similar language to include Congress must mean that neither Congress nor its officers were included within the language "Heads of Departments" in this part of cl. 2.
Thus with respect to four of the six voting members of the Commission, neither the President, the head of any department, nor the Judiciary has any voice in their selection.
The Appointments Clause specifies the method of appointment only for "Officers of the United States" whose appointment is not "otherwise provided for" in the Constitution. But there is no provision of the Constitution remotely providing any alternative means for the selection of the members of the Commission or for anybody like them. Appellee Commission has argued, and the Court of Appeals agreed, that the Appointments Clause of Art. II should not be read to exclude the "inherent power of Congress" to appoint its own officers to perform functions necessary to that body as an institution. But there is no need to read the Appointments Clause contrary to its plain language in order to reach the result sought by the Court of Appeals. Article I, § 3, cl. 5, expressly authorizes the selection of the President pro tempore of the Senate, and § 2, cl. 5, of that Article provides *128 for the selection of the Speaker of the House. Ranking nonmembers, such as the Clerk of the House of Representatives, are elected under the internal rules of each House[163] and are designated by statute as "officers of the Congress."[164] There is no occasion for us to decide whether any of these member officers are "Officers of the United States" whose "appointment" is otherwise provided for within the meaning of the Appointments Clause, since even if they were such officers their appointees would not be. Contrary to the fears expressed by the majority of the Court of Appeals, nothing in our holding with respect to Art. II, § 2, cl. 2, will deny to Congress "all power to appoint its own inferior officers to carry out appropriate legislative functions."[165]
Appellee Commission and amici contend somewhat obliquely that because the Framers had no intention of relegating Congress to a position below that of the co-equal Judicial and Executive Branches of the National Government, the Appointments Clause must somehow be read to include Congress or its officers as among those *129 in whom the appointment power may be vested. But the debates of the Constitutional Convention, and the Federalist Papers, are replete with expressions of fear that the Legislative Branch of the National Government will aggrandize itself at the expense of the other two branches.[166] The debates during the Convention, and the evolution of the draft version of the Constitution, seem to us to lend considerable support to our reading of the language of the Appointments Clause itself.
An interim version of the draft Constitution had vested in the Senate the authority to appoint Ambassadors, public Ministers, and Judges of the Supreme Court, and the language of Art. II as finally adopted is a distinct change in this regard. We believe that it was a deliberate change made by the Framers with the intent to deny Congress any authority itself to appoint those who were "Officers of the United States." The debates on the floor of the Convention reflect at least in part the way the change came about.
On Monday, August 6, 1787, the Committee on Detail to which had been referred the entire draft of the Constitution reported its draft to the Convention, including the following two articles that bear on the question before us:[167]
Article IX, § 1: "The Senate of the United States shall have power . . . to appoint Ambassadors, and Judges of the Supreme Court."
Article X, § 2: "[The President] shall commission all *130 the officers of the United States; and shall appoint officers in all cases not otherwise provided for by this Constitution."
It will be seen from a comparison of these two articles that the appointment of Ambassadors and Judges of the Supreme Court was confided to the Senate, and that the authority to appointnot merely nominate, but to actually appointall other officers was reposed in the President.
During a discussion of a provision in the same draft from the Committee on Detail which provided that the "Treasurer" of the United States should be chosen by both Houses of Congress, Mr. Read moved to strike out that clause, "leaving the appointment of the Treasurer as of other officers to the Executive."[168] Opposition to Read's motion was based, not on objection to the principle of executive appointment, but on the particular nature of the office of the "Treasurer."[169]
On Thursday, August 23, the Convention voted to insert after the word "Ambassadors" in the text of draft Art. IX the words "and other public Ministers." Immediately afterwards, the section as amended was referred to the "Committee of Five."[170] The following day the Convention took up Art. X. Roger Sherman objected to the draft language of § 2 because it conferred too much power on the President, and proposed to insert after the words "not otherwise provided for by this Constitution" the words "or by law." This motion was defeated by a vote of nine States to one.[171] On September *131 3 the Convention debated the Ineligibility and Incompatibility Clauses which now appear in Art. I, and made the Ineligibility Clause somewhat less stringent.[172]
Meanwhile, on Friday, August 31, a motion had been carried without opposition to refer such parts of the Constitution as had been postponed or not acted upon to a Committee of Eleven. Such reference carried with it both Arts. IX and X. The following week the Committee of Eleven made its report to the Convention, in which the present language of Art. II, § 2, cl. 2, dealing with the authority of the President to nominate is found, virtually word for word, as § 4 of Art. X.[173] The same Committee also reported a revised article concerning the Legislative Branch to the Convention. The changes are obvious. In the final version, the Senate is shorn of its power to appoint Ambassadors and Judges of the Supreme Court. The President is given, not the power to appoint public officers of the United States, but only the right to nominate them, and a provision is inserted by virtue of which Congress may require Senate confirmation of his nominees.
It would seem a fair surmise that a compromise had been made. But no change was made in the concept of the term "Officers of the United States," which since it had first appeared in Art. X had been taken by all concerned to embrace all appointed officials exercising responsibility under the public laws of the Nation.
Appellee Commission and amici urge that because of what they conceive to be the extraordinary authority reposed in Congress to regulate elections, this case stands on a different footing than if Congress had exercised its legislative authority in another field. There is, of course, no doubt that Congress has express authority to regulate *132 congressional elections, by virtue of the power conferred in Art. I, § 4.[174] This Court has also held that it has very broad authority to prevent corruption in national Presidential elections. Burroughs v. United States, 290 U. S. 534 (1934). But Congress has plenary authority in all areas in which it has substantive legislative jurisdiction, M`Culloch v. Maryland, 4 Wheat. 316 (1819), so long as the exercise of that authority does not offend some other constitutional restriction. We see no reason to believe that the authority of Congress over federal election practices is of such a wholly different nature from the other grants of authority to Congress that it may be employed in such a manner as to offend well-established constitutional restrictions stemming from the separation of powers.
The position that because Congress has been given explicit and plenary authority to regulate a field of activity, it must therefore have the power to appoint those who are to administer the regulatory statute is both novel and contrary to the language of the Appointments Clause. Unless their selection is elsewhere provided for, all officers of the United States are to be appointed in accordance with the Clause. Principal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary. No class or type of officer is excluded because of its special functions. The President appoints judicial as well as executive officers. Neither has it been disputedand apparently *133 it is not now disputedthat the Clause controls the appointment of the members of a typical administrative agency even though its functions, as this Court recognized in Humphrey's Executor v. United States, 295 U. S. 602, 624 (1935), may be "predominantly quasi-judicial and quasi-legislative" rather than executive. The Court in that case carefully emphasized that although the members of such agencies were to be independent of the Executive in their day-to-day operations, the Executive was not excluded from selecting them. Id., at 625-626.
Appellees argue that the legislative authority conferred upon the Congress in Art. I, § 4, to regulate "the Times, places and Manner of holding Elections for Senators and Representatives" is augmented by the provision in § 5 that "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members." Section 5 confers, however, not a general legislative power upon the Congress, but rather a power "judicial in character" upon each House of the Congress. Barry v. United States ex rel. Cunningham, 279 U. S. 597, 613 (1929). The power of each House to judge whether one claiming election as Senator or Representative has met the requisite qualifications, Powell v. McCormack, 395 U. S. 486 (1969), cannot reasonably be translated into a power granted to the Congress itself to impose substantive qualifications on the right to so hold such office. Whatever power Congress may have to legislate, such qualifications must derive from § 4, rather than § 5, of Art. I.
Appellees also rely on the Twelfth Amendment to the Constitution insofar as the authority of the Commission to regulate practices in connection with the Presidential election is concerned. This Amendment provides that certificates of the votes of the electors be "sealed [and] *134 directed to the President of the Senate," and that the "President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted." The method by which Congress resolved the celebrated disputed Hayes-Tilden election of 1876, reflected in 19 Stat. 227, supports the conclusion that Congress viewed this Amendment as conferring upon its two Houses the same sort of power "judicial in character," Barry v. United States ex rel. Cunningham, supra, at 613, as was conferred upon each House by Art. I, § 5, with respect to elections of its own members.
We are also told by appellees and amici that Congress had good reason for not vesting in a Commission composed wholly of Presidential appointees the authority to administer the Act, since the administration of the Act would undoubtedly have a bearing on any incumbent President's campaign for re-election. While one cannot dispute the basis for this sentiment as a practical matter, it would seem that those who sought to challenge incumbent Congressmen might have equally good reason to fear a Commission which was unduly responsive to members of Congress whom they were seeking to unseat. But such fears, however rational, do not by themselves warrant a distortion of the Framers' work.
Appellee Commission and amici finally contend, and the majority of the Court of Appeals agreed with them, that whatever shortcomings the provisions for the appointment of members of the Commission might have under Art. II, Congress had ample authority under the Necessary and Proper Clause of Art. I to effectuate this result. We do not agree. The proper inquiry when considering the Necessary and Proper Clause is not the authority of Congress to create an office or a commission, which is broad indeed, but rather its authority to provide *135 that its own officers may make appointments to such office or commission.
So framed, the claim that Congress may provide for this manner of appointment under the Necessary and Proper Clause of Art. I stands on no better footing than the claim that it may provide for such manner of appointment because of its substantive authority to regulate federal elections. Congress could not, merely because it concluded that such a measure was "necessary and proper" to the discharge of its substantive legislative authority, pass a bill of attainder or ex post facto law contrary to the prohibitions contained in § 9 of Art. I. No more may it vest in itself, or in its officers, the authority to appoint officers of the United States when the Appointments Clause by clear implication prohibits it from doing so.
The trilogy of cases from this Court dealing with the constitutional authority of Congress to circumscribe the President's power to remove officers of the United States is entirely consistent with this conclusion. In Myers v. United States, 272 U. S. 52 (1926), the Court held that Congress could not by statute divest the President of the power to remove an officer in the Executive Branch whom he was initially authorized to appoint. In explaining its reasoning in that case, the Court said:
"The vesting of the executive power in the President was essentially a grant of the power to execute the laws. But the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates. . . . As he is charged specifically to take care that they be faithfully executed, the reasonable implication, even in the absence of express words, was that as part of his executive power he should select those who were *136 to act for him under his direction in the execution of the laws.
.....
"Our conclusion on the merits, sustained by the arguments before stated, is that Article II grants to the President the executive power of the Government, i. e., the general administrative control of those executing the laws, including the power of appointment and removal of executive officersa conclusion confirmed by his obligation to take care that the laws be faithfully executed . . . ." Id., at 117, 163-164.
In the later case of Humphrey's Executor, where it was held that Congress could circumscribe the President's power to remove members of independent regulatory agencies, the Court was careful to note that it was dealing with an agency intended to be independent of executive authority "except in its selection." 295 U. S. at 625 (emphasis in original). Wiener v. United States, 357 U. S. 349 (1958), which applied the holding in Humphrey's Executor to a member of the War Claims Commission, did not question in any respect that members of independent agencies are not independent of the Executive with respect to their appointments.
This conclusion is buttressed by the fact that Mr. Justice Sutherland, the author of the Court's opinion in Humphrey's Executor, likewise wrote the opinion for the Court in Springer v. Philippine Islands, 277 U. S. 189 (1928), in which it was said:
"Not having the power of appointment, unless expressly granted or incidental to its powers, the legislature cannot engraft executive duties upon a legislative office, since that would be to usurp the power of appointment by indirection; though the case might be different if the additional duties *137 were devolved upon an appointee of the executive." Id., at 202.
3. The Commission's Powers
Thus, on the assumption that all of the powers granted in the statute may be exercised by an agency whose members have been appointed in accordance with the Appointments Clause,[175] the ultimate question is which, if any, of those powers may be exercised by the present voting Commissioners, none of whom was appointed as provided by that Clause. Our previous description of the statutory provisions, see supra, at 109-113, disclosed that the Commission's powers fall generally into three categories: functions relating to the flow of necessary information receipt, dissemination, and investigation; functions with respect to the Commission's task of fleshing out the statuterulemaking and advisory opinions; and functions necessary to ensure compliance with the statute and rulesinformal procedures, administrative determinations and hearings, and civil suits.
Insofar as the powers confided in the Commission are essentially of an investigative and informative nature, falling in the same general category as those powers which Congress might delegate to one of its own committees, there can be no question that the Commission as presently constituted may exercise them. Kilbourn v. Thompson, 103 U. S. 168 (1881); McGrain v. Daugherty, *138 273 U. S. 135 (1927); Eastland v. United States Servicemen's Fund, 421 U. S. 491 (1975). As this Court stated in McGrain, supra, at 175:
"A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite informationwhich not infrequently is truerecourse must be had to others who do possess it. Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed. All this was true before and when the Constitution was framed and adopted. In that period the power of inquirywith enforcing processwas regarded and employed as a necessary and appropriate attribute of the power to legislateindeed, was treated as inhering in it."
But when we go beyond this type of authority to the more substantial powers exercised by the Commission, we reach a different result. The Commission's enforcement power, exemplified by its discretionary power to seek judicial relief, is authority that cannot possibly be regarded as merely in aid of the legislative function of Congress. A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to "take Care that the Laws be faithfully executed." Art. II, § 3.
Congress may undoubtedly under the Necessary and Proper Clause create "offices" in the generic sense and provide such method of appointment to those "offices" as it chooses. But Congress' power under that Clause *139 is inevitably bounded by the express language of Art. II, § 2, cl. 2, and unless the method it provides comports with the latter, the holders of those offices will not be "Officers of the United States." They may, therefore, properly perform duties only in aid of those functions that Congress may carry out by itself, or in an area sufficiently removed from the administration and enforcement of the public law as to permit their being performed by persons not "Officers of the United States."
This Court observed more than a century ago with respect to litigation conducted in the courts of the United States:
"Whether tested, therefore, by the requirements of the Judiciary Act, or by the usage of the government, or by the decisions of this court, it is clear that all such suits, so far as the interests of the United States are concerned, are subject to the direction, and within the control of, the Attorney-General." Confiscation Cases, 7 Wall. 454, 458-459 (1869).
The Court echoed similar sentiments 59 years later in Springer v. Philippine Islands, 277 U. S., at 202, saying:
"Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions. It is unnecessary to enlarge further upon the general subject, since it has so recently received the full consideration of this Court. Myers v. United States, 272 U. S. 52.
"Not having the power of appointment, unless expressly granted or incidental to its powers, the legislature cannot engraft executive duties upon a legislative office, since that would be to usurp the power of appointment by indirection; though the *140 case might be different if the additional duties were devolved upon an appointee of the executive."
We hold that these provisions of the Act, vesting in the Commission primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights, violate Art. II, § 2, cl. 2, of the Constitution. Such functions may be discharged only by persons who are "Officers of the United States" within the language of that section.
All aspects of the Act are brought within the Commission's broad administrative powers: rulemaking, advisory opinions, and determinations of eligibility for funds and even for federal elective office itself. These functions, exercised free from day-to-day supervision of either Congress[176] or the Executive Branch, are more legislative and judicial in nature than are the Commission's *141 enforcement powers, and are of kinds usually performed by independent regulatory agencies or by some department in the Executive Branch under the direction of an Act of Congress. Congress viewed these broad powers as essential to effective and impartial administration of the entire substantive framework of the Act. Yet each of these functions also represents the performance of a significant governmental duty exercised pursuant to a public law. While the President may not insist that such functions be delegated to an appointee of his removable at will, Humphrey's Executor v. United States, 295 U. S. 602 (1935), none of them operates merely in aid of congressional authority to legislate or is sufficiently removed from the administration and enforcement of public law to allow it to be performed by the present Commission. These administrative functions may therefore be exercised only by persons who are "Officers of the United States."[177]
*142 It is also our view that the Commission's inability to exercise certain powers because of the method by which its members have been selected should not affect the validity of the Commission's administrative actions and determinations to this date, including its administration of those provisions, upheld today, authorizing the public financing of federal elections. The past acts of the Commission are therefore accorded de facto validity, just as we have recognized should be the case with respect to legislative acts performed by legislators held to have been elected in accordance with an unconstitutional apportionment plan. Connor v. Williams, 404 U. S. 549, 550-551 (1972). See Ryan v. Tinsley, 316 F. 2d 430, 431-432 (CA10 1963); Schaefer v. Thomson, 251 F. Supp. 450, 453 (Wyo. 1965), aff'd sub nom. Harrison v. Schaeffer, 383 U. S. 269 (1966). Cf. City of Richmond v. United States, 422 U. S. 358, 379 (1975) (BRENNAN, J., dissenting). We also draw on the Court's practice in *143 the apportionment and voting rights cases and stay, for a period not to exceed 30 days, the Court's judgment insofar as it affects the authority of the Commission to exercise the duties and powers granted it under the Act. This limited stay will afford Congress an opportunity to reconstitute the Commission by law or to adopt other valid enforcement mechanisms without interrupting enforcement of the provisions the Court sustains, allowing the present Commission in the interim to function de facto in accordance with the substantive provisions of the Act. Cf. Georgia v. United States, 411 U. S. 526, 541 (1973); Fortson v. Morris, 385 U. S. 231, 235 (1966); Maryland Comm. v. Tawes, 377 U. S. 656, 675-676 (1964).

CONCLUSION
In summary,[178] we sustain the individual contribution limits, the disclosure and reporting provisions, and the public financing scheme. We conclude, however, that the limitations on campaign expenditures, on independent expenditures by individuals and groups, and on expenditures by a candidate from his personal funds are constitutionally infirm. Finally, we hold that most of the powers conferred by the Act upon the Federal Election Commission can be exercised only by "Officers of the United States," appointed in conformity with Art. II, § 2, cl. 2, of the Constitution, and therefore cannot be exercised by the Commission as presently constituted.
In No. 75-436, the judgment of the Court of Appeals *144 is affirmed in part and reversed in part. The judgment of the District Court in No. 75-437 is affirmed. The mandate shall issue forthwith, except that our judgment is stayed, for a period not to exceed 30 days, insofar as it affects the authority of the Commission to exercise the duties and powers granted it under the Act.
So ordered.
MR. JUSTICE STEVENS took no part in the consideration or decision of these cases.

APPENDIX TO PER CURIAM OPINION[*]

TITLE 2. THE CONGRESS

CHAPTER 14FEDERAL ELECTION CAMPAIGNS

SUBCHAPTER I.DISCLOSURE OF FEDERAL CAMPAIGN

FUNDS
§ 431. Definitions.
When used in this subchapter and subchapter II of this chapter
(a) "election" means
(1) a general, special, primary, or runoff election;
(2) a convention or caucus of a political party held to nominate a candidate;
(3) a primary election held for the selection of delegates to a national nominating convention of a political party; and
(4) a primary election held for the expression of a preference for the nomination of persons for election to the office of President;
*145 (b) "candidate" means an individual who seeks nomination for election, or election, to Federal office, whether or not such individual is elected, and, for purposes of this paragraph, an individual shall be deemed to seek nomination for election, or election, if he has
(1) taken the action necessary under the law of a State to qualify himself for nomination for election, or election, to Federal office; or
(2) received contributions or made expenditures, or has given his consent for any other person to receive contributions or make expenditures, with a view to bringing about his nomination for election, or election, to such office;
(c) "Federal office" means the office of President or Vice President of the United States; or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress of the United States;
(d) "political committee" means any committee, club, association, or other group of persons which receives contributions or makes expenditures during a calendar year in an aggregate amount exceeding $1,000;
(e) "contribution"
(1) means a gift, subscription, loan, advance, or deposit of money or anything of value made for the purpose of
(A) influencing the nomination for election, or election, of any person to Federal office or for the purpose of influencing the results of a primary held for the selection of delegates to a national nominating convention of a political party; or
(B) influencing the result of an election held for the expression of a preference for the nomination of persons for election to the office of President of the United States;

*146 (2) means a contract, promise, or agreement, expressed or implied, whether or not legally enforceable, to make a contribution for such purposes;
(3) means funds received by a political committee which are transferred to such committee from another political committee or other source;
(4) means the payment, by any person other than a candidate or a political committee, of compensation for the personal services of another person which are rendered to such candidate or political committee without charge for any such purpose; but
(5) does not include
(A) the value of services provided without compensation by individuals who volunteer a portion or all of their time on behalf of a candidate or political committee;
(B) the use of real or personal property and the cost of invitations, food, and beverages, voluntarily provided by an individual to a candidate in rendering voluntary personal services on the individual's residential premises for candidate-related activities;
(C) the sale of any food or beverage by a vendor for use in a candidate's campaign at a charge less than the normal comparable charge, if such charge for use in a candidate's campaign is at least equal to the cost of such food or beverage to the vendor;
(D) any unreimbursed payment for travel expenses made by an individual who on his own behalf volunteers his personal services to a candidate;
(E) the payment by a State or local committee of a political party of the costs of preparation, *147 display, or mailing or other distribution incurred by such committee with respect to a printed slate card or sample ballot, or other printed listing, of three or more candidates for any public office for which an election is held in the State in which such committee is organized, except that this clause shall not apply in the case of costs incurred by such committee with respect to a display of any such listing made on broadcasting stations, or in newspapers, magazines, or other similar types of general public political advertising; or
(F) any payment made or obligation incurred by a corporation or a labor organization which, under the provisions of the last paragraph of section 610 of Title 18, would not constitute an expenditure by such corporation or labor organization;
to the extent that the cumulative value of activities by any individual on behalf of any candidate under each of clauses (B), (C), and (D) does not exceed $500 with respect to any election;
(f) "expenditure"
(1) means a purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made for the purpose of
(A) influencing the nomination for election, or the election, of any person to Federal office, or to the office of presidential and vice presidential elector; or
(B) influencing the results of a primary election held for the selection of delegates to a national nominating convention of a political party or for the expression of a preference for *148 the nomination of persons for election to the office of President of the United States;
(2) means a contract, promise, or agreement, express or implied, whether or not legally enforceable, to make any expenditure;
(3) means the transfer of funds by a political committee to another political committee; but
(4) does not include
(A) any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate;
(B) nonpartisan activity designed to encourage individuals to register to vote or to vote;
(C) any communication by any membership organization or corporation to its members or stockholders, if such membership organization or corporation is not organized primarily for the purpose of influencing the nomination for election, or election, of any person to Federal office;
(D) the use of real or personal property and the cost of invitations, food, and beverages, voluntarily provided by an individual to a candidate in rendering voluntary personal services on the individual's residential premises for candidate-related activities if the cumulative value of such activities by such individual on behalf of any candidate do [sic] not exceed $500 with respect to any election;
(E) any unreimbursed payment for travel expenses made by an individual who on his own behalf volunteers his personal services to a candidate if the cumulative amount for such individual incurred with respect to such candidate *149 does not exceed $500 with respect to any election;
(F) any communication by any person which is not made for the purpose of influencing the nomination for election, or election, of any person to Federal office; or
(G) the payment by a State or local committee of a political party of the costs of preparation, display, or mailing or other distribution incurred by such committee with respect to a printed slate card or sample ballot, or other printed listing, of three or more candidates for any public office for which an election is held in the State in which such committee is organized, except that this clause shall not apply in the case of costs incurred by such committee with respect to a display of any such listing made on broadcasting stations, or in newspapers, magazines or other similar types of general public political advertising; or
(H) any payment made or obligation incurred by a corporation or a labor organization which, under the provisions of the last paragraph of section 610 of Title 18, would not constitute an expenditure by such corporation or labor organization;
(g) "Commission" means the Federal Election Commission;
(h) "person" means an individual, partnership, committee, association, corporation, labor organization, and any other organization or group of persons;
(i) "State" means each State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States;
*150 (j) "identification" means
(1) in the case of an individual, his full name and the full address of his principal place of residence; and
(2) in the case of any other person, the full name and address of such person;
(k) "national committee" means the organization which, by virtue of the bylaws of a political party, is responsible for the day-to-day operation of such political party at the national level, as determined by the Commission;
(l) "State committee" means the organization which, by virtue of the bylaws of a political party, is responsible for the day-to-day operation of such political party at the State level, as determined by the Commission;
(m) "political party" means an association, committee, or organization which nominates a candidate for election to any Federal office, whose name appears on the election ballot as the candidate of such association, committee, or organization; and
(n) "principal campaign committee" means the principal campaign committee designated by a candidate under section 432 (f) (1) of this title.
§ 432. Organization of political committees.
(a) Chairman; treasurer; vacancies; official authorizations. Every political committee shall have a chairman and a treasurer. No contribution and no expenditure shall be accepted or made by or on behalf of a political committee at a time when there is a vacancy in the office of chairman or treasurer thereof. No expenditure shall be made for or on behalf of a political committee without the authorization of its chairman or treasurer, or their designated agents.
(b) Account of contributions; segregated funds. *151 Every person who receives a contribution in excess of $10 for a political committee shall, on demand of the treasurer, and in any event within 5 days after receipt of such contribution, render to the treasurer a detailed account thereof, including the amount of the contribution and the identification of the person making such contribution, and the date on which received. All funds of a political committee shall be segregated from, and may not be commingled with, any personal funds of officers, members, or associates of such committee.
(c) Recordkeeping. It shall be the duty of the treasurer of a political committee to keep a detailed and exact account of
(1) all contributions made to or for such committee;
(2) the identification of every person making a contribution in excess of $10, and the date and amount thereof and, if a person's contributions aggregate more than $100, the account shall include occupation, and the principal place of business (if any);
(3) all expenditures made by or on behalf of such committee; and
(4) the identification of every person to whom any expenditure is made, the date and amount thereof and the name and address of, and office sought by, each candidate on whose behalf such expenditure was made.
(d) Receipts; preservation. It shall be the duty of the treasurer to obtain and keep a receipted bill, stating the particulars, for every expenditure made by or on behalf of a political committee in excess of $100 in amount, and for any such expenditure in a lesser amount, if the aggregate amount of such expenditures to the same person during a calendar year exceeds $100. The treasurer *152 shall preserve all receipted bills and accounts required to be kept by this section for periods of time to be determined by the Commission.
(e) Unauthorized activities; notice. Any political committee which solicits or receives contributions or makes expenditures on behalf of any candidate that is not authorized in writing by such candidate to do so shall include a notice on the face or front page of all literature and advertisements published in connection with such candidate's campaign by such committee or on its behalf stating that the committee is not authorized by such candidate and that such candidate is not responsible for the activities of such committee.
(f) Principal campaign committees; one candidate limitation; office of President: national committee for candidate; duties. (1) Each individual who is a candidate for Federal office (other than the office of Vice President of the United States) shall designate a political committee to serve as his principal campaign committee. No political committee may be designated as the principal campaign committee of more than one candidate, except that the candidate for the office of President of the United States nominated by a political party may designate the national committee of such political party as his principal campaign committee. Except as provided in the preceding sentence, no political committee which supports more than one candidate may be designated as a principal campaign committee.
(2) Notwithstanding any other provision of this subchapter, each report or statement of contributions received or expenditures made by a political committee (other than a principal campaign committee) which is required to be filed with the Commission under this subchapter shall be filed instead with the principal campaign *153 committee for the candidate on whose behalf such contributions are accepted or such expenditures are made.
(3) It shall be the duty of each principal campaign committee to receive all reports and statements required to be filed with it under paragraph (2) of this subsection and to compile and file such reports and statements, together with its own reports and statements, with the Commission in accordance with the provisions of this subchapter.
§ 433. Registration of political committees.
(a) Statements of organization. Each political committee which anticipates receiving contributions or making expenditures during the calendar year in an aggregate amount exceeding $1,000 shall file with the Commission a statement of organization, within 10 days after its organization or, if later, 10 days after the date on which it has information which causes the committee to anticipate it will receive contributions or make expenditures in excess of $1,000. Each such committee in existence at the date of enactment of this Act shall file a statement of organization with the Commission at such time as it prescribes.
(b) Contents of statements. The statement of organization shall include
(1) the name and address of the committee;
(2) the names, addresses, and relationships of affiliated or connected organizations;
(3) the area, scope, or jurisdiction of the committee;
(4) the name, address, and position of the custodian of books and accounts;
(5) the name, address, and position of other principal officers, including officers and members of the finance committee, if any;

*154 (6) the name, address, office sought, and party affiliation of
(A) each candidate whom the committee is supporting; and
(B) any other individual, if any, whom the committee is supporting for nomination for election, or election, to any public office whatever; or, if the committee is supporting the entire ticket of any party, the name of the party;
(7) a statement whether the committee is a continuing one;
(8) the disposition of residual funds which will be made in the event of dissolution;
(9) a listing of all banks, safety deposit boxes, or other repositories used;
(10) a statement of the reports required to be filed by the committee with State or local officers, and, if so, the names, addresses, and positions of such persons; and
(11) such other information as shall be required by the Commission.
(c) Information changes; report. Any change in information previously submitted in a statement of organization shall be reported to the Commission within a 10-day period following the change.
(d) Disbanding of political committees or contributions and expenditures below prescribed ceiling; notice. Any committee which, after having filed one or more statements of organization, disbands or determines it will no longer receive contributions or make expenditures during the calendar year in an aggregate amount exceeding $1,000 shall so notify the Commission.
(e) Filing reports and notifications with appropriate principal campaign committees. In the case of a political *155 committee which is not a principal campaign committee, reports and notifications required under this section to be filed with the Commission shall be filed instead with the appropriate principal campaign committee.
§ 434. Reports by political committees and candidates.
(a) Receipts and expenditures; completion date, exception.
(1) Except as provided by paragraph (2), each treasurer of a political committee supporting a candidate or candidates for election to Federal office, and each candidate for election to such office, shall file with the Commission reports of receipts and expenditures on forms to be prescribed or approved by it. The reports referred to in the preceding sentence shall be filed as follows:
(A) (i) In any calendar year in which an individual is a candidate for Federal office and an election for such Federal office is held in such year, such reports shall be filed not later than the 10th day before the date on which such election is held and shall be complete as of the 15th day before the date of such election; except that any such report filed by registered or certified mail must be postmarked not later than the close of the 12th day before the date of such election.
(ii) such reports shall be filed not later than the 30th day after the day of such election and shall be complete as of the 20th day after the date of such election.
(B) In any other calendar year in which an individual is a candidate for Federal office, such reports shall be filed after December 31 of such calendar year, but not later than January 31 of the following calendar year and shall be complete as of the close of the calendar year with respect to which the report is filed.

*156 (C) Such reports shall be filed not later than the 10th day following the close of any calendar quarter in which the candidate or political committee concerned received contributions in excess of $1,000, or made expenditures in excess of $1,000, and shall be complete as of the close of such calendar quarter; except that any such report required to be filed after December 31 of any calendar year with respect to which a report is required to be filed under subparagraph (B) shall be filed as provided in such subparagraph.
(D) When the last day for filing any quarterly report required by subparagraph (C) occurs within 10 days of an election, the filing of such quarterly report shall be waived and superseded by the report required by subparagraph (A) (i).
Any contribution of $1,000 or more received after the 15th day, but more than 48 hours, before any election shall be reported within 48 hours after its receipt.
(2) Each treasurer of a political committee which is not a principal campaign committee shall file the reports required under this section with the appropriate principal campaign committee.
(3) Upon a request made by a presidential candidate or a political committee which operates in more than one State, or upon its own motion, the Commission may waive the reporting dates set forth in paragraph (1) (other than the reporting date set forth in paragraph (1) (B)), and require instead that such candidate or political committee file reports not less frequently than monthly. The Commission may not require a presidential candidate or a political committee operating in more than one State to file more than 12 reports (not counting any report referred to in paragraph (1) (B)) during any calendar year. If the Commission acts on its own motion *157 under this paragraph with respect to a candidate or a political committee, such candidate or committee may obtain judicial review in accordance with the provisions of chapter 7 of Title 5.
(b) Contents of reports. Each report under this section shall disclose
(1) the amount of cash on hand at the beginning of the reporting period;
(2) the full name and mailing address (occupation and the principal place of business, if any) of each person who has made one or more contributions to or for such committee or candidate (including the purchase of tickets for events such as dinners, luncheons, rallies, and similar fundraising events) within the calendar year in an aggregate amount or value in excess of $100, together with the amount and date of such contributions;
(3) the total sum of individual contributions made to or for such committee or candidate during the reporting period and not reported under paragraph (2);
(4) the name and address of each political committee or candidate from which the reporting committee or the candidate received, or to which that committee or candidate made, any transfer of funds, together with the amounts and dates of all transfers;
(5) each loan to or from any person within the calendar year in an aggregate amount or value in excess of $100, together with the full names and mailing addresses (occupations and the principal places of business, if any) of the lender, endorsers, and guarantors, if any, and the date and amount of such loans;
(6) the total amount of proceeds from

*158 (A) the sale of tickets to each dinner, luncheon, rally, and other fundraising event;
(B) mass collections made at such events; and
(C) sales of items such as political campaign pins, buttons, badges, flags, emblems, hats, banners, literature, and similar materials;
(7) each contribution, rebate, refund, or other receipt in excess of $100 not otherwise listed under paragraphs (2) through (6);
(8) the total sum of all receipts by or for such committee or candidate during the reporting period, together with total expenditures less transfers between political committees which support the same candidate and which do not support more than one candidate;
(9) the identification of each person to whom expenditures have been made by such committee or on behalf of such committee or candidate within the calendar year in an aggregate amount or value in excess of $100, the amount, date, and purpose of each such expenditure and the name and address of, and office sought by, each candidate on whose behalf such expenditure was made;
(10) the identification of each person to whom an expenditure for personal services, salaries, and reimbursed expenses in excess of $100 has been made, and which is not otherwise reported, including the amount, date, and purpose of such expenditure;
(11) the total sum of expenditures made by such committee or candidate during the calendar year, together with total receipts less transfers between political committees which support the same candidate and which do not support more than one candidate;

*159 (12) the amount and nature of debts and obligations owed by or to the committee, in such form as the supervisory officer may prescribe and a continuous reporting of their debts and obligations after the election at such periods as the Commission may require until such debts and obligations are extinguished, together with a statement as to the circumstances and conditions under which any such debt or obligation is extinguished and the consideration therefor; and
(13) such other information as shall be required by the Commission.
(c) Cumulative reports for calendar year; amounts for unchanged items carried forward; statement of inactive status. The reports required to be filed by subsection (a) of this section shall be cumulative during the calendar year to which they relate, but where there has been no change in an item reported in a previous report during such year, only the amount need be carried forward. If no contributions or expenditures have been accepted or expended during a calendar year, the treasurer of the political committee or candidate shall file a statement to that effect.
(d) Members of Congress; reporting exemption. This section does not require a Member of the Congress to report, as contributions received or as expenditures made, the value of photographic, matting, or recording services furnished to him by the Senate Recording Studio, the House Recording Studio, or by an individual whose pay is disbursed by the Secretary of the Senate or the Clerk of the House of Representatives and who furnishes such services as his primary duty as an employee of the Senate or House of Representatives, or if such services were paid for by the Republican or Democratic Senatorial Campaign Committee, the Democratic National Congressional *160 Committee, or the National Republican Congressional Committee. This subsection does not apply to such recording services furnished during the calendar year before the year in which the Member's term expires.
(e) Reports by other than political committees. Every person (other than a political committee or candidate) who makes contributions or expenditures, other than by contribution to a political committee or candidate, in an aggregate amount in excess of $100 within a calendar year shall file with the Commission a statement containing the information required by this section. Statements required by this subsection shall be filed on the dates on which reports by political committees are filed but need not be cumulative.
§ 437a. Reports by certain persons; exemptions.
Any person (other than an individual) who expends any funds or commits any act directed to the public for the purpose of influencing the outcome of an election, or who publishes or broadcasts to the public any material referring to a candidate (by name, description, or other reference) advocating the election or defeat of such candidate, setting forth the candidate's position on any public issue, his voting record, or other official acts (in the case of a candidate who holds or has held Federal office), or otherwise designed to influence individuals to cast their votes for or against such candidate or to withhold their votes from such candidate shall file reports with the Commission as if such person were a political committee. The reports filed by such person shall set forth the source of the funds used in carrying out any activity described in the preceding sentence in the same detail as if the funds were contributions within the meaning of section 431 (e) of this title, and payments of such funds in the same detail as if they were expenditures within the meaning of section 431 (f) of this title. The provisions *161 of this section do not apply to any publication or broadcast of the United States Government or to any news story, commentary, or editorial distributed through the facilities of a broadcasting station or a bona fide newspaper, magazine, or other periodical publication. A news story, commentary, or editorial is not considered to be distributed through a bona fide newspaper, magazine, or other periodical publication if
(1) such publication is primarily for distribution to individuals affiliated by membership or stock ownership with the person (other than an individual) distributing it or causing it to be distributed, and not primarily for purchase by the public at newsstands or paid by subscription; or
(2) the news story, commentary, or editorial is distributed by a person (other than an individual) who devotes a substantial part of his activities to attempting to influence the outcome of elections, or to influence public opinion with respect to matters of national or State policy or concern.
§ 437c. Federal Election Commission.
(a) Establishment; membership; term of office; vacancies; qualifications; compensation; chairman and vice chairman.
(1) There is established a commission to be known as the Federal Election Commission. The Commission is composed of the Secretary of the Senate and the Clerk of the House of Representatives, ex officio and without the right to vote, and six members appointed as follows:
(A) two shall be appointed, with the confirmation of a majority of both Houses of the Congress, by the President pro tempore of the Senate upon the recommendations of the majority leader of the Senate and the minority leader of the Senate;

*162 (B) two shall be appointed, with the confirmation of a majority of both Houses of the Congress, by the Speaker of the House of Representatives, upon the recommendations of the majority leader of the House and the minority leader of the House; and
(C) two shall be appointed, with the confirmation of a majority of both Houses of the Congress, by the President of the United States.
A member appointed under subparagraph (A), (B), or (C) shall not be affiliated with the same political party as the other member appointed under such paragraph.
(2) Members of the Commission shall serve for terms of 6 years, except that of the members first appointed
(A) one of the members appointed under paragraph (1) (A) shall be appointed for a term ending on the April 30 first occurring more than 6 months after the date on which he is appointed;
(B) one of the members appointed under paragraph (1) (B) shall be appointed for a term ending 1 year after the April 30 on which the term of the member referred to in subparagraph (A) of this paragraph ends;
(C) one of the members appointed under paragraph (1) (C) shall be appointed for a term ending 2 years thereafter;
(D) one of the members appointed under paragraph (1) (A) shall be appointed for a term ending 3 years thereafter;
(E) one of the members appointed under paragraph (1) (B) shall be appointed for a term ending 4 years thereafter; and
(F) one of the members appointed under paragraph *163 (1) (C) shall be appointed for a term ending 5 years thereafter.
An individual appointed to fill a vacancy occurring other than by the expiration of a term of office shall be appointed only for the unexpired term of the member he succeeds. Any vacancy occurring in the membership of the Commission shall be filled in the same manner as in the case of the original appointment.
(3) Members shall be chosen on the basis of their maturity, experience, integrity, impartiality, and good judgment and shall be chosen from among individuals who, at the time of their appointment, are not elected or appointed officers or employees in the executive, legislative, or judicial branch of the Government of the United States.
(4) Members of the Commission (other than the Secretary of the Senate and the Clerk of the House of Representatives) shall receive compensation equivalent to the compensation paid at level IV of the Executive Schedule (5 U. S. C. 5315).
(5) The Commission shall elect a chairman and a vice chairman from among its members (other than the Secretary of the Senate and the Clerk of the House of Representatives) for a term of one year. No member may serve as chairman more often than once during any term of office to which he is appointed. The chairman and the vice chairman shall not be affiliated with the same political party. The vice chairman shall act as chairman in the absence or disability of the chairman, or in the event of a vacancy in such office.
(b) Administration, enforcement, and formulation of policy; primary jurisdiction of civil enforcement.
The Commission shall administer, seek to obtain compliance with, and formulate policy with respect to this Act and sections 608, 610, 611, 613, 614, 615, 616, *164 and 617 of Title 18. The Commission has primary jurisdiction with respect to the civil enforcement of such provisions.
(c) Voting requirement; nondelegation of function.
All decisions of the Commission with respect to the exercise of its duties and powers under the provisions of this subchapter shall be made by a majority vote of the members of the Commission. A member of the Commission may not delegate to any person his vote or any decisionmaking authority or duty vested in the Commission by the provisions of this subchapter.
(d) Meetings.
The Commission shall meet at least once each month and also at the call of any member.
(e) Rules for conduct of activities; seal, judicial notice; principal office.
The Commission shall prepare written rules for the conduct of its activities, shall have an official seal which shall be judicially noticed, and shall have its principal office in or near the District of Columbia (but it may meet or exercise any of its powers anywhere in the United States).
(f) Staff director and general counsel: appointment and compensation; appointment and compensation of personnel and procurement of intermittent services by staff director; use of assistance, personnel, and facilities of Federal agencies and departments.
(1) The Commission shall have a staff director and a general counsel who shall be appointed by the Commission. The staff director shall be paid at a rate not to exceed the rate of basic pay in effect for level IV of the Executive Schedule (5 U. S. C. 5315). The general counsel shall be paid at a rate not to exceed the rate of basic pay in effect for level V of the Executive Schedule (5 U. S. C. 5316). With the approval of the *165 Commission, the staff director may appoint and fix the pay of such additional personnel as he considers desirable.
(2) With the approval of the Commission, the staff director may procure temporary and intermittent services to the same extent as is authorized by section 3109 (b) of Title 5, but at rates for individuals not to exceed the daily equivalent of the annual rate of basic pay in effect for grade GS-15 of the general schedule (5 U. S. C. 5332).
(3) In carrying out its responsibilities under this Act, the Commission shall, to the fullest extent practicable, avail itself of the assistance, including personnel and facilities, of other agencies and departments of the United States Government. The heads of such agencies and departments may make available to the Commission such personnel, facilities, and other assistance, with or without reimbursement, as the Commission may request.
§ 437d. Powers of Commission.
(a) Specific enumeration.
The Commission has the power
(1) to require, by special or general orders, any person to submit in writing such reports and answers to questions as the Commission may prescribe; and such submission shall be made within such a reasonable period of time and under oath or otherwise as the Commission may determine;
(2) to administer oaths or affirmations;
(3) to require by subpena, signed by the chairman or the vice chairman, the attendance and testimony of witnesses and the production of all documentary evidence relating to the execution of its duties;
(4) in any proceeding or investigation, to order testimony to be taken by deposition before any person who is designated by the Commission and has *166 the power to administer oaths and, in such instances, to compel testimony and the production of evidence in the same manner as authorized under paragraph (3) of this subsection;
(5) to pay witnesses the same fees and mileage as are paid in like circumstances in the courts of the United States;
(6) to initiate (through civil proceedings for injunctive, declaratory, or other appropriate relief), defend, or appeal any civil action in the name of the Commission for the purpose of enforcing the provisions of this Act, through its general counsel;
(7) to render advisory opinions under section 437 of this title;
(8) to make, amend, and repeal such rules, pursuant to the provisions of chapter 5 of Title 5, as are necessary to carry out the provisions of this Act;
(9) to formulate general policy with respect to the administration of this Act and sections 608, 610, 611, 613, 614, 615, 616, and 617 of Title 18;
(10) to develop prescribed forms under subsection (a) (1) of this section; and
(11) to conduct investigations and hearings expeditiously, to encourage voluntary compliance, and to report apparent violations to the appropriate law enforcement authorities.
(b) Judicial orders for compliance with subpenas and orders of Commission; contempt of court.
Any United States district court within the jurisdiction of which any inquiry is carried on, may, upon petition by the Commission, in case of refusal to obey a subpena or order of the Commission issued under subsection (a) of this section, issue an order requiring compliance therewith. Any failure to obey the order of the *167 court may be punished by the court as a contempt thereof.
(c) Civil liability for disclosure of information.
No person shall be subject to civil liability to any person (other than the Commission or the United States) for disclosing information at the request of the Commission.
(d) Transmittal to Congress: Budget estimates or requests and legislative recommendations; prior transmittal to Congress: legislative recommendations.
(1) Whenever the Commission submits any budget estimate or request to the President of the United States or the Office of Management and Budget, it shall concurrently transmit a copy of such estimate or request to the Congress.
(2) Whenever the Commission submits any legislative recommendations, or testimony, or comments on legislation, requested by the Congress or by any Member of the Congress, to the President of the United States or the Office of Management and Budget, it shall concurrently transmit a copy thereof to the Congress or to the Member requesting the same. No officer or agency of the United States shall have any authority to require the Commission to submit its legislative recommendations, testimony, or comments on legislation, to any office or agency of the United States for approval, comments, or review, prior to the submission of such recommendations, testimony, or comments to the Congress.
§ 437e. Reports to President and Congress.
The Commission shall transmit reports to the President of the United States and to each House of the Congress no later than March 31 of each year. Each such report shall contain a detailed statement with respect to the activities of the Commission in carrying out its duties under this subchapter, together with recommendations *168 for such legislative or other action as the Commission considers appropriate.
§ 437f. Advisory opinions.
(a) Written requests; written opinions within reasonable time; specific transactions or activities constituting violations of provisions.
Upon written request to the Commission by any individual holding Federal office, any candidate for Federal office, or any political committee, the Commission shall render an advisory opinion, in writing, within a reasonable time with respect to whether any specific transaction or activity by such individual, candidate, or political committee would constitute a violation of this Act, of chapter 95 or chapter 96 of Title 26 or of section 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18.
(b) Presumption of compliance with provisions based on good faith actions.
Notwithstanding any other provision of law, any person with respect to whom an advisory opinion is rendered under subsection (a) of this section who acts in good faith in accordance with the provisions and findings of such advisory opinion shall be presumed to be in compliance with the provision of this Act, of chapter 95 or chapter 96 of Title 26, or of section 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18, with respect to which such advisory opinion is rendered.
(c) Requests made public; transmittal to Commission of comments of interested parties with respect to such requests.
Any request made under subsection (a) shall be made public by the Commission. The Commission shall before rendering an advisory opinion with respect to such request, provide any interested party with an opportunity to transmit written comments to the Commission with respect to such request.
*169 § 437g. Enforcement.
(a) Violations; complaints and referrals; notification and investigation by Commission: venue, judicial orders; referral to law enforcement authorities: civil actions by Attorney General: venue, judicial orders, bond; subpenas; review by courts of appeals: time for petition, finality of judgment; review by Supreme Court; docket: advancement and priorities.
(1) (A) Any person who believes a violation of this Act or of section 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18 has occurred may file a complaint with the Commission.
(B) In any case in which the Clerk of the House of Representatives or the Secretary of the Senate (who receive reports and statements as custodian for the Commission) has reason to believe a violation of this act or section 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18 has occurred he shall refer such apparent violation to the Commission.
(2) The Commission upon receiving any complaint under paragraph (1) (A), or a referral under paragraph (1) (B), or if it has reason to believe that any person has committed a violation of any such provision, shall notify the person involved of such apparent violation and shall
(A) report such apparent violation to the Attorney General; or
(B) make an investigation of such apparent violation.
(3) Any investigation under paragraph (2) (B) shall be conducted expeditiously and shall include an investigation of reports and statements filed by any complainant under this subchapter, if such complainant is a candidate. Any notification or investigation made under paragraph (2) shall not be made public by the Commission or by *170 any other person without the written consent of the person receiving such notification or the person with respect to whom such investigation is made.
(4) The Commission shall, at the request of any person who receives notice of an apparent violation under paragraph (2), conduct a hearing with respect to such apparent violation.
(5) If the Commission determines, after investigation, that there is reason to believe that any person has engaged, or is about to engage in any acts or practices which constitute or will constitute a violation of this Act, it may endeavor to correct such violation by informal methods of conference, conciliation, and persuasion. If the Commission fails to correct the violation through informal methods, it may institute a civil action for relief, including a permanent or temporary injunction, restraining order, or any other appropriate order in the district court of the United States for the district in which the person against whom such action is brought is found, resides, or transacts business. Upon a proper showing that such person has engaged or is about to engage in such acts or practices, the court shall grant a permanent or temporary injunction, restraining order, or other order.
(6) The Commission shall refer apparent violations to the appropriate law enforcement authorities to the extent that violations of provisions of chapter 29 of Title 18 are involved, or if the Commission is unable to correct apparent violations of this Act under the authority given it by paragraph (5), or if the Commission determines that any such referral is appropriate.
(7) Whenever in the judgment of the Commission, after affording due notice and an opportunity for a hearing, any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of this Act or of section 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18, *171 upon request by the Commission the Attorney General on behalf of the United States shall institute a civil action for relief, including a permanent or temporary injunction, restraining order, or any other appropriate order in the district court of the United States for the district in which the person is found, resides, or transacts business. Upon a proper showing that such person has engaged or is about to engage in such acts or practices, a permanent or temporary injunction, restraining order, or other order shall be granted without bond by such court.
(8) In any action brought under paragraph (5) or (7) of this subsection, subpenas for witnesses who are required to attend a United States district court may run into any other district.
(9) Any party aggrieved by an order granted under paragraph (5) or (7) of this subsection may, at any time within 60 days after the date of entry thereof, file a petition with the United States court of appeals for the circuit in which such order was issued for judicial review of such order.
(10) The judgment of the court of appeals affirming or setting aside, in whole or in part, any such order of the district Court shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.
(11) Any action brought under this subsection shall be advanced on the docket of the court in which filed, and put ahead of all other actions (other than other actions brought under this subsection or under section 437h of this title).
(b) Reports of Attorney General to Commission respecting action taken; reports of Commission respecting status of referrals.
In any case in which the Commission refers an apparent violation to the Attorney General, the Attorney *172 General shall respond by report to the Commission with respect to any action taken by the Attorney General regarding such apparent violation. Each report shall be transmitted no later than 60 days after the date the Commission refers any apparent violation, and at the close of every 30-day period thereafter until there is final disposition of such apparent violation. The Commission may from time to time prepare and publish reports on the status of such referrals.
§ 437h. Judicial review.
(a) Actions, including declaratory judgments, for construction of constitutional questions; eligible plaintiffs; certification of such questions to courts of appeals sitting en banc.
The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President of the United States may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act or of section 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18. The district court immediately shall certify all questions of constitutionality of this Act or of section 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18, to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.
(b) Appeal to Supreme Court; time for appeal.
Notwithstanding any other provision of law, any decision on a matter certified under subsection (a) of this section shall be reviewable by appeal directly to the Supreme Court of the United States. Such appeal shall be brought no later than 20 days after the decision of the court of appeals.
(c) Advancement on appellate docket and expedited deposition of certified questions.
*173 It shall be the duty of the court of appeals and of the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any matter certified under subsection (a) of this section.
§ 438. Administrative and judicial provisions.
(a) Federal Election Commission; duties.
It shall be the duty of the Commission
(1) Forms. To develop and furnish to the person required by the provisions of this Act prescribed forms for the making of the reports and statements required to be filed with it under this subchapter;
(2) Manual for uniform bookkeeping and reporting methods. To prepare, publish, and furnish to the person required to file such reports and statements a manual setting forth recommended uniform methods of bookkeeping and reporting;
(3) Filing, coding, and cross-indexing system. To develop a filing, coding, and cross-indexing system consonant with the purposes of this subchapter;
(4) Public inspection; copies; sale or use restrictions. To make the reports and statements filed with it available for public inspection and copying, commencing as soon as practicable but not later than the end of the second day following the day during which it was received, and to permit copying of any such report or statement by hand or by duplicating machine, as requested by any person, at the expense of such person: Provided, That any information copied from such reports and statements shall not be sold or utilized by any person for the purpose of soliciting contributions or for any commercial purpose;
(5) Preservation of reports and statements. To preserve such reports and statements for a period of *174 10 years from date of receipt, except that reports and statements relating solely to candidates for the House of Representatives shall be preserved for only 5 years from the date of receipt;
(6) Index of reports and statements; publication in Federal Register. To compile and maintain a cumulative index of reports and statements filed with it, which shall be published in the Federal Register at regular intervals and which shall be available for purchase directly or by mail for a reasonable price;
(7) Special reports; publication. To prepare and publish from time to time special reports listing those candidates for whom reports were filed as required by this subchapter and those candidates for whom such reports were not filed as so required;
(8) Audits; investigations. To make from time to time audits and field investigations with respect to reports and statements filed under the provisions of this subchapter, and with respect to alleged failures to file any report or statement required under the provisions of this subchapter;
(9) Enforcement authorities; reports of violations. To report apparent violations of law to the appropriate law enforcement authorities; and
(10) Rules and regulations. To prescribe suitable rules and regulations to carry out the provisions of this subchapter, in accordance with the provisions of subsection (c) of this section.
(b) Commission; duties: national clearinghouse for information; studies, scope, publication, copies to general public at cost. It shall be the duty of the Commission to serve as a national clearinghouse for information in respect to the administration of elections. In carrying out its duties under this subsection, the Commission shall enter into contracts for the purpose of conducting independent *175 studies of the administration of elections. Such studies shall include, but shall not be limited to, studies of
(1) the method of selection of, and the type of duties assigned to, officials and personnel working on boards of elections;
(2) practices relating to the registration of voters; and
(3) voting and counting methods.
Studies made under this subsection shall be published by the Commission and copies thereof shall be made available to the general public upon the payment of the cost thereof.
(c) Proposed rules or regulations; statement, transmittal to Congress; Presidential elections and Congressional elections; "legislative days" defined.
(1) The Commission, before prescribing any rule or regulation under this section, shall transmit a statement with respect to such rule or regulation to the Senate or the House of Representatives, as the case may be, in accordance with the provisions of this subsection. Such statement shall set forth the proposed rule or regulation and shall contain a detailed explanation and justification of such rule or regulation.
(2) If the appropriate body of the Congress which receives a statement from the Commission under this subsection does not, through appropriate action, disapprove the proposed rule or regulation set forth in such statement no later than 30 legislative days after receipt of such statement, then the Commission may prescribe such rule or regulation. In the case of any rule or regulation proposed to deal with reports or statements required to be filed under this subchapter by a candidate for the office of President *176 of the United States, and by political committees supporting such a candidate both the Senate and the House of Representatives shall have the power to disapprove such proposed rule or regulation. The Commission may not prescribe any rule or regulation which is disapproved under this paragraph.
(3) If the Commission proposes to prescribe any rule or regulation dealing with reports or statements required to be filed under this subchapter by a candidate for the office of Senator, and by political committees supporting such candidate, it shall transmit such statement to the Senate. If the Commission proposes to prescribe any rule or regulation dealing with reports or statements required to be filed under this subchapter by a candidate for the office of Representative, Delegate, or Resident Commissioner, and by political committees supporting such candidate, it shall transmit such statement to the House of Representatives. If the Commission proposes to prescribe any rule or regulation dealing with reports or statements required to be filed under this subchapter by a candidate for the office of President of the United States, and by political committees supporting such candidate it shall transmit such statement to the House of Representatives and the Senate.
(4) For purposes of this subsection, the term "legislative days" does not include, with respect to statements transmitted to the Senate, any calendar day on which the Senate is not in session, and with respect to statements transmitted to the House of Representatives, any calendar day on which the House of Representatives is not in session, and with respect to statements transmitted to both such bodies, any calendar day on which both Houses of the Congress are not in session.
*177 (d) Rules and regulations; issuance; custody of reports and statements; Congressional cooperation.
(1) The Commission shall prescribe suitable rules and regulations to carry out the provisions of this subchapter, including such rules and regulations as may be necessary to require that
(A) reports and statements required to be filed under this subchapter by a candidate for the office of Representative in, or Delegate or Resident Commissioner to, the Congress of the United States, and by political committees supporting such candidate, shall be received by the Clerk of the House of Representatives as custodian for the Commission;
(B) reports and statements required to be filed under this subchapter by a candidate for the office of Senator, and by political committees supporting such candidate, shall be received by the Secretary of the Senate as custodian for the Commission; and
(C) the Clerk of the House of Representatives and the Secretary of the Senate, as custodians for the Commission, each shall make the reports and statements received by him available for public inspection and copying in accordance with paragraph (4) of subsection (a) of this section, and preserve such reports and statements in accordance with paragraph (5) of subsection (a) of this section.
(2) It shall be the duty of the Clerk of the House of Representatives and the Secretary of the Senate to cooperate with the Commission in carrying out its duties under this Act and to furnish such services and facilities as may be required in accordance with this section.
*178 § 439. Statements filed with State officers.
(a) "Appropriate State" defined. A copy of each statement required to be filed with the Commission by this subchapter shall be filed with the Secretary of State (or, if there is no office of Secretary of State, the equivalent State officer) of the appropriate State. For purposes of this subsection, the term "appropriate State" means
(1) for reports relating to expenditures and contributions in connection with the campaign for nomination for election, or election, of a candidate to the office of President or Vice President of the United States, each State in which an expenditure is made by him or on his behalf, and
(2) for reports relating to expenditures and contributions in connection with the campaign for nomination for election, or election, of a candidate to the office of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress of the United States, the State in which he seeks election.
(b) Duties of State officers. It shall be the duty of the Secretary of State, or the equivalent State officer, under subsection (a) of this section
(1) to receive and maintain in an orderly manner all reports and statements required by this subchapter to be filed with him;
(2) to preserve such reports and statements for a period of 10 years from date of receipt, except that reports and statements relating solely to candidates for the House of Representatives shall be preserved for only 5 years from the date of receipt;
(3) to make the reports and statements filed with him available for public inspection and copying during regular office hours, commencing as soon *179 as practicable but not later than the end of the day during which it was received, and to permit copying of any such report or statement by hand or by duplicating machine, requested by any person, at the expense of such person; and
(4) to compile and maintain a current list of all statements or parts of statements pertaining to each candidate.
§ 439a. Use of contributed amounts for certain purposes; rules of Commission.
Amounts received by a candidate as contributions that are in excess of any amount necessary to defray his expenditures, and any other amounts contributed to an individual for the purpose of supporting his activities as a holder of Federal office, may be used by such candidate or individual, as the case may be, to defray any ordinary and necessary expenses incurred by him in connection with his duties as a holder of Federal office, may be contributed by him to any organization described in section 170 (c) of Title 26, or may be used for any other lawful purpose. To the extent any such contribution, amount contributed, or expenditure thereof is not otherwise required to be disclosed under the provisions of this subchapter, such contribution, amount contributed, or expenditure shall be fully disclosed in accordance with rules promulgated by the Commission. The Commission is authorized to prescribe such rules as may be necessary to carry out the provisions of this section.
§ 441. Penalties for violations.
(a) Any person who violates any of the provisions of this subchapter shall be fined not more than $1,000 or imprisoned not more than 1 year, or both.
*180 (b) In case of any conviction under this subchapter, where the punishment inflicted does not include imprisonment, such conviction shall be deemed a misdemeanor conviction only.

SUBCHAPTER II.GENERAL PROVISIONS
§ 454. Partial invalidity.
If any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the validity of the remainder of the Act and the application of such provision to other persons and circumstances shall not be affected thereby.
§ 456. Additional enforcement authority.
(a) Findings, after notice and hearing, or failure to file timely reports; disqualification for prescribed period from candidacy in future Federal elections.
In any case in which the Commission, after notice and opportunity for a hearing on the record in accordance with section 554 of Title 5, makes a finding that a person who, while a candidate for Federal office, failed to file a report required by subchapter I of this chapter, and such finding is made before the expiration of the time within which the failure to file such report may be prosecuted as a violation of such subchapter I, such person shall be disqualified from becoming a candidate in any future election for Federal office for a period of time beginning on the date of such finding and ending one year after the expiration of the term of the Federal office for which such person was a candidate.
(b) Judicial review of findings.
Any finding by the Commission under subsection (a) of this section shall be subject to judicial review in accordance with the provisions of chapter 7 of Title 5.

*181 TITLE 18. CRIMES AND CRIMINAL PROCEDURE

CHAPTER 29ELECTIONS AND POLITICAL ACTIVITIES
§ 591. Definitions.
Except as otherwise specifically provided, when used in this section and in sections 597, 599, 600, 602, 608, 610, 611, 614, 615, and 617 of this title
(a) "election" means
(1) a general, special, primary, or runoff election,
(2) a convention or caucus of a political party held to nominate a candidate,
(3) a primary election held for the selection of delegates to a national nominating convention of a political party, or
(4) a primary election held for the expression of a preference for the nomination of persons for election to the office of President;
(b) a "candidate" means an individual who seeks nomination for election, or election, to Federal office, whether or not such individual is elected, and, for purposes of this paragraph, an individual shall be deemed to seek nomination for election, or election, to Federal office, if he has
(1) taken the action necessary under the law of a State to qualify himself for nomination for election, or election, or
(2) received contributions or made expenditures, or has given his consent for any other person to receive contributions or make expenditures, with a view to bringing about his nomination for election, or election, to such office;
(c) "Federal office" means the office of President or Vice President of the United States, or Senator *182 or Representative in, or Delegate or Resident Commissioner to, the Congress of the United States;
(d) "political committee" means any committee, club, association, or other group of persons which receives contributions or makes expenditures during a calendar year in an aggregate amount exceeding $1,000;
(e) "contribution"
(1) means a gift, subscription, loan, advance, or deposit of money or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business, which shall be considered a loan by each endorser or guarantor, in that proportion of the unpaid balance thereof that each endorser or guarantor bears to the total number of endorsers or gurantors), made for the purpose of influencing the nomination for election, or election, of any person to Federal office or for the purpose of influencing the results of a primary held for the selection of delegates to a national nominating convention of a political party or for the expression of a preference for the nomination of persons for election to the office of President of the United States;
(2) means a contract, promise, or agreement, express or implied, whether or not legally enforceable, to make a contribution for such purposes;
(3) means funds received by a political committee which are transferred to such committee from another political committee or other source;

*183 (4) means the payment, by any person other than a candidate or a political committee, of compensation for the personal services of another person which are rendered to such candidate or political committee without charge for any such purpose; but
(5) does not include
(A) the value of services provided without compensation by individuals who volunteer a portion or all of their time on behalf of a candidate or political committee;
(B) the use of real or personal property and the cost of invitations, food, and beverages, voluntarily provided by an individual to a candidate in rendering voluntary personal services on the individual's residential premises for candidate-related activities;
(C) the sale of any food or beverage by a vendor for use in a candidate's campaign at a charge less than the normal comparable charge, if such charge for use in a candidate's campaign is at least equal to the cost of such food or beverage to the vendor;
(D) any unreimbursed payment for travel expenses made by an individual who on his own behalf volunteers his personal services to a candidate; or
(E) the payment by a State or local committee of a political party of the costs of preparation, display, or mailing or other distribution incurred by such committee with respect to a printed slate card or sample *184 ballot, or other printed listing, of three or more candidates for any public office for which an election is held in the State in which such committee is organized, except that this clause shall not apply in the case of costs incurred by such committee with respect to a display of any such listing made on broadcasting stations, or in newspapers, magazines or other similar types of general public political advertising; to the extent that the cumulative value of activities by any person on behalf of any candidate under each of clauses (B), (C), and (D) does not exceed $500 with respect to any election;
(f) "expenditure"
(1) means a purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business), made for the purpose of influencing the nomination for election, or election, of any person to Federal office or for the purpose of influencing the results of a primary held for the selection of delegates to a national nominating convention of a political party or for the expression of a preference for the nomination of persons for election to the office of President of the United States;
(2) means a contract, promise, or agreement, express or implied, whether or not legally enforceable, to make any expenditure; and
(3) means the transfer of funds by a political committee to another political committee; but

*185 (4) does not include
(A) any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate;
(B) nonpartisan activity designed to encourage individuals to register to vote or to vote;
(C) any communication by any membership organization or corporation to its members or stockholders, if such membership organization or corporation is not organized primarily for the purpose of influencing the nomination for election, or election, of any person to Federal office;
(D) the use of real or personal property and the cost of invitations, food, and beverages, voluntarily provided by an individual to a candidate in rendering voluntary personal services on the individual's residential premises for candidate-related activities;
(E) any unreimbursed payment for travel expenses made by an individual who on his own behalf volunteers his personal services to a candidate;
(F) any communication by any person which is not made for the purpose of influencing the nomination for election, or election, of any person to Federal office;
(G) the payment by a State or local committee of a political party of the costs of *186 preparation, display, or mailing or other distribution incurred by such committee with respect to a printed slate card or sample ballot, or other printed listing, of three or more candidates for any public office for which an election is held in the State in which such committee is organized, except that this clause shall not apply in the case of costs incurred by such committee with respect to a display of any such listing made on broadcasting stations, or in newspapers, magazines or other similar types of general public political advertising;
(H) any costs incurred by a candidate in connection with the solicitation of contributions by such candidate, except that this clause shall not apply with respect to costs incurred by a candidate in excess of an amount equal to 20 percent of the expenditure limitation applicable to such candidate under section 608 (c) of this title; or
(I) any costs incurred by a political committee (as such term is defined by section 608 (b) (2) of this title) with respect to the solicitation of contributions to such political committee or to any general political fund controlled by such political committee, except that this clause shall not apply to exempt costs incurred with respect to the solicitation of contributions to any such political committee made through broadcasting stations, newspapers, magazines, outdoor advertising facilities, and *187 other similar types of general public political advertising; to the extent that the cumulative value of activities by any individual on behalf of any candidate under each of clauses (D) or (E) does not exceed $500 with respect to any election;
(g) "person" and "whoever" mean an individual, partnership, committee, association, corporation, or any other organization or group of persons;
(h) "State" means each State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States;
(i) "political party" means any association, committee, or organization which nominates a candidate for election to any Federal office whose name appears on the election ballot as the candidate of such association, committee, or organization;
(j) "State committee" means the organization which, by virtue of the bylaws of a political party, is responsible for the day-to-day operation of such political party at the State level, as determined by the Federal Election Commission;
(k) "national committee" means the organization which, by virtue of the bylaws of the political party, is responsible for the day-to-day operation of such political party at the national level, as determined by the Federal Election Commission established under section 437c (a) of Title 2; and
(l) "principal campaign committee" means the principal campaign committee designated by a candidate under section 432 (f) (1) of Title 2.
§ 608. Limitations on contributions and expenditures.
(a) Personal funds of candidate and family.
(1) No candidate may make expenditures from *188 his personal funds, or the personal funds of his immediate family, in connection with his campaigns during any calendar year for nomination for election, or for election, to Federal office in excess of, in the aggregate
(A) $50,000, in the case of a candidate for the office of President or Vice President of the United States;
(B) $35,000, in the case of a candidate for the office of Senator or for the office of Representative from a State which is entitled to only one Representative; or
(C) $25,000, in the case of a candidate for the office of Representative, or Delegate or Resident Commissioner, in any other State.
For purposes of this paragraph, any expenditure made in a year other than the calendar year in which the election is held with respect to which such expenditure was made, is considered to be made during the calendar year in which such election is held.
(2) For purposes of this subsection, "immediate family" means a candidate's spouse, and any child, parent, grandparent, brother, or sister of the candidate, and the spouses of such persons.
(3) No candidate or his immediate family may make loans or advances from their personal funds in connection with his campaign for nomination for election, or for election, to Federal office unless such loan or advance is evidenced by a written instrument fully disclosing the terms and conditions of such loan or advance.
(4) For purposes of this subsection, any such loan or advance shall be included in computing the total amount of such expenditures only to the extent *189 of the balance of such loan or advance outstanding and unpaid.
(b) Contributions by persons and committees.
(1) Except as otherwise provided by paragraphs (2) and (3), no person shall make contributions to any candidate with respect to any election for Federal office which, in the aggregate, exceed $1,000.
(2) No political committee (other than a principal campaign committee) shall make contributions to any candidate with respect to any election for Federal office which, in the aggregate, exceed $5,000. Contributions by the national committee of a political party serving as the principal campaign committee of a candidate for the office of President of the United States shall not exceed the limitation imposed by the preceding sentence with respect to any other candidate for Federal office. For purposes of this paragraph, the term "political committee" means an organization registered as a political committee under section 433, Title 2, United States Code, for a period of not less than 6 months which has received contributions from more than 50 persons and, except for any State political party organization, has made contributions to 5 or more candidates for Federal office.
(3) No individual shall make contributions aggregating more than $25,000 in any calendar year. For purposes of this paragraph, any contribution made in a year other than the calendar year in which the election is held with respect to which such contribution was made, is considered to be made during the calendar year in which such election is held.
(4) For purposes of this subsection
(A) contributions to a named candidate made *190 to any political committee authorized by such candidate, in writing, to accept contributions on his behalf shall be considered to be contributions made to such candidate; and
(B) contributions made to or for the benefit of any candidate nominated by a political party for election to the office of Vice President of the United States shall be considered to be contributions made to or for the benefit of the candidate of such party for election to the office of President of the United States.
(5) The limitations imposed by paragraphs (1) and (2) of this subsection shall apply separately with respect to each election, except that all elections held in any calendar year for the office of President of the United States (except a general election for such office) shall be considered to be one election.
(6) For purposes of the limitations imposed by this section, all contributions made by a person, either directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate, shall be treated as contributions from such person to such candidate. The intermediary or conduit shall report the original source and the intended recipient of such contribution to the Commission and to the intended recipient.
(c) Limitations on expenditures.
(1) No candidate shall make expenditures in excess of
(A) $10,000,000, in the case of a candidate for nomination for election to the office of President of the United States, except that *191 the aggregate of expenditures under this subparagraph in any one State shall not exceed twice the expenditure limitation applicable in such State to a candidate for nomination for election to the office of Senator, Delegate, or Resident Commissioner, as the case may be;
(B) $20,000,000, in the case of a candidate for election to the office of President of the United States;
(C) in the case of any campaign for nomination for election by a candidate for the office of Senator or by a candidate for the office of Representative from a State which is entitled to only one Representative, the greater of
(i) 8 cents multiplied by the voting age population of the State (as certified under subsection (g)); or
(ii) $100,000;
(D) in the case of any campaign for election by a candidate for the office of Senator or by a candidate for the office of Representative from a State which is entitled to only one Representative, the greater of
(i) 12 cents multiplied by the voting age population of the State (as certified under subsection (g)); or
(ii) $150,000;
(E) $70,000, in the case of any campaign for nomination for election, or for election, by a candidate for the office of Representative in any other State, Delegate from the District of Columbia, or Resident Commissioner; or
(F) $15,000, in the case of any campaign for nomination for election, or for election, by *192 a candidate for the office of Delegate from Guam or the Virgin Islands.
(2) For purposes of this subsection
(A) expenditures made by or on behalf of any candidate nominated by a political party for election to the office of Vice President of the United States shall be considered to be expenditures made by or on behalf of the candidate of such party for election to the office of President of the United States; and
(B) an expenditure is made on behalf of a candidate, including a vice presidential candidate, if it is made by
(i) an authorized committee or any other agent of the candidate for the purposes of making any expenditure; or
(ii) any person authorized or requested by the candidate, an authorized committee of the candidate, or an agent of the candidate, to make the expenditure.
(3) The limitations imposed by subparagraphs (C), (D), (E), and (F) of paragraph (1) of this subsection shall apply separately with respect to each election.
(4) The Commission shall prescribe rules under which any expenditure by a candidate for presidential nomination for use in 2 or more States shall be attributed to such candidate's expenditure limitation in each such State, based on the voting age population in such State which can reasonably be expected to be influenced by such expenditure.
(d) Adjustment of limitations based on price index.
(1) At the beginning of each calendar year (commencing in 1976), as there become available necessary *193 data from the Bureau of Labor Statistics of the Department of Labor, the Secretary of Labor shall certify to the Commission and publish in the Federal Register the per centum difference between the price index for the 12 months preceding the beginning of such calendar year and the price index for the base period. Each limitation established by subsection (c) and subsection (f) shall be increased by such per centum difference. Each amount so increased shall be the amount in effect for such calendar year.
(2) For purposes of paragraph (1)
(A) the term "price index" means the average over a calendar year of the Consumer Price Index (all itemsUnited States city average) published monthly by the Bureau of Labor Statistics; and
(B) the term "base period" means the calendar year 1974.
(e) Expenditure relative to clearly identified candidate.
(1) No person may make any expenditure (other than an expenditure made by or on behalf of a candidate within the meaning of subsection (c) (2) (B)) relative to a clearly identified candidate during a calendar year which, when added to all other expenditures made by such person during the year advocating the election or defeat of such candidate, exceeds $1,000.
(2) For purposes of paragraph (1)
(A) "clearly identified" means
(i) the candidate's name appears;
(ii) a photograph or drawing of the candidate appears; or

*194 (iii) the identity of the candidate is apparent by unambiguous reference; and
(B) "expenditure" does not include any payment made or incurred by a corporation or a labor organization which, under the provisions of the last paragraph of section 610, would not constitute an expenditure by such corporation or labor organization.
(f) Exceptions for national and State committees.
(1) Notwithstanding any other provision of law with respect to limitations on expenditures or limitations on contributions, the national committee of a political party and a State committee of a political party, including any subordinate committee of a State committee, may make expenditures in connection with the general election campaign of candidates for Federal office, subject to the limitations contained in paragraphs (2) and (3) of this subsection.
(2) The national committee of a political party may not make any expenditure in connection with the general election campaign of any candidate for President of the United States who is affiliated with such party which exceeds an amount equal to 2 cents multiplied by the voting age population of the United States (as certified under subsection (g)). Any expenditure under this paragraph shall be in addition to any expenditure by a national committee of a political party serving as the principal campaign committee of a candidate for the office of President of the United States.
(3) The national committee of a political party, or a State committee of a political party, including any subordinate committee of a State committee, may not make any expenditure in connection with the general election campaign of a candidate for *195 Federal office in a State who is affiliated with such party which exceeds
(A) in the case of a candidate for election to the office of Senator, or of Representative from a State which is entitled to only one Representative, the greater of
(i) 2 cents multiplied by the voting age population of the State (as certified under subsection (g)); or
(ii) $20,000; and
(B) in the case of a candidate for election to the office of Representative, Delegate, or Resident Commissioner in any other State, $10,000.
(g) Voting age population estimates. During the first week of January 1975, and every subsequent year, the Secretary of Commerce shall certify to the Commission and publish in the Federal Register an estimate of the voting age population of the United States, of each State, and of each congressional district as of the first day of July next preceding the date of certification. The term "voting age population" means resident population, 18 years of age or older.
(h) Knowing violations. No candidate or political committee shall knowingly accept any contribution or make any expenditure in violation of the provisions of this section. No officer or employee of a political committee shall knowingly accept a contribution made for the benefit or use of a candidate, or knowingly make any expenditure on behalf of a candidate, in violation of any limitation imposed on contributions and expenditures under this section.
(i) Penalties. Any person who violates any provision of this section shall be fined not more than $25,000 or imprisoned not more than 1 year, or both.

*196 § 610. Contributions or expenditures by national banks, corporations or labor organizations.
It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization to make a contribution or expenditure in connection with any election at which presidential and vice presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person to accept or receive any contribution prohibited by this section.
Every corporation or labor organization which makes any contribution or expenditure in violation of this section shall be fined not more than $25,000; and every officer or director of any corporation, or officer of any labor organization, who consents to any contribution or expenditure by the corporation or labor organization, as the case may be, and any person who accepts or receives any contribution, in violation of this section, shall be fined not more than $1,000 or imprisoned not more than 1 year, or both; and if the violation was willful, shall be fined not more than $50,000 or imprisoned not more than 2 years or both.
For the purposes of this section "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exist for the purpose, *197 in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.
As used in this section, the phrase "contribution or expenditure" shall include any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business) to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section; but shall not include communications by a corporation to its stockholders and their families or by a labor organization to its members and their families on any subject; nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and their families, or by a labor organization aimed at its members and their families; the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation or labor organization: Provided, That it shall be unlawful for such a fund to make a contribution or expenditure by utilizing money or anything of value secured by physical force, job discrimination, financial reprisals, or the threat of force, job discrimination, or financial reprisal; or by dues, fees, or other monies required as a condition of membership in a labor organization or as a condition of employment, or by monies obtained in any commercial transaction.
§ 611. Contributions by Government contractors.
Whoever
(a) entering into any contract with the United States or any department or agency thereof either *198 for the rendition of personal services or furnishing any material, supplies, or equipment to the United States or any department or agency thereof or for selling any land or building to the United States or any department or agency thereof, if payment for the performance of such contract or payment for such material, supplies, equipment, land, or building is to be made in whole or in part from funds appropriated by the Congress, at any time between the commencement of negotiations for and the later of
(1) the completion of performance under, or
(2) the termination of negotiations for, such contract or furnishing of material, supplies, equipment, land or buildings,
directly or indirectly makes any contribution of money or other thing of value, or promises expressly or impliedly to make any such contribution, to any political party, committee, or candidate for public office or to any person for any political purpose or use; or
(b) knowingly solicits any such contribution from any such person for any such purpose during any such period;
shall be fined not more than $25,000 or imprisoned not more than 5 years, or both.
This section does not prohibit or make unlawful the establishment or administration of, or the solicitation of contributions to, any separate segregated fund by any corporation or labor organization for the purpose of influencing the nomination for election, or election, of any person to Federal office, unless the provisions of section 610 of this title prohibit or make unlawful the establishment or administration of, or the solicitation of contributions to, such fund.
For purposes of this section, the term "labor organization" *199 has the meaning given it by section 610 of this title.

TITLE 26. INTERNAL REVENUE CODE
§ 6096. Designation by individuals.
(a) In general. Every individual (other than a non-resident alien) whose income tax liability for the taxable year is $1 or more may designate that $1 shall be paid over to the Presidential Election Campaign Fund in accordance with the provisions of section 9006 (a). In the case of a joint return of husband and wife having an income tax liability of $2 or more, each spouse may designate that $1 shall be paid to the fund.
(b) Income tax liability. For purposes of subsection (a), the income tax liability for an individual for any taxable year is the amount of the tax imposed by chapter 1 on such individual for such taxable year (as shown on his return), reduced by the sum of the credits (as shown in his return) allowable under sections 33, 37, 38, 40, and 41.
(c) Manner and time of designation. A designation under subsection (a) may be made with respect to any taxable year
(1) at the time of filing the return of the tax imposed by chapter 1 for such taxable year, or
(2) at any other time (after the time of filing the return of the tax imposed by chapter 1 for such taxable year) specified in regulations prescribed by the Secretary or his delegate.
Such designation shall be made in such manner as the Secretary or his delegate prescribes by regulations except that, if such designation is made at the time of filing the return of the tax imposed by chapter 1 for such taxable year, such designation shall be made either on the *200 first page of the return or on the page bearing the taxpayer's signature.
CHAPTER 95PRESIDENTIAL ELECTION CAMPAIGN FUND
§ 9001. Short title.
This chapter may be cited as the "Presidential Election Campaign Fund Act."
§ 9002. Definitions.
For purposes of this chapter
(1) The term "authorized committee" means, with respect to the candidates of a political party for President and Vice President of the United States, any political committee which is authorized in writing by such candidates to incur expenses to further the election of such candidates. Such authorization shall be addressed to the chairman of such political committee, and a copy of such authorization shall be filed by such candidates with the Commission. Any withdrawal of any authorization shall also be in writing and shall be addressed and filed in the same manner as the authorization.
(2) The term "candidate" means, with respect to any presidential election, an individual who
(A) has been nominated for election to the office of President of the United States or the office of Vice President of the United States by a major party, or
(B) has qualified to have his name on the election ballot (or to have the names of electors pledged to him on the election ballot) as the candidate of a political party for election to either such office in 10 or more States.
For purposes of paragraphs (6) and (7) of this section and purposes of section 9004 (a) (2), the term "candidate" means, with respect to any preceding presidential *201 election, an individual who received popular votes for the office of President in such election.
(3) The term "Commission" means the Federal Election Commission established by section 437c (a) (1) of Title 2, United States Code.
(4) The term "eligible candidates" means the candidates of a political party for President and Vice President of the United States who have met all applicable conditions for eligibility to receive payments under this chapter set forth in section 9003.
(5) The term "fund" means the Presidential Election Campaign Fund established by section 9006 (a).
(6) The term "major party" means, with respect to any presidential election, a political party whose candidate for the office of President in the preceding presidential election received, as the candidate of such party, 25 percent or more of the total number of popular votes received by all candidates for such office.
(7) The term "minor party" means, with respect to any presidential election, a political party whose candidate for the office of President in the preceding presidential election received, as the candidate of such party, 5 percent or more but less than 25 percent of the total number of popular votes received by all candidates for such office.
(8) The term "new party" means, with respect to any presidential election, a political party which is neither a major party nor a minor party.
(9) The term "political committee" means any committee, association, or organization (whether or not incorporated) which accepts contributions or makes expenditures for the purpose of influencing, or attempting to influence, the nomination or election of one or more individuals to Federal, State, or local elective public office.
*202 (10) The term "presidential election" means the election of presidential and vice-presidential electors.
(11) The term "qualified campaign expense" means an expense
(A) incurred
(i) by the candidate of a political party for the office of President to further his election to such office or to further the election of the candidate of such political party for the office of Vice President, or both,
(ii) by the candidate of a political party for the office of Vice President to further his election to such office or to further the election of the candidate of such political party for the office of President, or both, or
(iii) by an authorized committee of the candidates of a political party for the offices of President and Vice President to further the election of either or both of such candidates to such offices;
(B) incurred within the expenditure report period (as defined in paragraph (12)), or incurred before the beginning of such period to the extent such expense is for property, services, or facilities used during such period; and
(C) neither the incurring nor payment of which constitutes a violation of any law of the United States or of the State in which such expense is incurred or paid.
An expense shall be considered as incurred by a candidate or an authorized committee if it is incurred by a person authorized by such candidate or such committee, as the case may be, to incur such expense on behalf of such candidate or such committee. If an authorized committee of the candidates of a political party for *203 President and vice President of the United States also incurs expenses to further the election of one or more other individuals to Federal, State, or local elective public office, expenses incurred by such committee which are not specifically to further the election of such other individual or individuals shall be considered as incurred to further the election of such candidates for President and Vice President in such proportion as the Commission prescribes by rules or regulations.
(12) The term "expenditure report period" with respect to any presidential election means
(A) in the case of a major party, the period beginning with the first day of September before the election, or, if earlier, with the date on which such major party at its national convention nominated its candidate for election to the office of President of the United States, and ending 30 days after the date of the presidential election; and
(B) in the case of a party which is not a major party, the same period as the expenditure report period of the major party which has the shortest expenditure report period for such presidential election under subparagraph (A).
§ 9003. Condition for eligibility for payments.
(a) In general. In order to be eligible to receive any payments under section 9006, the candidates of a political party in a presidential election shall, in writing
(1) agree to obtain and furnish to the Commission such evidence as it may request of the qualified campaign expenses of such candidates;
(2) agree to keep and furnish to the Commission such records, books, and other information as it may request; and
(3) agree to an audit and examination by the *204 Commission under section 9007 and to pay any amounts required to be paid under such section.
(b) Major parties. In order to be eligible to receive any payments under section 9006, the candidates of a major party in a presidential election shall certify to the Commission, under penalty of perjury, that
(1) such candidates and their authorized committees will not incur qualified campaign expenses in excess of the aggregate payments to which they will be entitled under section 9004; and
(2) no contributions to defray qualified campaign expenses have been or will be accepted by such candidates or any of their authorized committees except to the extent necessary to make up any deficiency in payments received out of the fund on account of the application of section 9006 (d), and no contributions to defray expenses which would be qualified campaign expenses but for subparagraph (C) of section 9002 (11) have been or will be accepted by such candidates or any of their authorized committees.
Such certification shall be made within such time prior to the day of the presidential election as the Commission shall prescribe by rules or regulations.
(c) Minor and new parties. In order to be eligible to receive any payments under section 9006, the candidates of a minor or new party in a presidential election shall certify to the Commission, under penalty of perjury, that
(1) such candidates and their authorized committees will not incur qualified campaign expenses in excess of the aggregate payments to which the eligible candidates of a major party are entitled under section 9004; and

*205 (2) such candidates and their authorized committees will accept and expend or retain contributions to defray qualified campaign expenses only to the extent that the qualified campaign expenses incurred by such candidates and their authorized committees certified to under paragraph (1) exceed the aggregate payments received by such candidates out of the fund pursuant to section 9006.
Such certification shall be made within such time prior to the day of the presidential election as the Commission shall prescribe by rules or regulations.
§ 9004. Entitlement of eligible candidates to payments.
(a) In general. Subject to the provisions of this chapter
(1) The eligible candidates of each major party in a presidential election shall be entitled to equal payments under section 9006 in an amount which, in the aggregate, shall not exceed the expenditure limitations applicable to such candidates under section 608 (c) (1) (B) of Title 18, United States Code.
(2) (A) The eligible candidates of a minor party in a presidential election shall be entitled to payments under section 9006 equal in the aggregate to an amount which bears the same ratio to the amount allowed under paragraph (1) for a major party as number of popular votes received by the candidate for President of the minor party, as such candidate, in the preceding presidential election bears to the average number of popular votes received by the candidates for President of the major parties in the preceding presidential election.
(B) If the candidate of one or more political parties (not including a major party) for the office of President was a candidate for such office in the preceding presidential election and received 5 percent *206 or more but less than 25 percent of the total number of popular votes received by all candidates for such office, such candidate and his running mate for the office of Vice President, upon compliance with the provisions of section 9003 (a) and (c), shall be treated as eligible candidates entitled to payments under section 9006 in an amount computed as provided in subparagraph (A) by taking into account all the popular votes received by such candidate for the office of President in the preceding presidential election. If eligible candidates of a minor party are entitled to payments under this subparagraph, such entitlement shall be reduced by the amount of the entitlement allowed under subparagraph (A).
(3) The eligible candidates of a minor party or a new party in a presidential election whose candidate for President in such election receives, as such candidate, 5 percent or more of the total number of popular votes cast for the office of President in such election shall be entitled to payments under section 9006 equal in the aggregate to an amount which bears the same ratio to the amount allowed under paragraph (1) for a major party as the number of popular votes received by such candidate in such election bears to the average number of popular votes received in such election by the candidates for President of the major parties. In the case of eligible candidates entitled to payments under paragraph (2), the amount allowable under this paragraph shall be limited to the amount, if any, by which the entitlement under the preceding sentence exceeds the amount of the entitlement under paragraph (2).
(b) Limitations. The aggregate payments to which the eligible candidates of a political party shall be entitled *207 under subsections (a) (2) and (3) with respect to a presidential election shall not exceed an amount equal to the lower of
(1) the amount of qualified campaign expenses incurred by such eligible candidates and their authorized committees, reduced by the amount of contributions to defray qualified campaign expenses received and expended or retained by such eligible candidates and such committees; or
(2) the aggregate payments to which the eligible candidates of a major party are entitled under subsection (a) (1), reduced by the amount of contributions described in paragraph (1) of this subsection.
(c) Restrictions. The eligible candidates of a political party shall be entitled to payments under subsection (a) only
(1) to defray qualified campaign expenses incurred by such eligible candidates or their authorized committees; or
(2) to repay loans the proceeds of which were used to defray such qualified campaign expenses, or otherwise to restore funds (other than contributions to defray qualified campaign expenses received and expended by such candidates or such committees) used to defray such qualified campaign expenses.
§ 9005. Certification by Commission.
(a) Initial certifications. Not later than 10 days after the candidates of a political party for President and Vice President of the United States have met all applicable conditions for eligibility to receive payments under this chapter set forth in section 9003, the Commission shall certify to the Secretary for payment to such eligible candidates under section 9006 payment in full of amounts to which such candidates are entitled under section 9004.
*208 (b) Finality of certifications and determinations. Initial certifications by the Commission under subsection (a), and all determinations made by it under this chapter shall be final and conclusive, except to the extent that they are subject to examination and audit by the Commission under section 9007 and judicial review under section 9011.
§ 9006. Payments to eligible candidates.
(a) Establishment of campaign fund. There is hereby established on the books of the Treasury of the United States a special fund to be known as the "Presidential Election Campaign Fund." The Secretary shall, from time to time, transfer to the fund an amount not in excess of the sum of the amounts designated (subsequent to the previous Presidential election) to the fund by individuals under section 6096. There is appropriated to the fund for each fiscal year, out of amounts in the general fund of the Treasury not otherwise appropriated, an amount equal to the amounts so designated during each fiscal year, which shall remain available to the fund without fiscal year limitation.
(b) Transfer to the general fund. If, after a Presidential election and after all eligible candidates have been paid the amount which they are entitled to receive under this chapter, there are moneys remaining in the fund, the Secretary shall transfer the moneys so remaining to the general fund of the Treasury.
(c) Payments from the fund. Upon receipt of a certification from the Commission under section 9005 for payment to the eligible candidates of a political party, the Secretary shall pay to such candidates out of the fund the amount certified by the Commission. Amounts paid to any such candidates shall be under the control of such candidates.
(d) Insufficient amounts in fund. If at the time of a *209 certification by the Commission under section 9005 for payment to the eligible candidates of a political party, the Secretary or his delegate determines that the moneys in the fund are not, or may not be, sufficient to satisfy the full entitlements of the eligible candidates of all political parties, he shall withhold from such payment such amount as he determines to be necessary to assure that the eligible candidates of each political party will receive their pro rata share of their full entitlement. Amounts withheld by reason of the preceding sentence shall be paid when the Secretary or his delegate determines that there are sufficient moneys in the fund to pay such amounts, or portions thereof, to all eligible candidates from whom amounts have been withheld, but, if there are not sufficient moneys in the fund to satisfy the full entitlement of the eligible candidates of all political parties, the amounts so withheld shall be paid in such manner that the eligible candidates of each political party receive their pro rata share of their full entitlement.
§ 9007. Examinations and audits; repayments.
(a) Examinations and audits. After each presidential election, the Commission shall conduct a thorough examination and audit of the qualified campaign expenses of the candidates of each political party for President and Vice President.
(b) Repayments.
(1) If the Commission determines that any portion of the payments made to the eligible candidates of a political party under section 9006 was in excess of the aggregate payments to which candidates were entitled under section 9004, it shall so notify such candidates, and such candidates shall pay to the Secretary an amount equal to such portion.
(2) If the Commission determines that the eligible candidates of a political party and their authorized *210 committees incurred qualified campaign expenses in excess of the aggregate payments to which the eligible candidates of a major party were entitled under section 9004, it shall notify such candidates of the amount of such excess and such candidates shall pay to the Secretary an amount equal to such amount.
(3) If the Commission determines that the eligible candidates of a major party or any authorized committee of such candidates accepted contributions (other than contributions to make up deficiencies in payments out of the fund on account of the application of section 9006 (d)) to defray qualified campaign expenses (other than qualified campaign expenses with respect to which payment is required under paragraph (2)), it shall notify such candidates of the amount of the contributions so accepted, and such candidates shall pay to the Secretary an amount equal to such amount.
(4) If the Commission determines that any amount of any payment made to the eligible candidates of a political party under section 9006 was used for any purpose other than
(A) to defray the qualified campaign expenses with respect to which such payment was made; or
(B) to repay loans the proceeds of which were used, or otherwise to restore funds (other than contributions to defray qualified campaign expenses which were received and expended) which were used to defray such qualified campaign expenses,
it shall notify such candidates of the amount so used, and such candidates shall pay to the Secretary an amount equal to such amount.
(5) No payment shall be required from the eligible *211 candidates of a political party under this subsection to the extent that such payment, when added to other payments required from such candidates under this subsection, exceeds the amount of payments received by such candidates under section 9006.
(c) Notification. No notification shall be made by the Commission under subsection (b) with respect to a presidential election more than 3 years after the day of such election.
(d) Deposit of repayments. All payments received by the Secretary under subsection (b) shall be deposited by him in the general fund of the Treasury.
§ 9008. Payments for presidential nominating conventions.
(a) Establishment of accounts. The Secretary shall maintain in the fund, in addition to any account which he maintains under section 9006 (a), a separate account for the national committee of each major party and minor party. The Secretary shall deposit in each such account an amount equal to the amount which each such committee may receive under subsection (b). Such deposits shall be drawn from amounts designated by individuals under section 6096 and shall be made before any transfer is made to any account for any eligible candidate under section 9006 (a).
(b) Entitlement to payments from the fund.
(1) Major parties. Subject to the provisions of this section, the national committee of a major party shall be entitled to payments under paragraph (3), with respect to any presidential nominating convention, in amounts which, in the aggregate, shall not exceed $2 million.
(2) Minor parties. Subject to the provisions of this section, the national committee of a minor party *212 shall be entitled to payments under paragraph (3), with respect to any presidential nominating convention, in amounts which, in the aggregate, shall not exceed an amount which bears the same ratio to the amount the national committee of a major party is entitled to receive under paragraph (1) as the number of popular votes received by the candidate for President of the minor party, as such candidate, in the preceding presidential election bears to the average number of popular votes received by the candidates for President of the United States of the major parties in the preceding presidential election.
(3) Payments. Upon receipt of certification from the Commission under subsection (g), the Secretary shall make payments from the appropriate account maintained under subsection (a) to the national committee of a major party or minor party which elects to receive its entitlement under this subsection. Such payments shall be available for use by such committee in accordance with the provisions of sub-section (c).
(4) Limitation. Payments to the national committee of a major party or minor party under this subsection from the account designated for such committee shall be limited to the amounts in such account at the time of payment.
(5) Adjustment of entitlements. The entitlements established by this subsection shall be adjusted in the same manner as expenditure limitations established by section 608 (c) and section 608 (f) of Title 18, United States Code, are adjusted pursuant to the provisions of section 608 (d) of such title.
(c) Use of funds. No part of any payment made under subsection (b) shall be used to defray the expenses *213 of any candidate or delegate who is participating in any presidential nominating convention. Such payments shall be used only
(1) to defray expenses incurred with respect to a presidential nominating convention (including the payment of deposits) by or on behalf of the national committee receiving such payments; or
(2) to repay loans the proceeds of which were used to defray such expenses, or otherwise to restore funds (other than contributions to defray such expenses received by such committee) used to defray such expenses.
(d) Limitation of expenditures.
(1) Major parties. Except as provided by paragraph (3), the national committee of a major party may not make expenditures with respect to a presidential nominating convention which, in the aggregate, exceed the amount of payments to which such committee is entitled under subsection (b) (1).
(2) Minor parties. Except as provided by paragraph (3), the national committee of a minor party may not make expenditures with respect to a presidential nominating convention which, in the aggregate, exceed the amount of the entitlement of the national committee of a major party under subsection (b) (1).
(3) Exception. The Commission may authorize the national committee of a major party or minor party to make expenditures which, in the aggregate, exceed the limitation established by paragraph (1) or paragraph (2) of this subsection. Such authorization shall be based upon a determination by the Commission that, due to extraordinary and unforeseen circumstances, such expenditures are necessary *214 to assure the effective operation of the presidential nominating convention by such committee.
(e) Availability of payments. The national committee of a major party or minor party may receive payments under subsection (b) (3) beginning on July 1 of the calendar year immediately preceding the calendar year in which a presidential nominating convention of the political party involved is held.
(f) Transfer to the fund. If, after the close of a presidential nominating convention and after the national committee of the political party involved has been paid the amount which it is entitled to receive under this section, there are moneys remaining in the account of such national committee, the Secretary shall transfer the moneys so remaining to the fund.
(g) Certification by Commission. Any major party or minor party may file a statement with the Commission in such form and manner and at such times as it may require, designating the national committee of such party. Such statement shall include the information required by section 433 (b) of Title 2, United States Code, together with such additional information as the Commission may require. Upon receipt of a statement filed under the preceding sentences, the Commission promptly shall verify such statement according to such procedures and criteria as it may establish and shall certify to the Secretary for payment in full to any such committee of amounts to which such committee may be entitled under subsection (b). Such certifications shall be subject to an examination and audit which the Commission shall conduct no later than December 31 of the calendar year in which the presidential nominating convention involved is held.
(h) Repayments. The Commission shall have the same authority to require repayments from the national *215 committee of a major party or a minor party as it has with respect to repayments from any eligible candidate under section 9007 (b). The provisions of section 9007 (c) and section 9007 (d) shall apply with respect to any repayment required by the Commission under this subsection.
§ 9009. Reports to Congress; regulations.
(a) Reports. The Commission shall, as soon as practicable after each presidential election, submit a full report to the Senate and House of Representatives setting forth
(1) the qualified campaign expenses (shown in such detail as the Commission determines necessary) incurred by the candidates of each political party and their authorized committees;
(2) the amounts certified by it under section 9005 for payment to eligible candidates of each political party;
(3) the amount of payments, if any, required from such candidates under section 9007, and the reasons for each payment required;
(4) the expenses incurred by the national committee of a major party or minor party with respect to a presidential nominating convention;
(5) the amounts certified by it under section 9008 (g) for payment to each such committee; and
(6) the amount of payments, if any, required from such committees under section 9008 (h), and the reasons for each such payment.
Each report submitted pursuant to this section shall be printed as a Senate document.
(b) Regulations, etc. The Commission is authorized to prescribe such rules and regulations in accordance with the provisions of subsection (c), to conduct such *216 examinations and audits (in addition to the examinations and audits required by section 9007 (a)), to conduct such investigations, and to require the keeping and submission of such books, records, and information, as it deems necessary to carry out the functions and duties imposed on it by this chapter.
(c) Review of regulations.
(1) The Commission, before prescribing any rule or regulation under subsection (b), shall transmit a statement with respect to such rule or regulation to the Senate and to the House of Representatives, in accordance with the provisions of this subsection. Such statement shall set forth the proposed rule or regulation and shall contain a detailed explanation and justification of such rule or regulation.
(2) If either such House does not, through appropriate action, disapprove the proposed rule or regulation set forth in such statement no later than 30 legislative days after receipt of such statement, then the Commission may prescribe such rule or regulation. The Commission may not prescribe any rule or regulation which is disapproved by either such House under this paragraph.
(3) For purposes of this subsection, the term "legislative days" does not include any calendar day on which both Houses of the Congress are not in session.
§ 9010. Participation by Commission in judicial proceedings.
(a) Appearance by counsel. The Commission is authorized to appear in and defend against any action filed under section 9011, either by attorneys employed in its office or by counsel whom it may appoint without regard to the provisions of Title 5, United States Code, governing appointments in the competitive service, and *217 whose compensation it may fix without regard to the provisions of chapter 51 and subchapter III of chapter 53 of such title.
(b) Recovery of certain payments. The Commission is authorized through attorneys and counsel described in subsection (a) to appear in the district courts of the United States to seek recovery of any amounts determined to be payable to the Secretary as a result of examination and audit made pursuant to section 9007.
(c) Declaratory and injunctive relief. The Commission is authorized through attorneys and counsel described in subsection (a) to petition the courts of the United States for declaratory or injunctive relief concerning any civil matter covered by the provisions of this subtitle or section 6096. Upon application of the Commission an action brought pursuant to this subsection shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28, United States Code, and any appeal shall lie to the Supreme Court. It shall be the duty of the judges designated to hear the case to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case to be in every way expedited.
(d) Appeal. The Commission is authorized on behalf of the United States to appeal from, and to petition the Supreme Court for certiorari to review, judgments or decrees entered with respect to actions in which it appears pursuant to the authority provided in this section.
§ 9011. Judicial review.
(a) Review of certification, determination, or other action by the Commission. Any certification, determination, or other action by the Commission made or taken pursuant to the provisions of this chapter shall be subject to review by the United States Court of Appeals for *218 the District of Columbia upon petition filed in such Court by any interested person. Any petition filed pursuant to this section shall be filed within 30 days after the certification, determination, or other action by the Commission for which review is sought.
(b) Suits to implement chapter.
(1) The Commission, the national committee of any political party, and individuals eligible to vote for President are authorized to institute such actions, including actions for declaratory judgment or injunctive relief, as may be appropriate to implement or contrue[1] any provisions of this chapter.
(2) The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this subsection and shall exercise the same without regard to whether a person asserting rights under provisions of this subsection shall have exhausted any administrative or other remedies that may be provided at law. Such proceedings shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28, United States Code, and any appeal shall lie to the Supreme Court. It shall be the duty of the judges designated to hear the case to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case to be in every way expedited.
§ 9012. Criminal penalties.
(a) Excess expenses.

(1) It shall be unlawful for an eligible candidate of a political party for President and Vice President in a presidential election or any of his authorized committees knowingly and willfully to incur qualified *219 campaign expenses in excess of the aggregate payments to which the eligible candidates of a major party are entitled under section 9004 with respect to such election. It shall be unlawful for the national committee of a major party or minor party knowingly and willfully to incur expenses with respect to a presidential nominating convention in excess of the expenditure limitation applicable with respect to such committee under section 9008 (d), unless the incurring of such expenses is authorized by the Commission under section 9008 (d) (3).
(2) Any person who violates paragraph (1) shall be fined not more than $5,000, or imprisoned not more than 1 year or both. In the case of a violation by an authorized committee, any officer or member of such committee who knowingly and willfully consents to such violation shall be fined not more than $5,000, or imprisoned not more than 1 year, or both.
(b) Contributions.

(1) It shall be unlawful for an eligible candidate of a major party in a presidential election or any of his authorized committees knowingly and willfully to accept any contribution to defray qualified campaign expenses, except to the extent necessary to make up any deficiency in payments received out of the fund on account of the application of section 9006 (d), or to defray expenses which would be qualified campaign expenses but for subparagraph (C) of section 9002 (11).
(2) It shall be unlawful for an eligible candidate of a political party (other than a major party) in a presidential election or any of his authorized committees knowingly and willfully to accept and expend or retain contributions to defray qualified *220 campaign expenses in an amount which exceeds the qualified campaign expenses incurred with respect to such election by such eligible candidate and his authorized committees.
(3) Any person who violates paragraph (1) or (2) shall be fined not more than $5,000, or imprisoned not more than 1 year, or both. In the case of a violation by an authorized committee, any officer or member of such committee who knowingly and willfully consents to such violation shall be fined not more than $5,000, or imprisoned not more than 1 year, or both.
(c) Unlawful use of payments.

(1) It shall be unlawful for any person who receives any payment under section 9006, or to whom any portion of any payment received under such section is transferred, knowingly and willfully to use, or authorize the use of, such payment or such portion for any purpose other than
(A) to defray the qualified campaign expenses with respect to which such payment was made; or
(B) to repay loans the proceeds of which were used, or otherwise to restore funds (other than contributions to defray qualified campaign expenses which were received and expended) which were used, to defray such qualified campaign expenses.
(2) It shall be unlawful for the national committee of a major party or minor party which receives any payment under section 9008 (b) (3) to use, or authorize the use of, such payment for any purpose other than a purpose authorized by section 9008 (c).
(3) Any person who violates paragraph (1) shall *221 be fined not more than $10,000, or imprisoned not more than 5 years, or both.
(d) False statements, etc.

(1) It shall be unlawful for any person knowingly and willfully
(A) to furnish any false, fictitious, or fraudulent evidence, books, or information to the Commission under this subtitle, or to include in any evidence, books, or information so furnished any misrepresentation of a material fact, or to falsify or conceal any evidence, books, or information relevant to a certification by the Commission or an examination and audit by the Commission under this chapter; or
(B) to fail to furnish to the Commission any records, books, or information requested by it for purposes of this chapter.
(2) Any person who violates paragraph (1) shall be fined not more than $10,000, or imprisoned not more than 5 years, or both.
(e) Kickbacks and illegal payments.

(1) It shall be unlawful for any person knowingly and willfully to give or accept any kickback or any illegal payment in connection with any qualified campaign expense of eligible candidates or their authorized committees. It shall be unlawful for the national committee of a major party or minor party knowingly and willfully to give or accept any kickback or any illegal payment in connection with any expense incurred by such committee with respect to a presidential nominating convention.
(2) Any person who violates paragraph (1) shall be fined not more than $10,000, or imprisoned not more than 5 years, or both.

*222 (3) In addition to the penalty provided by paragraph (2), any person who accepts any kickback or illegal payment in connection with any qualified campaign expense of eligible candidates or their authorized committees, or in connection with any expense incurred by the national committee of a major party or minor party with respect to a presidential nominating convention, shall pay to the Secretary, for deposit in the general fund of the Treasury, an amount equal to 125 percent of the kickback or payment received.
(f) Unauthorized expenditures and contributions.

(1) Except as provided in paragraph (2), it shall be unlawful for any political committee which is not an authorized committee with respect to the eligible candidates of a political party for President and Vice President in a presidential election knowingly and willfully to incur expenditures to further the election of such candidates, which would constitute qualified campaign expenses if incurred by an authorized committee of such candidates, in an aggregate amount exceeding $1,000.
(2) This subsection shall not apply to
(A) expenditures by a broadcaster regulated by the Federal Communications Commission, or by a periodical publication, in reporting the news or in taking editorial positions; or
(B) expenditures by any organization described in section 501 (c) which is exempt from tax under section 501 (a) in communicating to its members the views of that organization.
(3) Any political committee which violates paragraph (1) shall be fined not more than $5,000, and any officer or member of such committee who knowingly and willfully consents to such violation and *223 any other individual who knowingly and willfully violates paragraph (1) shall be fined not more than $5,000, or imprisoned not more than 1 year, or both.
(g) Unauthorized disclosure of information.

(1) It shall be unlawful for any individual to disclose any information obtained under the provisions of this chapter except as may be required by law.
(2) Any person who violates paragraph (1) shall be fined not more than $5,000, or imprisoned not more than 1 year, or both.

CHAPTER 96PRESIDENTIAL PRIMARY MATCHING PAYMENT ACCOUNT
§ 9031. Short title.
This chapter may be cited as the "Presidential Primary Matching Payment Account Act."
§ 9032. Definitions.
For the purposes of this chapter
(1) The term "authorized committee" means, with respect to the candidates of a political party for President and Vice President of the United States, any political committee which is authorized in writing by such candidates to incur expenses to further the election of such candidates. Such authorization shall be addressed to the chairman of such political committee, and a copy of such authorization shall be filed by such candidates with the Commission. Any withdrawal of any authorization shall also be in writing and shall be addressed and filed in the same manner as the authorization.
(2) The term "candidate" means an individual who seeks nomination for election to be President of the United States. For purposes of this paragraph, *224 an individual shall be considered to seek nomination for election if he
(A) takes the action necessary under the law of a State to qualify himself for nomination for election;
(B) receives contributions or incurs qualified campaign expenses; or
(C) gives his consent for any other person to receive contributions or to incur qualified campaign expenses on his behalf.
(3) The term "Commission" means the Federal Election Commission established by section 437c (a) (1) of Title 2, United States Code.
(4) Except as provided by section 9034 (a), the term "contribution"
(A) means a gift, subscription, loan, advance, or deposit of money, or anything of value, the payment of which was made on or after the beginning of the calendar year immediately preceding the calendar year of the presidential election with respect to which such gift, subscription, loan, advance, or deposit of money, or anything of value, is made for the purpose of influencing the result of a primary election;
(B) means a contract, promise, or agreement, whether or not legally enforceable, to make a contribution for any such purpose;
(C) means funds received by a political committee which are transferred to that committee from another committee; and
(D) means the payment by any person other than a candidate, or his authorized committee, of compensation for the personal services of another person which are rendered to the candidate or committee without charge; but

*225 (E) does not include
(i) except as provided in subparagraph (D), the value of personal services rendered to or for the benefit of a candidate by an individual who receives no compensation for rendering such service to or for the benefit of the candidate; or
(ii) payments under section 9037.
(5) The term "matching payment account" means the Presidential Primary Matching Payment Account established under section 9037 (a).
(6) The term "matching payment period" means the period beginning with the beginning of the calendar year in which a general election for the office of President of the United States will be held and ending on the date on which the national convention of the party whose nomination a candidate seeks nominates its candidate for the office of President of the United States, or, in the case of a party which does not make such nomination by national convention, ending on the earlier of
(A) the date such party nominates its candidate for the office of President of the United States; or
(B) the last day of the last national convention held by a major party during such calendar year.
(7) The term "primary election" means an election, including a runoff election or a nominating convention or caucus held by a political party, for the selection of delegates to a national nominating convention of a political party, or for the expression of a preference for the nomination of persons for election to the office of President of the United States.

*226 (8) The term "political committee" means any individual, committee, association, or organization (whether or not incorporated) which accepts contributions or incurs qualified campaign expenses for the purpose of influencing, or attempting to influence, the nomination of any person for election to the office of President of the United States.
(9) The term "qualified campaign expense" means a purchase, payment, distribution, loan, advance, deposit, or gift of money or of anything of value
(A) incurred by a candidate, or by his authorized committee, in connection with his campaign for nomination for election; and
(B) neither the incurring nor payment of which constitutes a violation of any law of the United States or of the State in which the expense is incurred or paid.
For purposes of this paragraph, an expense is incurred by a candidate or by an authorized committee if it is incurred by a person specifically authorized in writing by the candidate or committee, as the case may be, to incur such expense on behalf of the candidate or the committee.
(10) The term "State" means each State of the United States and the District of Columbia.
§ 9033. Eligibility for payments.
(a) Conditions. To be eligible to receive payments under section 9037, a candidate shall, in writing
(1) agree to obtain and furnish to the Commission any evidence it may request of qualified campaign expenses;
(2) agree to keep and furnish to the Commission any records, books, and other information it may request; and
(3) agree to an audit and examination by the *227 Commission under section 9038 and to pay any amounts required to be paid under such section.
(b) Expense limitation; declaration of intent; minimum contributions. To be eligible to receive payments under section 9037, a candidate shall certify to the Commission that
(1) the candidate and his authorized committees will not incur qualified campaign expenses in excess of the limitation on such expenses under section 9035;
(2) the candidate is seeking nomination by a political party for election to the office of President of the United States;
(3) the candidate has received matching contributions which in the aggregate, exceed $5,000 in contributions from residents of each of at least 20 States; and
(4) the aggregate of contributions certified with respect to any person under paragraph (3) does not exceed $250.
§ 9034. Entitlement of eligible candidates to payments.
(a) In general. Every candidate who is eligible to receive payments under section 9033 is entitled to payments under section 9037 in an amount equal to the amount of each contribution received by such candidate on or after the beginning of the calendar year immediately preceding the calendar year of the presidential election with respect to which such candidate is seeking nomination, or by his authorized committees, disregarding any amount of contributions from any person to the extent that the total of the amounts contributed by such person on or after the beginning of such preceding calendar year exceeds $250. For purposes of this subsection and section 9033 (b), the term "contribution" means a gift of money made by a written instrument which identifies *228 the person making the contribution by full name and mailing address, but does not include a subscription, loan, advance, or deposit of money, or anything of value or anything described in subparagraph (B), (C), or (D) of section 9032 (4).
(b) Limitations. The total amount of payments to which a candidate is entitled under subsection (a) shall not exceed 50 percent of the expenditure limitation applicable under section 608 (c) (1) (A) of Title 18, United States Code.
§ 9035. Qualified campaign expense limitation.
No candidate shall knowingly incur qualified campaign expenses in excess of the expenditure limitation applicable under section 608 (c) (1) (A) of Title 18, United States Code.
§ 9036. Certification by Commission.
(a) Initial certifications. Not later than 10 days after a candidate establishes his eligibility under section 9033 to receive payments under section 9037, the Commission shall certify to the Secretary for payment to such candidate under section 9037 payment in full of amounts to which such candidate is entitled under section 9034. The Commission shall make such additional certifications as may be necessary to permit candidates to receive payments for contributions under section 9037.
(b) Finality of determinations. Initial certifications by the Commission under subsection (a), and all determinations made by it under this chapter, are final and conclusive, except to the extent that they are subject to examination and audit by the Commission under section 9038 and judicial review under section 9041.
§ 9037. Payments to eligible candidates.
(a) Establishment of account. The Secretary shall maintain in the Presidential Election Campaign Fund *229 established by section 9006 (a), in addition to any account which he maintains under such section, a separate account to be known as the Presidential Primary Matching Payment Account. The Secretary shall deposit into the matching payment account, for use by the candidate of any political party who is eligible to receive payments under section 9033, the amount available after the Secretary determines that amounts for payments under section 9006 (c) and for payments under section 9008 (b) (3) are available for such payments.
(b) Payments from the matching payment account. Upon receipt of a certification from the Commission under section 9036, but not before the beginning of the matching payment period, the Secretary or his delegate shall promptly transfer the amount certified by the Commission from the matching payment account to the candidate. In making such transfers to candidates of the same political party, the Secretary or his delegate shall seek to achieve an equitable distribution of funds available under subsection (a), and the Secretary or his delegate shall take into account, in seeking to achieve an equitable distribution, the sequence in which such certifications are received.
§ 9038. Examinations and audits; repayments.
(a) Examinations and audits. After each matching payment period, the Commission shall conduct a thorough examination and audit of the qualified campaign expenses of every candidate and his authorized committees who received payments under section 9037.
(b) Repayments.
(1) If the Commission determines that any portion of the payments made to a candidate from the matching payment account was in excess of the aggregate amount of payments to which such candidate was entitled under section 9034, it shall *230 notify the candidate, and the candidate shall pay to the Secretary or his delegate an amount equal to the amount of excess payments.
(2) If the Commission determines that any amount of any payment made to a candidate from the matching payment account was used for any purpose other than
(A) to defray the qualified campaign expenses with respect to which such payment was made; or
(B) to repay loans the proceeds of which were used, or otherwise to restore funds (other than contributions to defray qualified campaign expenses which were received and expended) which were used, to defray qualified campaign expenses;
it shall notify such candidate of the amount so used, and the candidate shall pay to the Secretary or his delegate an amount equal to such amount.
(3) Amounts received by a candidate from the matching payment account may be retained for the liquidation of all obligations to pay qualified campaign expenses incurred for a period not exceeding 6 months after the end of the matching payment period. After all obligations have been liquidated, that portion of any unexpended balance remaining in the candidate's accounts which bears the same ratio to the total unexpended balance as the total amount received from the matching payment account bears to the total of all deposits made into the candidate's accounts shall be promptly repaid to the matching payment account.
(c) Notification. No notification shall be made by the Commission under subsection (b) with respect to a matching payment period more than 3 years after the end of such period.
*231 (d) Deposit of repayments. All payments received by the Secretary or his delegate under subsection (b) shall be deposited by him in the matching payment account.
§ 9039. Reports to Congress; regulations.
(a) Reports. The Commission shall, as soon as practicable after each matching payment period, submit a full report to the Senate and House of Representatives setting forth
(1) the qualified campaign expenses (shown in such detail as the Commission determines necessary) incurred by the candidates of each political party and their authorized committees;
(2) the amounts certified by it under section 9036 for payment to each eligible candidate; and
(3) the amount of payments, if any, required from candidates under section 9038, and the reasons for each payment required.
Each report submitted pursuant to this section shall be printed as a Senate document.
(b) Regulations, etc. The Commission is authorized to prescribe rules and regulations in accordance with the provisions of subsection (c), to conduct examinations and audits (in addition to the examinations and audits required by section 9038 (a)), to conduct investigations, and to require the keeping and submission of any books, records, and information, which it determines to be necessary to carry out its responsibilities under this chapter.
(c) Review of regulations.
(1) The Commission, before prescribing any rule or regulation under subsection (b), shall transmit a statement with respect to such rule or regulation to the Senate and to the House of Representatives, *232 in accordance with the provisions of this subsection. Such statement shall set forth the proposed rule or regulation and shall contain a detailed explanation and justification of such rule or regulation.
(2) If either such House does not, through appropriate action, disapprove the proposed rule or regulation set forth in such statement no later than 30 legislative days after receipt of such statement, then the Commission may prescribe such rule or regulation. The Commission may not prescribe any rule or regulation which is disapproved by either such House under this paragraph.
(3) For purposes of this subsection, the term "legislative days" does not include any calendar day on which both Houses of the Congress are not in session.
§ 9040. Participation by Commission in judicial proceedings.
(a) Appearance by counsel. The Commission is authorized to appear in and defend against any action instituted under this section, either by attorneys employed in its office or by counsel whom it may appoint without regard to the provisions of Title 5, United States Code, governing appointments in the competitive service, and whose compensation it may fix without regard to the provisions of chapter 51 and subchapter III of chapter 53 of such title.
(b) Recovery of certain payments. The Commission is authorized, through attorneys and counsel described in subsection (a), to institute actions in the district courts of the United States to seek recovery of any amounts determined to be payable to the Secretary or his delegate as a result of an examination and audit made pursuant to section 9038.
*233 (c) Injunctive relief. The Commission is authorized, through attorneys and counsel described in subsection (a), to petition the courts of the United States for such injunctive relief as is appropriate to implement any provision of this chapter.
(d) Appeal. The Commission is authorized on behalf of the United States to appeal from, and to petition the Supreme Court for certiorari to review, judgments or decrees entered with respect to actions in which it appears pursuant to the authority provided in this section.
§ 9041. Judicial review.
(a) Review of agency action by the Commission. Any agency action by the Commission made under the provisions of this chapter shall be subject to review by the United States Court of Appeals for the District of Columbia Circuit upon petition filed in such court within 30 days after the agency action by the Commission for which review is sought.
(b) Review procedures. The provisions of chapter 7 of Title 5, United States Code, apply to judicial review of any agency action, as defined in section 551 (13) of Title 5, United States Code, by the Commission.
§ 9042. Criminal penalties.
(a) Excess campaign expenses. Any person who violates the provisions of section 9035 shall be fined not more than $25,000, or imprisoned not more than 5 years, or both. Any officer or member of any political committee who knowingly consents to any expenditure in violation of the provisions of section 9035 shall be fined not more than $25,000, or imprisoned not more than 5 years, or both.
(b) Unlawful use of payments.
(1) It is unlawful for any person who receives any payment under section 9037, or to whom any portion *234 of any such payment is transferred, knowingly and willfully to use, or authorize the use of, such payment or such portion for any purpose other than
(A) to defray qualified campaign expenses; or
(B) to repay loans the proceeds of which were used, or otherwise to restore funds (other than contributions to defray qualified campaign expenses which were received and expended) which were used, to defray qualified campaign expenses.
(2) Any person who violates the provisions of paragraph (1) shall be fined not more than $10,000, or imprisoned not more than 5 years, or both.
(c) False statements, etc.
(1) It is unlawful for any person knowingly and willfully
(A) to furnish any false, fictitious, or fraudulent evidence, books, or information to the Commission under this chapter, or to include in any evidence, books, or information so furnished any misrepresentation of a material fact, or to falsify or conceal any evidence, books, or information relevant to a certification by the Commission or an examination and audit by the Commission under this chapter; or
(B) to fail to furnish to the Commission any records, books, or information requested by it for purposes of this chapter.
(2) Any person who violates the provisions of paragraph (1) shall be fined not more than $10,000, or imprisoned not more than 5 years, or both.
(d) Kickbacks and illegal payments.
(1) It is unlawful for any person knowingly and willfully to give or accept any kickback or any illegal *235 payment in connection with any qualified campaign expense of a candidate, or his authorized committees, who receives payments under section 9037.
(2) Any person who violates the provisions of paragraph (1) shall be fined not more than $10,000, or imprisoned not more than 5 years, or both.
(3) In addition to the penalty provided by paragraph (2), any person who accepts any kickback or illegal payment in connection with any qualified campaign expense of a candidate or his authorized committees shall pay to the Secretary for deposit in the matching payment account, an amount equal to 125 percent of the kickback or payment received.
MR. CHIEF JUSTICE BURGER, concurring in part and dissenting in part.
For reasons set forth more fully later, I dissent from those parts of the Court's holding sustaining the statutory provisions (a) for disclosure of small contributions, (b) for limitations on contributions, and (c) for public financing of Presidential campaigns. In my view, the Act's disclosure scheme is impermissibly broad and violative of the First Amendment as it relates to reporting contributions in excess of $10 and $100. The contribution limitations infringe on First Amendment liberties and suffer from the same infirmities that the Court correctly sees in the expenditure ceilings. The system for public financing of Presidential campaigns is, in my judgment, an impermissible intrusion by the Government into the traditionally private political process.
More broadly, the Court's result does violence to the intent of Congress in this comprehensive scheme of campaign finance. By dissecting the Act bit by bit, and casting off vital parts, the Court fails to recognize that the whole of this Act is greater than the sum of its parts. *236 Congress intended to regulate all aspects of federal campaign finances, but what remains after today's holding leaves no more than a shadow of what Congress contemplated. I question whether the residue leaves a workable program.

(1)

DISCLOSURE PROVISIONS
Disclosure is, in principle, the salutary and constitutional remedy for most of the ills Congress was seeking to alleviate. I therefore agree fully with the broad proposition that public disclosure of contributions by individuals and by entitiesparticularly corporations and labor unionsis an effective means of revealing the type of political support that is sometimes coupled with expectations of special favors or rewards. That disclosure impinges on First Amendment rights is conceded by the Court, ante, at 64-66, but given the objectives to which disclosure is directed, I agree that the need for disclosure outweighs individual constitutional claims.
Disclosure is, however, subject to First Amendment limitations which are to be defined by looking to the relevant public interests. The legitimate public interest is the elimination of the appearance and reality of corrupting influences. Serious dangers to the very processes of government justify disclosure of contributions of such dimensions reasonably thought likely to purchase special favors. These fears have been at the root of the Court's prior decisions upholding disclosure requirements, and I therefore have no disagreement, for example, with Burroughs v. United States, 290 U. S. 534 (1934).
The Court's theory, however, goes beyond permissible limits. Under the Court's view, disclosure serves broad informational purposes, enabling the public to be fully informed on matters of acute public interest. Forced disclosure of one aspect of a citizen's political activity, *237 under this analysis, serves the public right to know. This open-ended approach is the only plausible justification for the otherwise irrationally low ceilings of $10 and $100 for anonymous contributions. The burdens of these low ceilings seem to me obvious, and the Court does not try to question this. With commendable candor, the Court acknowledges:
"It is undoubtedly true that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute." Ante, at 68.
Examples come readily to mind. Rank-and-file union members or rising junior executives may now think twice before making even modest contributions to a candidate who is disfavored by the union or management hierarchy. Similarly, potential contributors may well decline to take the obvious risks entailed in making a reportable contribution to the opponent of a well-entrenched incumbent. This fact of political life did not go unnoticed by the Congress:
"The disclosure provisions really have in fact made it difficult for challengers to challenge incumbents." 120 Cong. Rec. 34392 (1974) (remarks of Sen. Long).
See Pollard v. Roberts, 283 F. Supp. 248 (ED Ark.), aff'd per curiam, 393 U. S. 14 (1968).
The public right to know ought not be absolute when its exercise reveals private political convictions. Secrecy, like privacy, is not per se criminal. On the contrary, secrecy and privacy as to political preferences and convictions are fundamental in a free society. For example, one of the great political reforms was the advent of the secret ballot as a universal practice. Similarly, the enlightened labor legislation of our time has enshrined the secrecy of choice of a bargaining representative for *238 workers. In other contexts, this Court has seen to it that governmental power cannot be used to force a citizen to disclose his private affiliations, NAACP v. Button, 371 U. S. 415 (1963), even without a record reflecting any systematic harassment or retaliation, as in Shelton v. Tucker, 364 U. S. 479 (1960). For me it is far too late in the day to recognize an ill-defined "public interest" to breach the historic safeguards guaranteed by the First Amendment.
We all seem to agree that whatever the legitimate public interest in this area, proper analysis requires us to scrutinize the precise means employed to implement that interest. The balancing test used by the Court requires that fair recognition be given to competing interests. With respect, I suggest the Court has failed to give the traditional standing to some of the First Amendment values at stake here. Specifically, it has failed to confine the particular exercise of governmental power within limits reasonably required.
"In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom." Cantwell v. Connecticut, 310 U. S. 296, 304 (1940).
"Unduly" must mean not more than necessary, and until today, the Court has recognized this criterion in First Amendment cases:
"In the area of First Amendment freedoms, government has the duty to confine itself to the least intrusive regulations which are adequate for the purpose." Lamont v. Postmaster General, 381 U. S. 301, 310 (1965) (BRENNAN, J., concurring). (Emphasis added.)
Similarly, the Court has said:
"[E]ven though the governmental purpose be legitimate *239 and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." Shelton v. Tucker, supra, at 488.
In light of these views,[1] it seems to me that the threshold limits fixed at $10 and $100 for anonymous contributions are constitutionally impermissible on their face. As the Court's opinion notes, ante, at 83, Congress gave little or no thought, one way or the other, to these limits, but rather lifted figures out of a 65-year-old statute.[2] As we are all painfully aware, the 1976 dollar is not what it used to be and is surely not the dollar of 1910. Ten dollars in 1976 will, for example, purchase only what $1.68 would buy in 1910. United States Dept. of Labor, Handbook of Labor Statistics 1975, p. 313 (Dec. 1975). To argue that a 1976 contribution of $10 or $100 entails a risk of corruption or its appearance is simply too extravagant to be maintained. No public right to know justifies the compelled disclosure of such contributions, at the risk of discouraging them. There is, in short, no relation whatever between the means used and the legitimate goal of ventilating possible undue influence. Congress has used a shotgun to kill wrens as well as hawks.
*240 In saying that the lines drawn by Congress are "not wholly without rationality," the Court plainly fails to apply the traditional test:
"Precision of regulation must be the touchstone in an area so closely touching on our most precious freedoms." NAACP v. Button, 371 U. S. 415, 438 (1938).
See, e. g., Aptheker v. Secretary of State, 378 U. S. 500 (1964); United States v. Robel, 389 U. S. 258 (1967); Lamont v. Postmaster General, supra. The Court's abrupt departure[3] from traditional standards is wrong; surely a greater burden rests on Congress than merely to avoid "irrationality" when regulating in the core area of the First Amendment. Even taking the Court at its word, the particular dollar amounts fixed by Congress that must be reported to the Commission fall short of meeting the test of rationality when measured by the goals sought to be achieved.
Finally, no legitimate public interest has been shown in forcing the disclosure of modest contributions that are the prime support of new, unpopular, or unfashionable political causes. There is no realistic possibility that such modest donations will have a corrupting influence especially on parties that enjoy only "minor" status. Major parties would not notice them; minor parties need them. Furthermore, as the Court candidly recognizes, ante, at 70, minor parties and new parties tend to be sharply ideological in character, and the public can readily discern where such parties stand, without resorting to the indirect device of recording the names of financial supporters. To hold, as the Court has, that privacy must sometimes yield to congressional investigations of alleged subversion, is quite different from making domestic political *241 partisans give up privacy. Cf. Eastland v. United States Servicemen's Fund, 421 U. S. 491 (1975). In any event, the dangers to First Amendment rights here are too great. Flushing out the names of supporters of minority parties will plainly have a deterrent effect on potential contributors, a consequence readily admitted by the Court, ante, at 71, 83, and supported by the record.[4]
I would therefore hold unconstitutional the provisions requiring reporting of contributions of more than $10 and to make a public record of the name, address, and occupation of a contributor of more than $100.

(2)

CONTRIBUTION AND EXPENDITURE LIMITS
I agree fully with that part of the Court's opinion that holds unconstitutional the limitations the Act puts on campaign expenditures which "place substantial and direct restrictions on the ability of candidates, citizens, and associations to engage in protected political expression, restrictions that the First Amendment cannot tolerate." Ante, at 58-59. Yet when it approves similarly stringent limitations on contributions, the Court ignores the reasons it finds so persuasive in the context of expenditures. For me contributions and expenditures are two sides of the same First Amendment coin.
By limiting campaign contributions, the Act restricts the amount of money that will be spent on political activity *242 and does so directly. Appellees argue, as the Court notes, that these limits will "act as a brake on the skyrocketing cost of political campaigns," ante, at 26. In treating campaign expenditure limitations, the Court says that the "First Amendment denies government the power to determine that spending to promote one's political views is wasteful, excessive, or unwise." Ante, at 57. Limiting contributions, as a practical matter, will limit expenditures and will put an effective ceiling on the amount of political activity and debate that the Government will permit to take place. The argument that the ceiling is not, after all, very low as matters now stand gives little comfort for the future, since the Court elsewhere notes the rapid inflation in the cost of political campaigning.[5]Ante, at 57.
The Court attempts to separate the two communicative aspects of political contributionsthe "moral" support that the gift itself conveys, which the Court suggests is the same whether the gift is $10 or $10,000,[6] and the *243 fact that money translates into communication. The Court dismisses the effect of the limitations on the second aspect of contributions: "[T]he transformation of contributions into political debate involves speech by someone other than the contributor." Ante, at 21. On this premisethat contribution limitations restrict only the speech of "someone other than the contributor"rests the Court's justification for treating contributions differently from expenditures. The premise is demonstrably flawed; the contribution limitations will, in specific instances, limit exactly the same political activity that the expenditure ceilings limit,[7] and at least one of the "expenditure" *244 limitations the Court finds objectionable operates precisely like the "contribution" limitations.[8]
The Court's attempt to distinguish the communication inherent in political contributions from the speech aspects of political expenditures simply "will not wash." We do little but engage in word games unless we recognize that peoplecandidates and contributorsspend money on political activity because they wish to communicate ideas, and their constitutional interest in doing so is precisely the same whether they or someone else utters the words.
The Court attempts to make the Act seem less restrictive by casting the problem as one that goes to freedom of association rather than freedom of speech. I have long thought freedom of association and freedom of expression were two peas from the same pod. The contribution limitations of the Act impose a restriction on certain forms of associational activity that are for the most part, as the Court recognizes, ante, at 29, harmless in fact. And the restrictions are hardly incidental in their effect upon particular campaigns. Judges are ill-equipped to gauge the precise impact of legislation, but a law that impinges upon First Amendment rights requires us to make the attempt. It is not simply speculation to think that the limitations on contributions will foreclose some candidacies.[9] The limitations will also alter the nature of some electoral contests drastically.[10]
*245 At any rate, the contribution limits are a far more severe restriction on First Amendment activity than the sort of "chilling" legislation for which the Court has shown such extraordinary concern in the past. See, e. g., Cohen v. California, 403 U. S. 15 (1971); see also cases reviewed in Miller v. California, 413 U. S. 15 (1973); Redrup v. New York, 386 U. S. 767 (1967); Memoirs v. Massachusetts, 383 U. S. 413 (1966). If such restraints can be justified at all, they must be justified by the very strongest of state interests. With this much the Court clearly agrees; the Court even goes so far as to note that legislation cutting into these important interests must employ "means closely drawn to avoid unnecessary abridgment of associational freedoms." Ante, at 25.
After a bow to the "weighty interests" Congress meant to serve, the Court then forsakes this analysis in one sentence: "Congress was surely entitled to conclude that disclosure was only a partial measure, and that contribution ceilings were a necessary legislative concomitant to deal with the reality or appearance of corruption . . . ." Ante, at 28. In striking down the limitations on campaign expenditures, the Court relies in part on its conclusion that other meansnamely, disclosure and contribution ceilingswill adequately serve the statute's aim. It is not clear why the same analysis is not also appropriate in weighing the need for contribution ceilings in addition to disclosure requirements. Congress may well be *246 entitled to conclude that disclosure was a "partial measure," but I had not thought until today that Congress could enact its conclusions in the First Amendment area into laws immune from the most searching review by this Court.
Finally, it seems clear to me that in approving these limitations on contributions the Court must rest upon the proposition that "pooling" money is fundamentally different from other forms of associational or joint activity. But see ante, at 66. I see only two possible ways in which money differs from volunteer work, endorsements, and the like. Money can be used to buy favors, because an unscrupulous politician can put it to personal use; second, giving money is a less visible form of associational activity. With respect to the first problem, the Act does not attempt to do any more than the bribery laws to combat this sort of corruption. In fact, the Act does not reach at all, and certainly the contribution limits do not reach, forms of "association" that can be fully as corrupt as a contribution intended as a quid pro quo such as the eleventh-hour endorsement by a former rival, obtained for the promise of a federal appointment. This underinclusiveness is not a constitutional flaw, but it demonstrates that the contribution limits do not clearly focus on this first distinction. To the extent Congress thought that the second problem, the lesser visibility of contributions, required that money be treated differently from other forms of associational activity, disclosure laws are the simple and wholly efficacious answer; they make the invisible apparent.

(3)

PUBLIC FINANCING
I dissent from Part III sustaining the constitutionality of the public financing provisions of Subtitle H.
Since the turn of this century when the idea of Government *247 subsidies for political campaigns first was broached, there has been no lack of realization that the use of funds from the public treasury to subsidize political activity of private individuals would produce substantial and profound questions about the nature of our democratic society. The Majority Leader of the Senate, although supporting such legislation in 1967, said that "the implications of these questions . . . go to the very heart and structure of the Government of the Republic."[11] The Solicitor General in his amicus curiae brief states that "the issues involved here are of indisputable moment."[12] He goes on to express his view that public financing will have "profound effects in the way candidates approach issues and each other."[13] Public financing, he notes, "affects the role of the party in campaigns for office, changes the role of the incumbent government vis-a-vis all parties, and affects the relative strengths and strategies of candidates vis-a-vis each other and their party's leaders."[14]
The Court chooses to treat this novel public financing of political activity as simply another congressional appropriation whose validity is "necessary and proper" to Congress' power to regulate and reform elections and primaries, relying on United States v. Classic, 313 U. S. 299 (1941), and Burroughs v. United States, 290 U. S. 534 (1934). No holding of this Court is directly in point, because no federal scheme allocating public funds in a comparable manner has ever been before us. The uniqueness of the plan is not relevant, of course, to whether Congress has power to enact it. Indeed, I do not question the power of Congress to regulate elections; nor do I *248 challenge the broad proposition that the General Welfare Clause is a grant, not a limitation, of power. M'Culloch v. Maryland, 4 Wheat. 316, 420 (1819); United States v. Butler, 297 U. S. 1, 66 (1936).
I would, however, fault the Court for not adequately analyzing and meeting head on the issue whether public financial assistance to the private political activity of individual citizens and parties is a legitimate expenditure of public funds. The public monies at issue here are not being employed simply to police the integrity of the electoral process or to provide a forum for the use of all participants in the political dialogue, as would, for example, be the case if free broadcast time were granted. Rather, we are confronted with the Government's actual financing, out of general revenues, a segment of the political debate itself. As Senator Howard Baker remarked during the debate on this legislation:
"I think there is something politically incestuous about the Government financing and, I believe, inevitably then regulating, the day-to-day procedures by which the Government is selected . . . .
"I think it is extraordinarily important that the Government not control the machinery by which the public expresses the range of its desires, demands, and dissent." 120 Cong. Rec. 8202 (1974).
If this "incest" affected only the issue of the wisdom of the plan, it would be none of the concern of judges. But, in my view, the inappropriateness of subsidizing, from general revenues, the actual political dialogue of the peoplethe process which begets the Government itself is as basic to our national tradition as the separation of church and state also deriving from the First Amendment, see Lemon v. Kurtzman, 403 U. S. 602, 612 (1971); Walz v. Tax Comm'n, 397 U. S. 664, 668-669 (1970), *249 or the separation of civilian and military authority, see Orloff v. Willoughby, 345 U. S. 83, 93-94 (1953), neither of which is explicit in the Constitution but both of which have developed through case-by-case adjudication of express provisions of the Constitution.
Recent history shows dangerous examples of systems with a close, "incestuous" relationship between "government" and "politics"; the Court's opinion simply dismisses possible dangers by noting that:
"Subtitle H is a congressional effort, not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people." Ante, at 92-93.
Congress, it reassuringly adds by way of a footnote, has expressed its determination to avoid such a possibility.[15]Ante, at 93 n. 126. But the Court points to no basis for predicting that the historical pattern of "varying measures of control and surveillance," Lemon v. Kurtzman, supra, at 621, which usually accompany grants from Government will not also follow in this case.[16] Up to now, the Court has always been extraordinarily sensitive, when dealing with First Amendment rights, to the risk that the "flag tends to follow the dollars." Yet, here, where Subtitle H specifically requires the auditing of records of political parties and candidates by Government inspectors,[17] the Court shows *250 little sensitivity to the danger it has so strongly condemned in other contexts. See, e. g., Everson v. Board of Education, 330 U. S. 1 (1947). Up to now, this Court has scrupulously refrained, absent claims of invidious discrimination,[18] from entering the arena of intraparty disputes concerning the seating of convention delegates. Graham v. Fong Eu, 403 F. Supp. 37 (ND Cal. 1975), summarily aff'd, 423 U. S. 1067 (1976); Cousins v. Wigoda, 419 U. S. 477 (1975); O'Brien v. Brown, 409 U. S. 1 (1972). An obvious underlying basis for this reluctance is that delegate selection and the management of political conventions have been considered a strictly private political matter, not the business of Government inspectors. But once the Government finances these national conventions by the expenditure of millions of dollars from the public treasury, we may be providing a springboard for later attempts to impose a whole range of requirements on delegate selection and convention activities. Does this foreshadow judicial decisions allowing the federal courts to "monitor" these conventions to assure compliance with court orders or regulations?
Assuming, arguendo, that Congress could validly appropriate public money to subsidize private political activity, it has gone about the task in Subtitle H in a manner which is not, in my view, free of constitutional infirmity.[19] I do not question that Congress has "wide discretion in the manner of prescribing details of expenditures" in some contexts, Cincinnati Soap Co. v. United States, 301 U. S. 308, 321 (1937). Here, however, Congress has not itself appropriated a specific sum to attain the ends of the Act but has delegated to a limited group *251 of citizensthose who file tax returnsthe power to allocate general revenue for the Act's purposesand of course only a small percentage of that limited group has exercised the power. There is nothing to assure that the "fund" will actually be adequate for the Act's objectives. Thus, I find it difficult to see a rational basis for concluding that this scheme would, in fact, attain the stated purposes of the Act when its own funding scheme affords no real idea of the amount of the available funding.
I agree with MR. JUSTICE REHNQUIST that the scheme approved by the Court today invidiously discriminates against minor parties. Assuming, arguendo, the constitutionality of the overall scheme, there is a legitimate governmental interest in requiring a group to make a "preliminary showing of a significant modicum of support." Jenness v. Fortson, 403 U. S. 431, 442 (1971). But the present system could preclude or severely hamper access to funds before a given election by a group or an individual who might, at the time of the election, reflect the views of a major segment or even a majority of the electorate. The fact that there have been few drastic realignments in our basic two-party structure in 200 years is no constitutional justification for freezing the status quo of the present major parties at the expense of such future political movements. Cf. discussion, ante, at 73. When and if some minority party achieves majority status, Congress can readily deal with any problems that arise. In short, I see grave risks in legislation, enacted by incumbents of the major political parties, which distinctly disadvantages minor parties or independent candidates. This Court has, until today, been particularly cautious when dealing with enactments that tend to perpetuate those who control legislative power. See Reynolds v. Sims, 377 U. S. 533, 570 (1964).
I would also find unconstitutional the system of *252 matching grants which makes a candidate's ability to amass private funds the sole criterion for eligibility for public funds. Such an arrangement can put at serious disadvantage a candidate with a potentially large, widely diffusedbut poorconstituency. The ability of a candidate's supporters to help pay for his campaign cannot be equated with their willingness to cast a ballot for him. See Lubin v. Panish, 415 U. S. 709 (1974); Bullock v. Carter, 405 U. S. 134 (1972).

(4)
I cannot join in the attempt to determine which parts of the Act can survive review here. The statute as it now stands is unworkable and inequitable.
I agree with the Court's holding that the Act's restrictions on expenditures made "relative to a clearly identified candidate," independent of any candidate or his committee, are unconstitutional. Ante, at 39-51. Paradoxically the Court upholds the limitations on individual contributions, which embrace precisely the same sort of expenditures "relative to a clearly identified candidate" if those expenditures are "authorized or requested" by the "candidate or his agents." Ante, at 24 n. 25. The Act as cut back by the Court thus places intolerable pressure on the distinction between "authorized" and "unauthorized" expenditures on behalf of a candidate; even those with the most sanguine hopes for the Act might well concede that the distinction cannot be maintained. As the Senate Report on the bill said:
"Whether campaigns are funded privately or publicly. . . controls are imperative if Congress is to enact meaningful limits on direct contributions. Otherwise, wealthy individuals limited to a $3,000 direct contribution [$1,000 in the bill as finally enacted] could also purchase one hundred thousand *253 dollars' worth of advertisements for a favored candidate. Such a loophole would render direct contribution limits virtually meaningless." S. Rep. No. 93-689, p. 18 (1974).
Given the unfortunate record of past attempts to draw distinctions of this kind, see ante, at 61-62, it is not too much to predict that the Court's holding will invite avoidance, if not evasion, of the intent of the Act, with "independent" committees undertaking "unauthorized" activities in order to escape the limits on contributions. The Court's effort to blend First Amendment principles and practical politics has produced a strange offspring.
Moreover, the Actor so much as the Court leaves standingcreates significant inequities. A candidate with substantial personal resources is now given by the Court a clear advantage over his less affluent opponents, who are constrained by law in fundraising, because the Court holds that the "First Amendment cannot tolerate" any restrictions on spending. Ante, at 59. Minority parties, whose situation is difficult enough under an Act that excludes them from public funding, are prevented from accepting large single-donor contributions. At the same time the Court sustains the provision aimed at broadening the base of political support by requiring candidates to seek a greater number of small contributors, it sustains the unrealistic disclosure thresholds of $10 and $100 that I believe will deter those hoped-for small contributions. Minor parties must now compete for votes against two major parties whose expenditures will be vast. Finally, the Act's distinction between contributions in money and contributions in services remains, with only the former being subject to any limits. As Judge Tamm put it in dissent from the Court of Appeals' opinion:
"[T]he classification created only regulates certain *254 types of disproportional influences. Under section 591 (e) (5), services are excluded from contributions. This allows the housewife to volunteer time that might cost well over $1000 to hire on the open market, while limiting her neighbor who works full-time to a regulated contribution. It enhances the disproportional influence of groups who command large quantities of these volunteer services and will continue to magnify this inequity by not allowing for an inflation adjustment to the contribution limit. It leads to the absurd result that a lawyer's contribution of services to aid a candidate in complying with FECA is exempt, but his first amendment activity is regulated if he falls ill and hires a replacement." 171 U. S. App. D. C. 172, 266, 519 F. 2d 821, 915 (1975).
One need not call problems of this order equal protection violations to recognize that the contribution limitations of the Act create grave inequities that are aggravated by the Court's interpretation of the Act.
The Court's piecemeal approach fails to give adequate consideration to the integrated nature of this legislation. A serious question is raised, which the Court does not consider:[20] when central segments, key operative provisions, of this Act are stricken, can what remains function in anything like the way Congress intended? The incongruities are obvious. The Commission is now eliminated, yet its very purpose was to guide candidates and campaign workersand their accountants and lawyers through an intricate statutory maze where a misstep can lead to imprisonment. All candidates can now spend freely; affluent candidates, after today, can spend their own money without limit; yet, contributions for the ordinary *255 candidate are severely restricted in amountand small contributors are deterred. I cannot believe that Congress would have enacted a statutory scheme containing such incongruous and inequitable provisions.
Although the statute contains a severability clause, 2 U. S. C. § 454 (1970 ed., Supp. IV), such a clause is not an "inexorable command."[21]Dorchy v. Kansas, 264 U. S. 286, 290 (1924). The clause creates a rebuttable presumption that " `eliminating invalid parts, the legislature would have been satisfied with what remained.' " Welsh v. United States, 398 U. S. 333, 364 (1970) (Harlan, J., concurring, quoting from Champlin Rfg. Co. v. Commission, 286 U. S. 210, 235 (1932)). Here just as the presumption of constitutionality of a statute has been overcome to the point that major proportions and chapters of the Act have been declared unconstitutional, for me the presumption of severability has been rebutted. To invoke a severability clause to salvage parts of a comprehensive, integrated statutory scheme, which parts, standing alone, are unworkable and in many aspects unfair, exalts a formula at the expense of the broad objectives of Congress.
Finally, I agree with the Court that the members of the Federal Election Commission were unconstitutionally appointed. However, I disagree that we should give blanket de facto validation to all actions of the Commission undertaken until today. The issue is not before us and we cannot know what acts we are ratifying. I would leave this issue to the District Court to resolve if and when any challenges are brought.
In the past two decades the Court has frequently *256 spoken of the broad coverage of the First Amendment, especially in the area of political dialogue:
"[T]o assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," Roth v. United States, 354 U. S. 476, 484 (1957);
and:
"[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs . . . [including] discussions of candidates . . . ," Mills v. Alabama, 384 U. S. 214, 218 (1966);
and again:
"[I]t can hardly be doubted that the constitutional guarantee [of the First Amendment] has its fullest and most urgent application precisely to the conduct of campaigns for political office." Monitor Patriot Co. v. Roy, 401 U. S. 265, 272 (1971).
To accept this generalization one need not agree that the Amendment has its "fullest and most urgent application" only in the political area, for others would think religious freedom is on the same or even a higher plane. But I doubt that the Court would tolerate for an instant a limitation on contributions to a church or other religious cause; however grave an "evil" Congress thought the limits would cure, limits on religious expenditures would most certainly fall as well. To limit either contributions or expenditures as to churches would plainly restrict "the free exercise" of religion. In my view Congress can no more ration political expression than it can ration religious expression; and limits on political or religious contributions and expenditures effectively curb expression in both areas. There are many prices we pay for the freedoms secured by the First Amendment; the risk of undue *257 influence is one of them, confirming what we have long known: Freedom is hazardous, but some restraints are worse.
MR. JUSTICE WHITE, concurring in part and dissenting in part.
I concur in the Court's answers to certified questions 1, 2, 3 (b), 3 (c), 3 (e), 3 (f), 3 (h), 5, 6, 7 (a), 7 (b), 7 (c), 7 (d), 8 (a), 8 (b), 8 (c), 8 (d), 8 (e), and 8 (f). I dissent from the answers to certified questions 3 (a), 3 (d), and 4 (a). I also join in Part III of the Court's opinion and in much of Parts I-B, II, and IV.

I
It is accepted that Congress has power under the Constitution to regulate the election of federal officers, including the President and the Vice President. This includes the authority to protect the elective processes against the "two great natural and historical enemies of all republics, open violence and insidious corruption," Ex parte Yarbrough, 110 U. S. 651, 658 (1884); for "[i]f this government is anything more than a mere aggregation of delegated agents of other States and governments, each of which is superior to the general government, it must have the power to protect the elections on which its existence depends from violence and corruption," the latter being the consequence of "the free use of money in elections, arising from the vast growth of recent wealth . . . ." Id., at 657-658, 667.
This teaching from the last century was quoted at length and reinforced in Burroughs v. United States, 290 U. S. 534, 546-548 (1934). In that case the Court sustained the Federal Corrupt Practices Act of 1925, Title III of the Act of Feb. 28, 1925, 43 Stat. 1070, which, among other things, required political committees to keep *258 records and file reports concerning all contributions and expenditures received and made by political committees for the purposes of influencing the election of candidates for federal office. The Court noted the conclusion of Congress that public disclosure of contributions would tend to prevent the corrupt use of money to influence elections; this, together with the requirement "that the treasurer's statement shall include full particulars in respect of expenditures," made it "plain that the statute as a whole is calculated to discourage the making and use of contributions for purposes of corruption." 290 U. S., at 548. Congress clearly had the power to further as it did that fundamental goal:
"The power of Congress to protect the election of President and Vice President from corruption being clear, the choice of means to that end presents a question primarily addressed to the judgment of Congress. If it can be seen that the means adopted are really calculated to attain the end, the degree of their necessity, the extent to which they conduce to the end, the closeness of the relationship between the means adopted and the end to be attained, are matters for congressional determination alone." Id., at 547-548.
Pursuant to this undoubted power of Congress to vindicate the strong public interest in controlling corruption and other undesirable uses of money in connection with election campaigns, the Federal Election Campaign Act substantially broadened the reporting and disclosure requirements that so long have been a part of the federal law. Congress also concluded that limitations on contributions and expenditures were essential if the aims of the Act were to be achieved fully. In another major innovation, aimed at insulating candidates from the time-consuming and entangling task of raising huge sums of *259 money, provision was made for public financing of political campaigns for federal office. A Federal Election Commission (FEC) was also created to administer the law.
The disclosure requirements and the limitations on contributions and expenditures are challenged as invalid abridgments of the right of free speech protected by the First Amendment. I would reject these challenges. I agree with the Court's conclusion and much of its opinion with respect to sustaining the disclosure provisions. I am also in agreement with the Court's judgment upholding the limitations on contributions. I dissent, however, from the Court's view that the expenditure limitations of 18 U. S. C. §§ 608 (c) and (e) (1970 ed., Supp. IV) violate the First Amendment.
Concededly, neither the limitations on contributions nor those on expenditures directly or indirectly purport to control the content of political speech by candidates or by their supporters or detractors. What the Act regulates is giving and spending money, acts that have First Amendment significance not because they are themselves communicative with respect to the qualifications of the candidate, but because money may be used to defray the expenses of speaking or otherwise communicating about the merits or demerits of federal candidates for election. The act of giving money to political candidates, however, may have illegal or other undesirable consequences: it may be used to secure the express or tacit understanding that the giver will enjoy political favor if the candidate is elected. Both Congress and this Court's cases have recognized this as a mortal danger against which effective preventive and curative steps must be taken.
Since the contribution and expenditure limitations are neutral as to the content of speech and are not motivated by fear of the consequences of the political speech *260 of particular candidates or of political speech in general, this case depends on whether the nonspeech interests of the Federal Government in regulating the use of money in political campaigns are sufficiently urgent to justify the incidental effects that the limitations visit upon the First Amendment interests of candidates and their supporters.
Despite its seeming struggle with the standard by which to judge this case, this is essentially the question the Court asks and answers in the affirmative with respect to the limitations on contributions which individuals and political committees are permitted to make to federal candidates. In the interest of preventing undue influence that large contributors would have or that the public might think they would have, the Court upholds the provision that an individual may not give to a candidate, or spend on his behalf if requested or authorized by the candidate to do so, more than $1,000 in any one election. This limitation is valid although it imposes a low ceiling on what individuals may deem to be their most effective means of supporting or speaking on behalf of the candidatei. e., financial support given directly to the candidate. The Court thus accepts the congressional judgment that the evils of unlimited contributions are sufficiently threatening to warrant restriction regardless of the impact of the limits on the contributor's opportunity for effective speech and in turn on the total volume of the candidate's political communications by reason of his inability to accept large sums from those willing to give.
The congressional judgment, which I would also accept, was that other steps must be taken to counter the corrosive effects of money in federal election campaigns. One of these steps is § 608 (e), which, aside from those funds that are given to the candidate or spent at his *261 request or with his approval or cooperation, limits what a contributor may independently spend in support or denigration of one running for federal office. Congress was plainly of the view that these expenditures also have corruptive potential; but the Court strikes down the provision, strangely enough claiming more insight as to what may improperly influence candidates than is possessed by the majority of Congress that passed this bill and the President who signed it. Those supporting the bill undeniably included many seasoned professionals who have been deeply involved in elective processes and who have viewed them at close range over many years.
It would make little sense to me, and apparently made none to Congress, to limit the amounts an individual may give to a candidate or spend with his approval but fail to limit the amounts that could be spent on his behalf. Yet the Court permits the former while striking down the latter limitation. No more than $1,000 may be given to a candidate or spent at his request or with his approval or cooperation; but otherwise, apparently, a contributor is to be constitutionally protected in spending unlimited amounts of money in support of his chosen candidate or candidates.
Let us suppose that each of two brothers spends $1 million on TV spot announcements that he has individually prepared and in which he appears, urging the election of the same named candidate in identical words. One brother has sought and obtained the approval of the candidate; the other has not. The former may validly be prosecuted under § 608 (e); under the Court's view, the latter may not, even though the candidate could scarcely help knowing about and appreciating the expensive favor. For constitutional purposes it is difficult to see the difference between the two situations. I would take the word of those who knowthat limiting *262 independent expenditures is essential to prevent transparent and widespread evasion of the contribution limits.
In sustaining the contribution limits, the Court recognizes the importance of avoiding public misapprehension about a candidate's reliance on large contributions. It ignores that consideration in invalidating § 608 (e). In like fashion, it says that Congress was entitled to determine that the criminal provisions against bribery and corruption, together with the disclosure provisions, would not in themselves be adequate to combat the evil and that limits on contributions should be provided. Here, the Court rejects the identical kind of judgment made by Congress as to the need for and utility of expenditure limits. I would not do so.
The Court also rejects Congress' judgment manifested in § 608 (c) that the federal interest in limiting total campaign expenditures by individual candidates justifies the incidental effect on their opportunity for effective political speech. I disagree both with the Court's assessment of the impact on speech and with its narrow view of the values the limitations will serve.
Proceeding from the maxim that "money talks," the Court finds that the expenditure limitations will seriously curtail political expression by candidates and interfere substantially with their chances for election. The Court concludes that the Constitution denies Congress the power to limit campaign expenses; federal candidates and I would suppose state candidates, tooare to have the constitutional right to raise and spend unlimited amounts of money in quest of their own election.
As an initial matter, the argument that money is speech and that limiting the flow of money to the speaker violates the First Amendment proves entirely too much. Compulsory bargaining and the right to strike, both provided for or protected by federal law, inevitably have *263 increased the labor costs of those who publish newspapers, which are in turn an important factor in the recent disappearance of many daily papers. Federal and state taxation directly removes from company coffers large amounts of money that might be spent on larger and better newspapers. The antitrust laws are aimed at preventing monopoly profits and price fixing, which gouge the consumer. It is also true that general price controls have from time to time existed and have been applied to the newspapers or other media. But it has not been suggested, nor could it be successfully, that these laws, and many others, are invalid because they siphon off or prevent the accumulation of large sums that would otherwise be available for communicative activities.
In any event, as it should be unnecessary to point out, money is not always equivalent to or used for speech, even in the context of political campaigns. I accept the reality that communicating with potential voters is the heart of an election campaign and that widespread communication has become very expensive. There are, however, many expensive campaign activities that are not themselves communicative or remotely related to speech. Furthermore, campaigns differ among themselves. Some seem to spend much less money than others and yet communicate as much as or more than those supported by enormous bureaucracies with unlimited financing. The record before us no more supports the conclusion that the communicative efforts of congressional and Presidential candidates will be crippled by the expenditure limitations than it supports the contrary. The judgment of Congress was that reasonably effective campaigns could be conducted within the limits established by the Act and that the communicative efforts of these campaigns would not seriously suffer. In this posture *264 of the case, there is no sound basis for invalidating the expenditure limitations, so long as the purposes they serve are legitimate and sufficiently substantial, which in my view they are.
In the first place, expenditure ceilings reinforce the contribution limits and help eradicate the hazard of corruption. The Court upholds the overall limit of $25,000 on an individual's political contributions in a single election year on the ground that it helps reinforce the limits on gifts to a single candidate. By the same token, the expenditure limit imposed on candidates plays its own role in lessening the chance that the contribution ceiling will be violated. Without limits on total expenditures, campaign costs will inevitably and endlessly escalate. Pressure to raise funds will constantly build and with it the temptation to resort in "emergencies" to those sources of large sums, who, history shows, are sufficiently confident of not being caught to risk flouting contribution limits. Congress would save the candidate from this predicament by establishing a reasonable ceiling on all candidates. This is a major consideration in favor of the limitation. It should be added that many successful candidates will also be saved from large, overhanging campaign debts which must be paid off with money raised while holding public office and at a time when they are already preparing or thinking about the next campaign. The danger to the public interest in such situations is self-evident.
Besides backing up the contribution provisions, which are aimed at preventing untoward influence on candidates that are elected, expenditure limits have their own potential for preventing the corruption of federal elections themselves. For many years the law has required the disclosure of expenditures as well as contributions. As Burroughs indicates, the corrupt use of money by candidates *265 is as much to be feared as the corrosive influence of large contributions. There are many illegal ways of spending money to influence elections. One would be blind to history to deny that unlimited money tempts people to spend it on whatever money can buy to influence an election. On the assumption that financing illegal activities is low on the campaign organization's priority list, the expenditure limits could play a substantial role in preventing unethical practices. There just would not be enough of "that kind of money" to go around.
I have little doubt in addition that limiting the total that can be spent will ease the candidate's understandable obsession with fundraising, and so free him and his staff to communicate in more places and ways unconnected with the fundraising function. There is nothing objectionableindeed it seems to me a weighty interest in favor of the provisionin the attempt to insulate the political expression of federal candidates from the influence inevitably exerted by the endless job of raising increasingly large sums of money. I regret that the Court has returned them all to the treadmill.
It is also important to restore and maintain public confidence in federal elections. It is critical to obviate or dispel the impression that federal elections are purely and simply a function of money, that federal offices are bought and sold or that political races are reserved for those who have the facilityand the stomachfor doing whatever it takes to bring together those interests, groups, and individuals that can raise or contribute large fortunes in order to prevail at the polls.
The ceiling on candidate expenditures represents the considered judgment of Congress that elections are to be decided among candidates none of whom has overpowering advantage by reason of a huge campaign war chest. At least so long as the ceiling placed upon the candidates *266 is not plainly too low, elections are not to turn on the difference in the amounts of money that candidates have to spend. This seems an acceptable purpose and the means chosen a commonsense way to achieve it. The Court nevertheless holds that a candidate has a constitutional right to spend unlimited amounts of money, mostly that of other people, in order to be elected. The holding perhaps is not that federal candidates have the constitutional right to purchase their election, but many will so interpret the Court's conclusion in this case. I cannot join the Court in this respect.
I also disagree with the Court's judgment that § 608 (a), which limits the amount of money that a candidate or his family may spend on his campaign, violates the Constitution. Although it is true that this provision does not promote any interest in preventing the corruption of candidates, the provision does, nevertheless, serve salutary purposes related to the integrity of federal campaigns. By limiting the importance of personal wealth, § 608 (a) helps to assure that only individuals with a modicum of support from others will be viable candidates. This in turn would tend to discourage any notion that the outcome of elections is primarily a function of money. Similarly, § 608 (a) tends to equalize access to the political arena, encouraging the less wealthy, unable to bankroll their own campaigns, to run for political office.
As with the campaign expenditure limits, Congress was entitled to determine that personal wealth ought to play a less important role in political campaigns than it has in the past. Nothing in the First Amendment stands in the way of that determination.
For these reasons I respectfully dissent from the Court's answers to certified questions 3 (a), 3 (d), and 4 (a).

*267 II
I join the answers in Part IV of the Court's opinion, ante, at 141-142, n. 177, to the questions certified by the District Court relating to the composition and powers of the FEC, i. e., questions 8 (a), 8 (b), 8 (c), 8 (d) (with the qualifications stated infra, at 282-286), 8 (e), and 8 (f). I also agree with much of that part of the Court's opinion, including the conclusions that these questions are properly before us and ripe for decision, that the FEC's past acts are de facto valid, that the Court's judgment should be stayed, and that the FEC may function de facto while the stay is in effect.
The answers to the questions turn on whether the FEC is illegally constituted because its members were not selected in the manner required by Art. II, § 2, cl. 2, the Appointments Clause. It is my view that with one exception Congress could endow a properly constituted commission with the powers and duties it has given the FEC.[1]
Section 437c creates an eight-member FEC. Two members, the Secretary of the Senate and the Clerk of the House of Representatives, are ex officio members *268 without the right to vote or to hold an FEC office.[2] Of the remaining six, two are appointed by the President pro tempore of the Senate upon the recommendation of the majority and minority leaders of that body; two are similarly appointed by the Speaker of the House; and two are appointed by the President of the United States. The appointment of each of these six members is subject to confirmation by a majority of both Houses of Congress. § 437c (a) (1). Each member is appointed for a term of years; none can be an elected or appointed officer or employee of any branch of the Government at the time of his appointment. §§ 437c (a) (2), (3). The FEC is empowered to elect its own officers, § 437c (a) (5), and to appoint a staff director and general counsel. § 437c (f). Decisions are by a majority vote. § 437c (c).
It is apparent that none of the members of the FEC is selected in a manner Art. II specifies for the appointment of officers of the United States. The Appointments Clause provides:
"[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."[3]
Although two of the members of the FEC are initially selected by the President, his nominations are subject to confirmation by both Houses of Congress. Neither *269 he, the head of any department, nor the Judiciary has any voice in the selection of the remaining members of the FEC. The challenge to the FEC, therefore, is that its members are officers of the United States the mode of whose appointment was required to, but did not, conform to the Appointments Clause. That challenge is well taken.
The Appointments Clause applies only to officers of the United States whose appointment is not "otherwise provided for" in the Constitution. Senators and Congressmen are officers of the United States, but the Constitution expressly provides the mode of their selection.[4] The Constitution also expressly provides that each House of Congress is to appoint its own officers.[5] But it is not contended here that FEC members are officers of either House selected pursuant to these express provisions, if for no other reason, perhaps, than that none of the Commissioners was selected in the manner specified by these provisionsnone of them was finally selected by either House acting alone as Art. I authorizes.
The appointment power provided in Art. II also applies only to officers, as distinguished from employees,[6] of the United States, but there is no claim the Commissioners are employees of the United States rather than officers. That the Commissioners are among those officers of the United States referred to in the Appointments Clause of Art. II is evident from the breadth of their *270 assigned duties and the nature and importance of their assigned functions.
The functions and duties of the FEC relate to three different aspects of the election laws: First, the provisions of the Criminal Code, 18 U. S. C. §§ 608-617 (1970 ed., Supp. IV), which establish major substantive limitations on political contributions and expenditures by individuals, political organizations, and candidates; second, the reporting and disclosure provisions contained in 2 U. S. C. §§ 431-437b (1970 ed., Supp. IV), these sections requiring the filing of detailed reports of political contributions and expenditures; and third, the provisions of 26 U. S. C. §§ 9001-9042 (1970 ed., Supp. IV) with respect to the public financing of Presidential primary and general election campaigns. From the "representative examples of [the FEC's] various powers" the Court describes, ante, at 109-113, it is plain that the FEC is the primary agency for the enforcement and administration of major parts of the election laws. It does not replace or control the executive agencies with respect to criminal prosecutions, but within the wide zone of its authority the FEC is independent of executive as well as congressional control except insofar as certain of its regulations must be laid before and not be disapproved by Congress. § 438 (c); 26 U. S. C. §§ 9009 (c), 9039 (c) (1970 ed., Supp. IV). With duties and functions such as these, members of the FEC are plainly "officers of the United States" as that term is used in Art. II, § 2, cl. 2.
It is thus not surprising that the FEC, in defending the legality of its members' appointments, does not deny that they are "officers of the United States" as that term is used in the Appointments Clause of Art. II.[7] Instead, *271 for reasons the Court outlines, ante, at 131-132, 133-134, its position appears to be that even if its members are officers of the United States, Congress may nevertheless appoint a majority of the FEC without participation by the President.[8] This position that Congress may itself appoint the members of a body that is to administer a wide-ranging statute will not withstand examination in light of either the purpose and history of the Appointments Clause or of prior cases in this Court.
The language of the Appointments Clause was not mere inadvertence. The matter of the appointment of officers of the new Federal Government was repeatedly debated by the Framers, and the final formulation of the Clause arrived at only after the most careful debate and consideration of its place in the overall design of government. The appointment power was a major building block fitted into the constitutional structure designed to avoid the accumulation or exercise of arbitrary power by the Federal Government. The basic approach was that official power should be divided among the Executive, Legislative, and Judicial Departments. The separation-of-powers principle was implemented by a series of provisions, among which was the knowing decision that Congress was to have no power whatsoever to appoint federal officers, except for the power of each House to appoint its own officers serving in the strictly legislative *272 processes and for the confirming power of the Senate alone.
The decision to give the President the exclusive power to initiate appointments was thoughtful and deliberate. The Framers were attempting to structure three departments of government so that each would have affirmative powers strong enough to resist the encroachment of the others. A fundamental tenet was that the same persons should not both legislate and administer the laws.[9] From the very outset, provision was made to prohibit members of Congress from holding office in another branch of the Government while also serving in Congress. There was little if any dispute about this incompatibility provision which survived in Art. I, § 6, of the Constitution as finally ratified.[10] Today, no person may serve in Congress and at the same time be Attorney General, Secretary of State, a member of the judiciary, a United States attorney, or a member of the Federal Trade Commission or the National Labor Relations Board.
Early in the 1787 Convention it was also proposed that members of Congress be absolutely ineligible during the term for which they were elected, and for a period thereafter, for appointment to any state or federal office.[11] But to meet substantial opposition to so stringent a provision, ineligibility for state office was first eliminated,[12] and under the language ultimately adopted, Congressmen *273 were disqualified from being appointed only to those offices which were created, or for which the emoluments were increased, during their term of office.[13] Offices not in this category could be filled by Representatives or Senators, but only upon resignation.
Immediately upon settling the ineligibility provision, the Framers returned to the appointment power which they had several times before debated and postponed for later consideration.[14] From the outset, there had been no dispute that the Executive alone should appoint, and not merely nominate, purely executive officers,[15] but at one stage judicial officers were to be selected by the entire Congress.[16] This provision was subsequently changed to lodge the power to choose judges in the Senate,[17] which was later also given the power to appoint ambassadors and other public ministers.[18] But following resolution of the dispute over the ineligibility provision, which served both to prevent members of Congress from appointing themselves to federal office and to limit their being appointed to federal office, it was determined that the appointment of all principal officers, whether executive or not, should originate with the President and that the Senate should have only the power of advice and consent.[19] Inferior officers *274 could be otherwise appointed, but not by Congress itself.[20] This allocation of the appointment power, in which for the first time the Executive had the power to initiate appointment to all principal offices and the Senate was empowered to advise and consent to nominations by the Executive,[21] was made possible by adoption of the ineligibility provisions and was formulated as part of the fundamental compromises with respect to the composition of the Senate, the respective roles of the House and Senate, and the placement of the election of the President in the electoral college.
Under Art. II as finally adopted, law enforcement authority was not to be lodged in elected legislative officials subject to political pressures. Neither was the Legislative Branch to have the power to appoint those who were to enforce and administer the law. Also, the appointment power denied Congress and vested in the President was not limited to purely executive officers but reached officers performing purely judicial functions as well as all other officers of the United States.
I thus find singularly unpersuasive the proposition that because the FEC is implementing statutory policies with respect to the conduct of elections, which policies Congress has the power to propound, its members may be appointed by Congress. One might as well argue that the exclusive and plenary power of Congress over interstate commerce authorizes Congress to appoint the members of the Interstate Commerce Commission and of many other regulatory commissions; that its exclusive power to provide for patents and copyrights would permit the administration of the patent laws to be carried out by a congressional committee; or that the exclusive power of the Federal Government to establish post offices authorizes *275 Congress itself or the Speaker of the House and the President pro tempore of the Senate to appoint postmasters and to enforce the postal laws.
Congress clearly has the power to create federal offices and to define the powers and duties of those offices, Myers v. United States, 272 U. S. 52, 128-129 (1926), but no case in this Court even remotely supports the power of Congress to appoint an officer of the United States aside from those officers each House is authorized by Art. I to appoint to assist in the legislative processes.
In Myers, a postmaster of the first class was removed by the President prior to the expiration of his statutory four-year term. Challenging the President's power to remove him contrary to the statute, he sued for his salary. The challenge was rejected here. The Court said that under the Constitution the power to appoint the principal officers of the Executive Branch was an inherent power of the President:
"[T]he reasonable implication, even in the absence of express words, was that as part of his executive power [the President] should select those who were to act for him under his direction in the execution of the laws." Id., at 117.
Further, absent express limitation in the Constitution, the President was to have unrestricted power to remove those administrative officers essential to him in discharging his duties. These fundamental rules were to extend to those bureau and department officers with power to issue regulations and to discharge duties of a quasi-judicial naturethose members of "executive tribunal whose decisions after hearing affect interests of individuals." Id., at 135. As for inferior officers such as the plaintiff postmaster, the same principles were to govern if Congress chose to place the appointment in the President with the advice and consent of the Senate, as *276 was the case in Myers. Under the Appointments Clause, Congress couldbut did not in the Myers casepermit the appointment of inferior officers by the heads of departments, in which event, the Court said, Congress would have the authority to establish a term of office and limit the reasons for their removal. But in no circumstance could Congress participate in the removal:
"[T]he Court never has held, nor reasonably could hold, although it is argued to the contrary on behalf of the appellant, that the excepting clause enables Congress to draw to itself, or to either branch of it, the power to remove or the right to participate in the exercise of that power. To do this would be to go beyond the words and implications of that clause and to infringe the constitutional principle of the separation of governmental powers." Id., at 161.
Humphrey's Executor v. United States, 295 U. S. 602 (1935), limited the reach of the Myers case. There the President attempted to remove a member of the Federal Trade Commission prior to the expiration of his statutory term and for reasons not specified in the statute. The Court ruled that the Presidential removal power vindicated in Myers related solely to "purely executive officers," 295 U. S., at 628, from whom the Court sharply distinguished officers such as the members of the Federal Trade Commission who were to be free from political dominance and control, whose duties are "neither political nor executive, but predominantly quasi-judicial and quasi-legislative." Id., at 624. Contrary to the dicta in Myers, such an officer was thought to occupy "no place in the executive department," to exercise "no part of the executive power vested by the Constitution in the President," 295 U. S., at 628, and to be immune from removal by the President except on terms specified by Congress. The Commissioners were described as being *277 in part an administrative body carrying out legislative policies and in part an agency of the Judiciary, ibid.; such a body was intended to be "independent of executive authority, except in its selection, and free to exercise its judgment without the leave or hindrance of any other official or any department of the government." Id., at 625-626. (Emphasis in original.)
The holding in Humphrey's Executor was confirmed in Wiener v. United States, 357 U. S. 349 (1958), but the Court did not question what Humphrey's Executor had expressly recognizedthat members of independent agencies are not independent of the Executive with respect to their appointments. Nor did either Wiener or Humphrey's Executor suggest that Congress could not only create the independent agency, specify its duties, and control the grounds for removal of its members but could also itself appoint or remove them without the participation of the Executive Branch of the Government. To have so held would have been contrary to the Appointments Clause as the Myers case recognized.
It is said that historically Congress has used its own officers to receive and file the reports of campaign expenditures and contributions as required by law and that this Court should not interfere with this practice. But the Act before us creates a separate and independent campaign commission with members, some nominated by the President, who have specified terms of office, are not subject to removal by Congress, and are free from congressional control in their day-to-day functions. The FEC, it is true, is the designated authority with which candidates and political committees must file reports of contributions and expenditures, as required by the Act. But the FEC may also make rules and regulations with respect to the disclosure requirements, may investigate reported violations, issue subpoenas, hold its own hearings *278 and institute civil enforcement proceedings in its own name. Absent a request by the FEC, it would appear that the Attorney General has no role in the civil enforcement of the reporting and disclosure requirements. The FEC may also issue advisory opinions with respect to the legality of any particular activities so as to protect those persons who in good faith have conducted themselves in reliance on the FEC's opinion. These functions go far beyond mere information gathering, and there is no long history of lodging such enforcement powers in congressional appointees.
Nor do the FEC's functions stop with policing the reporting and disclosure requirements of the Act. The FEC is given express power to administer, obtain compliance with, and "to formulate general policy"[22] with respect to 18 U. S. C. §§ 608-617, so much so that the Act expressly provides that "[t]he Commission has primary jurisdiction with respect to the civil enforcement of such provisions."[23] Following its own proceedings the FEC may request the Attorney General to bring civil enforcement proceedings, a request which the Attorney General must honor.[24] And good-faith conduct taken in accordance *279 with the FEC's advisory opinions as to whether any transaction or activity would violate any of these criminal provisions "shall be presumed to be in compliance with" these sections.[25] § 437f (b). Finally, the FEC has the central role in administering and enforcing the provisions *280 of Title 26 contemplating the public financing of political campaigns.[26]
It is apparent that the FEC is charged with the enforcement of the election laws in major respects. Indeed, except for the conduct of criminal proceedings, it would appear that the FEC has the entire responsibility for enforcement of the statutes at issue here. By no stretch of the imagination can its various functions in this respect be considered mere adjuncts to the legislative process or to the powers of Congress to judge the election and qualifications of its own members.
It is suggested, without accounting for the President's role in appointing some of its members, that the FEC would be willing to forgo its civil enforcement powers and that absent these functions, it is left with nothing that purely legislative officers may not do. The difficulty is that the statute invests the FEC not only with the authority but with the duties that unquestionably make its members officers of the United States, fully as much as the members of other commissions charged with the major responsibility for administering statutes. What is more, merely forgoing its authority to bring suit would still leave the FEC with the power to issue rules and regulations, its advisory opinion authority, and primary duties to enforce the Act. Absent notice and hearing by the FEC and a request on its part, it would not appear that the Executive Branch of the Government would have any authority under the statute to institute civil enforcement proceedings with respect to the reporting and disclosure requirements or the relevant provisions of Titles 18 and 26.
There is no doubt that the development of the administrative *281 agency in response to modern legislative and administrative need has placed severe strain on the separation-of-powers principle in its pristine formulation. See Kilbourn v. Thompson, 103 U. S. 168, 191 (1881). Any notion that the Constitution bans any admixture of powers that might be deemed legislative, executive, and judicial has had to give way. The independent agency has survived attacks from various directions: that it exercises invalidly delegated legislative power, Sunshine Coal Co. v. Adkins, 310 U. S. 381 (1940); that it invalidly exercises judicial power, ibid.; and that its functions are so executive in nature that its members must be subject to Presidential control, Humphrey's Executor v. United States, 295 U. S. 602 (1935). Until now, however, it has not been insisted that the commands of the Appointments Clause must also yield to permit congressional appointments of members of a major agency. With the Court, I am not convinced that we should create a broad exception to the requirements of that Clause that all officers of the United States be appointed in accordance with its terms. The provision applies to all officers, however their duties may be classified; and even if some of the FEC's functions, such as rulemaking, are purely legislative, I know of no authority for the congressional appointment of its own agents to make binding rules and regulations necessary to or advisable for the administration and enforcement of a major statute where the President has not participated either in the appointment of each of the administrators or in the fashioning of the rules or regulations which they propound.
I do not dispute the legislative power of Congress coercively to gather and make available for public inspection massive amounts of information relevant to the legislative process. Its own officers may, as they have *282 done for years, receive and file contribution and expenditure reports of candidates and political committees. Arguably, the Commissioners, although not properly appointed by the President, should at least be able to perform this function. But the members of the FEC are appointed for definite terms of office, are not removable by the President or by Congress, and even if their duties were to be severely limited, they would appear to remain Art. II officers. In any event, the task of gathering and publishing campaign finance information has been one of the specialties of the officers of the respective Houses, and these same officers under the present law continue to receive such information and to act as custodians for the FEC, at least with respect to the Senate and House political campaigns. They are also instructed to cooperate with the FEC. § 438 (d).
For these reasons I join in the Court's answers to certified questions 8 (a), 8 (b), 8 (c), 8 (e) and 8 (f), and with the following reservations to question 8 (d).
Question 8 (d) asks whether § 438 (c) violates the constitutional rights of one or more of the plaintiffs in that "it empowers the Federal Election Commission to make rules under the F. E. C. A. in the manner specified therein." Section 438 (c) imposes certain preconditions to the effectiveness of "any rule or regulation under this section . . . ," but does not itself authorize the issuance of rules or regulations. That authorization is to be found in § 438 (a) (10), which includes among the duties of the FEC the task of prescribing "rules and regulations to carry out the provisions of this subchapter, in accordance with the provisions of subsection (c)." The "subchapter" referred to is the subchapter dealing with federal election campaigns and the reports of contributions and expenditures required to be filed with the FEC.[27] Subsection *283 (c), which is the provision expressly mentioned in question 8 (d), requires that any rule or regulation prescribed by the FEC under § 438 shall be transmitted to the Senate or the House, or to both as thereafter directed. After 30 legislative days,[28] the rule or regulation will become effective unless (1) either House has disapproved the rule if it relates to reports by Presidential candidates or their supporting committees; (2) the House has disapproved it if it relates to reports to be filed by House candidates or their committees; or (3) the Senate has disapproved it if the rule relates to reports by Senate candidates or their related committees.
By expressly referring to subsection (c), question 8 (d) appears to focus on the disapproval requirement; but the Court's answer is not responsive in these terms. Rather, the Court expressly disclaims holding that the FEC's rules and regulations are invalid because of the requirement that they are subject to disapproval by one or both Houses of Congress. Ante, at 140 n. 176. As I understand it, the FEC's rules and regulations, whether or not issued in compliance with § 438 (c), are invalid because the members of the FEC have not been appointed in accordance with Art. II. To the extent that this is the basis for the Court's answer to the question, I am in agreement.
If the FEC members had been nominated by the President and confirmed by the Senate as provided in Art. II, *284 nothing in the Constitution would prohibit Congress from empowering the Commission to issue rules and regulations without later participation by, or consent of, the President or Congress with respect to any particular rule or regulation or initially to adjudicate questions of fact in accordance with a proper interpretation of the statute. Sunshine Coal Co. v. Adkins, 310 U. S. 381 (1940); RFC v. Bankers Trust Co., 318 U. S. 163 (1943); Humphrey's Executor v. United States, 295 U. S. 602 (1935). The President must sign the statute creating the rulemaking authority of the agency or it must have been passed over his veto, and he must have nominated the members of the agency in accordance with Art. II; but agency regulations issued in accordance with the statute are not subject to his veto even though they may be substantive in character and have the force of law.
I am also of the view that the otherwise valid regulatory power of a properly created independent agency is not rendered constitutionally infirm, as violative of the President's veto power, by a statutory provision subjecting agency regulations to disapproval by either House of Congress. For a bill to become law it must pass both Houses and be signed by the President or be passed over his veto. Also, "Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary . . ." is likewise subject to the veto power.[29] Under § 438 (c) the FEC's regulations are subject to disapproval; but for a regulation to become effective, neither House need approve it, pass it, or take any action at all with respect to it. The regulation becomes effective by nonaction. This no more invades the President's powers than does a regulation not required to be laid before Congress. Congressional influence over the substantive content of agency regulation may be enhanced, *285 but I would not view the power of either House to disapprove as equivalent to legislation or to an order, resolution, or vote requiring the concurrence of both Houses.[30]
In terms of the substantive content of regulations and the degree of congressional influence over agency lawmaking, I do not suggest that there is no difference between the situation where regulations are subject to disapproval by Congress and the situation where the agency need not run the congressional gantlet. But the President's veto power, which gives him an important role in the legislative process, was obviously not considered an inherently executive function. Nor was its principal aim to provide another check against poor legislation. The major purpose of the veto power appears to have been to shore up the Executive Branch and to provide it with some bargaining and survival power against what the Framers feared would be the overweening power of legislators. As Hamilton said the veto power was to provide a defense against the legislative department's intrusion on the rights and powers of other departments; without such power, "the legislative and executive powers might speedily come to be blended in the same hands."[31]
I would be much more concerned if Congress purported to usurp the functions of law enforcement, to control the outcome of particular adjudications, or to pre-empt the President's appointment power; but in the *286 light of history and modern reality, the provision for congressional disapproval of agency regulations does not appear to transgress the constitutional design, at least where the President has agreed to legislation establishing the disapproval procedure or the legislation has been passed over his veto. It would be considerably different if Congress itself purported to adopt and propound regulations by the action of both Houses. But here no action of either House is required for the agency rule to go into effect, and the veto power of the President does not appear to be implicated.
MR. JUSTICE MARSHALL, concurring in part and dissenting in part.
I join in all of the Court's opinion except Part I-C-2, which deals with 18 U. S. C. § 608 (a) (1970 ed., Supp. IV). That section limits the amount a candidate may spend from his personal funds, or family funds under his control, in connection with his campaigns during any calendar year. See ante, at 51-52, n. 57. The Court invalidates § 608 (a) as violative of the candidate's First Amendment rights. "[T]he First Amendment," the Court explains, "simply cannot tolerate § 608 (a)'s restriction upon the freedom of a candidate to speak without legislative limit on behalf of his own candidacy." Ante, at 54. I disagree.
To be sure, § 608 (a) affects the candidate's exercise of his First Amendment rights. But unlike the other expenditure limitations contained in the Act and invalidated by the Courtthe limitation on independent expenditures relative to a clearly identified candidate, § 608 (e), and the limitations on overall candidate expenditures, § 608 (c)the limitations on expenditures by candidates from personal resources contained in § 608 (a) need never prevent the speaker from spending another *287 dollar to communicate his ideas. Section 608 (a) imposes no overall limit on the amount a candidate can spend; it simply limits the "contribution" a candidate may make to his own campaign. The candidate remains free to raise an unlimited amount in contributions from others. So long as the candidate does not contribute to his campaign more than the amount specified in § 608 (a), and so long as he does not accept contributions from others in excess of the limitations imposed by § 608 (b), he is free to spend without limit on behalf of his campaign.
It is significant, moreover, that the ceilings imposed by § 608 (a) on candidate expenditures from personal resources are substantially higher than the $1,000 limit imposed by § 608 (e) on independent expenditures by noncandidates. Presidential and Vice Presidential candidates may contribute $50,000 of their own money to their campaigns, Senate candidates $35,000, and most House candidates $25,000. Those ceilings will not affect most candidates. But they will admittedly limit the availability of personal funds for some candidates, and the question is whether that limitation is justified.
The Court views "[t]he ancillary interest in equalizing the relative financial resources of candidates" as the relevant rationale for § 608 (a), and deems that interest insufficient to justify § 608 (a). Ante, at 54. In my view the interest is more precisely the interest in promoting the reality and appearance of equal access to the political arena. Our ballot-access decisions serve as a reminder of the importance of the general interest in promoting equal access among potential candidates. See, e. g., Lubin v. Panish, 415 U. S. 709 (1974); Bullock v. Carter, 405 U. S. 134 (1972). While admittedly those cases dealt with barriers to entry different from those we consider here, the barriers to which § 608 (a) is directed *288 are formidable ones, and the interest in removing them substantial.
One of the points on which all Members of the Court agree is that money is essential for effective communication in a political campaign. It would appear to follow that the candidate with a substantial personal fortune at his disposal is off to a significant "headstart." Of course, the less wealthy candidate can potentially overcome the disparity in resources through contributions from others. But ability to generate contributions may itself depend upon a showing of a financial base for the campaign or some demonstration of pre-existing support, which in turn is facilitated by expenditures of substantial personal sums. Thus the wealthy candidate's immediate access to a substantial personal fortune may give him an initial advantage that his less wealthy opponent can never overcome. And even if the advantage can be overcome, the perception that personal wealth wins elections may not only discourage potential candidates without significant personal wealth from entering the political arena, but also undermine public confidence in the integrity of the electoral process.[1]
The concern that candidacy for public office not become, or appear to become, the exclusive province of the wealthy assumes heightened significance when one considers the impact of § 608 (b), which the Court today upholds. That provision prohibits contributions from individuals and groups to candidates in excess of $1,000, and contributions from political committees in excess of $5,000. While the limitations on contributions are neutral in the sense that *289 all candidates are foreclosed from accepting large contributions, there can be no question that large contributions generally mean more to the candidate without a substantial personal fortune to spend on his campaign. Large contributions are the less wealthy candidate's only hope of countering the wealthy candidate's immediate access to substantial sums of money. With that option removed, the less wealthy candidate is without the means to match the large initial expenditures of money of which the wealthy candidate is capable. In short, the limitations on contributions put a premium on a candidate's personal wealth.
In view of § 608 (b)'s limitations on contributions, then, § 608 (a) emerges not simply as a device to reduce the natural advantage of the wealthy candidate, but as a provision providing some symmetry to a regulatory scheme that otherwise enhances the natural advantage of the wealthy.[2] Regardless of whether the goal of equalizing access would justify a legislative limit on personal candidate expenditures standing by itself, I think it clear that that goal justifies § 608 (a)'s limits when they are considered in conjunction with the remainder of the *290 Act. I therefore respectfully dissent from the Court's invalidation of § 608 (a).
MR. JUSTICE BLACKMUN, concurring in part and dissenting in part.
I am not persuaded that the Court makes, or indeed is able to make, a principled constitutional distinction between the contribution limitations, on the one hand, and the expenditure limitations, on the other, that are involved here. I therefore do not join Part I-B of the Court's opinion or those portions of Part I-A that are consistent with Part I-B. As to those, I dissent.
I also dissent, accordingly, from the Court's responses to certified questions 3 (b), (c), and (h). I would answer those questions in the affirmative.
I do join the remainder of the Court's opinion and its answers to the other certified questions.
MR. JUSTICE REHNQUIST, concurring in part and dissenting in part.
I concur in Parts I, II, and IV of the Court's opinion. I concur in so much of Part III of the Court's opinion as holds that the public funding of the cost of a Presidential election campaign is a permissible exercise of congressional authority under the power to tax and spend granted by Art. I, but dissent from Part III-B-1 of the Court's opinion, which holds that certain aspects of the statutory treatment of minor parties and independent candidates are constitutionally valid. I state as briefly as possible my reasons for so doing.
The limits imposed by the First and Fourteenth Amendments on governmental action may vary in their stringency depending on the capacity in which the government is acting. The government as proprietor, Adderley v. Florida, 385 U. S. 39 (1966), is, I believe, *291 permitted to affect putatively protected interests in a manner in which it might not do if simply proscribing conduct across the board. Similarly, the government as employer, Pickering v. Board of Education, 391 U. S. 563 (1968), and CSC v. Letter Carriers, 413 U. S. 548 (1973), may prescribe conditions of employment which might be constitutionally unacceptable if enacted into standards of conduct made applicable to the entire citizenry.
For the reasons stated in the dissenting opinion of Mr. Justice Jackson in Beauharnais v. Illinois, 343 U. S. 250, 288-295 (1952), and by Mr. Justice Harlan in his dissenting opinion in Roth v. United States, 354 U. S. 476, 500-503 (1957), I am of the opinion that not all of the strictures which the First Amendment imposes upon Congress are carried over against the States by the Fourteenth Amendment, but rather that it is only the "general principle" of free speech, Gitlow v. New York, 268 U. S. 652, 672 (1925) (Holmes J., dissenting), that the latter incorporates. See Palko v. Connecticut, 302 U. S. 319, 324-325 (1937).
Given this view, cases which deal with state restrictions on First Amendment freedoms are not fungible with those which deal with restrictions imposed by the Federal Government, and cases which deal with the government as employer or proprietor are not fungible with those which deal with the government as a lawmaker enacting criminal statutes applying to the population generally. The statute before us was enacted by Congress, not with the aim of managing the Government's property nor of regulating the conditions of Government employment, but rather with a view to the regulation of the citizenry as a whole. The case for me, then, presents the First Amendment interests of the appellants at their strongest, and the legislative authority of Congress in the position where it is most vulnerable to First Amendment attacks.
*292 While this approach undoubtedly differs from some of the underlying assumptions in the opinion of the Court, opinions are written not to explore abstract propositions of law but to decide concrete cases. I therefore join in all of the Court's opinion except Part III-B-1, which sustains, against appellants' First and Fifth Amendment challenges, the disparities found in the congressional plan for financing general Presidential elections between the two major parties, on the one hand, and minor parties and candidacies on the other.
While I am not sure that I agree with the Court's comment, ante, at 95, that "public financing is generally less restrictive of access to the electoral process than the ballot-access regulations dealt with in prior cases," in any case that is not, under my view, an adequate answer to appellants' claim. The electoral laws relating to ballot access which were examined in Lubin v. Panish, 415 U. S. 709, 716 (1974); American Party of Texas v. White, 415 U. S. 767, 780 (1974); and Storer v. Brown, 415 U. S. 724, 729 730 (1974), all arose out of state efforts to regulate minor party candidacies and the actual physical size of the ballot. If the States are to afford a republican form of government, they must by definition provide for general elections and for some standards as to the contents of the official ballots which will be used at those elections. The decision of the state legislature to enact legislation embodying such regulations is therefore not in any sense an optional one; there must be some standards, however few, which prescribe the contents of the official ballot if the popular will is to be translated into a choice among candidates. Dealing thus by necessity with these issues, the States have strong interests in "limiting places on the ballot to those candidates who demonstrate substantial popular support," ante, at 96. They have a like interest in discouraging *293 "splintered parties and unrestrained factionalism" which might proliferate the number of candidates on a state ballot so as to make it virtually unintelligible to the average voter. Storer v. Brown, supra, at 736.
Congress, on the other hand, while undoubtedly possessing the legislative authority to undertake the task if it wished, is not obliged to address the question of public financing of Presidential elections at all. When it chooses to legislate in this area, so much of its action as may arguably impair First Amendment rights lacks the same sort of mandate of necessity as does a State's regulation of ballot access.
Congress, of course, does have an interest in not "funding hopeless candidacies with large sums of public money," ante, at 96, and may for that purpose legitimately require " `some preliminary showing of a significant modicum of support,' Jenness v. Fortson, [403 U. S. 431, 442 (1971),] as an eligibility requirement for public funds." Ante, at 96. But Congress in this legislation has done a good deal more than that. It has enshrined the Republican and Democratic Parties in a permanently preferred position, and has established requirements for funding minor-party and independent candidates to which the two major parties are not subject. Congress would undoubtedly be justified in treating the Presidential candidates of the two major parties differently from minor-party or independent Presidential candidates, in view of the long demonstrated public support of the former. But because of the First Amendment overtones of the appellants' Fifth Amendment equal protection claim, something more than a merely rational basis for the difference in treatment must be shown, as the Court apparently recognizes. I find it impossible to subscribe to the Court's reasoning that because no third party has posed a credible threat to the two major parties in Presidential *294 elections since 1860, Congress may by law attempt to assure that this pattern will endure forever.
I would hold that, as to general election financing, Congress has not merely treated the two major parties differently from minor parties and independents, but has discriminated in favor of the former in such a way as to run afoul of the Fifth and First Amendments to the United States Constitution.
NOTES
[*] Together with No. 75-437, Buckley et al. v. Valeo, Secretary of the United States Senate, et al., on appeal from the United States District Court for the District of Columbia.
[] Thomas F. Monaghan filed a brief for James B. Longley as amicus curiae urging reversal.

Mr. Cox filed a brief for Hugh Scott et al. as amici curiae urging affirmance.
Briefs of amici curiae were filed by Jerome B. Falk, Jr., Daniel H. Lowenstein, Howard F. Sachs, and Guy L. Heinemann for the California Fair Political Practices Commission et al.; by Lee Metcalf, pro se, and G. Roger King for Mr. Metcalf; by Vincent Hallinan for the Socialist Labor Party; by Marguerite M. Buckley for the Los Angeles County Central Committee of the Peace and Freedom Party; and by the Committee for Democratic Election Laws.
[1] Federal Election Campaign Act of 1971, 86 Stat. 3, as amended by the Federal Election Campaign Act Amendments of 1974, 88 Stat. 1263. The pertinent portions of the legislation are set forth in the Appendix to this opinion.
[2] 171 U. S. App. D. C. 172, 519 F. 2d 821 (1975).
[3] The Revenue Act of 1971, Title VIII, 85 Stat. 562, as amended, 87 Stat. 138, and further amended by the Federal Election Campaign Act Amendments of 1974, § 403 et seq., 88 Stat. 1291. This subtitle consists of two parts: Chapter 95 deals with funding national party conventions and general election campaigns for president, and Chapter 96 deals with matching funds for Presidential primary campaigns.
[4] "§ 437h. Judicial review.

"(a) . . .
"The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President of the United States may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act or of section 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18. The district court immediately shall certify all questions of constitutionality of this Act or of section 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18, to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.
"(b) . . .
"Notwithstanding any other provision of law, any decision on a matter certified under subsection (a) of this section shall be reviewable by appeal directly to the Supreme Court of the United States. Such appeal shall be brought no later than 20 days after the decision of the court of appeals.
"(c) . . .
"It shall be the duty of the court of appeals and of the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any matter certified under subsection (a) of this section."
[5] Center for Public Financing of Elections, Common Cause, the League of Women Voters of the United States, Chellis O'Neal Gregory, Norman F. Jacknis, Louise D. Wides, Daniel R. Noyes, Mrs. Edgar B. Stern, Charles P. Taft, John W. Gardner, and Ruth Clusen.
[6] The Court of Appeals also suggested in its en banc order that the issues arising under Subtitle H (relating to the public financing of Presidential campaigns) might require, under 26 U. S. C. § 9011 (b) (1970 ed., Supp. IV), a different mode of review from the other issues raised in the case. The court suggested that a three-judge District Court should consider the constitutionality of these provisions in order to protect against the contingency that this Court might eventually hold these issues to be subject to determination by a three-judge court, either under § 9011 (b), or 28 U. S. C. §§ 2282, 2284. 171 U. S. App. D. C. 168, 170, 519 F. 2d 817, 819 (1975). The case was argued simultaneously to both the Court of Appeals, sitting en banc, and a three-judge District Court. The three-judge court limited its consideration to issues under Subtitle H. The three-judge court adopted the Court of Appeals' opinion on these questions in toto and simply entered an order with respect to those matters. 401 F. Supp. 1235. Thus, two judgments are before us one from each courtupholding the constitutionality of Subtitle H, though the two cases before the Court will generally be referred to hereinafter in the singular. Since the jurisdiction of this Court to hear at least one of the appeals is clear, we need not resolve the jurisdictional ambiguities that occasioned the joint sitting of the Court of Appeals and the three-judge court.
[7] The court held one provision, § 437a, unconstitutionally vague and overbroad on the ground that the provision is " `susceptible to a reading necessitating reporting by groups whose only connection with the elective process arises from completely nonpartisan public discussion of issues of public importance.' " 171 U. S. App. D. C., at 183, 519 F. 2d, at 832. No appeal has been taken from that holding.
[8] The court recognized that some of the powers delegated to the Commission, when exercised in a concrete context, may be predominantly executive or judicial or unrelated to the Commission's legislative function; however, since the Commission had not yet exercised most of these challenged powers, consideration of the constitutionality of those grants of authority was postponed. See n. 157, infra.
[9] See n. 4, supra.
[10] This Court has held, for instance, that an organization "may assert, on behalf of its members, a right personal to them to be protected from compelled disclosure . . . of their affiliation." NAACP v. Alabama, 357 U. S. 449, 458 (1958). See also Bates v. Little Rock, 361 U. S. 516, 523 n. 9 (1960). Similarly, parties with sufficient concrete interests at stake have been held to have standing to raise constitutional questions of separation of powers with respect to an agency designated to adjudicate their rights. Palmore v. United States, 411 U. S. 389 (1973); Glidden Co. v. Zdanok, 370 U. S. 530 (1962); Coleman v. Miller, 307 U. S. 433 (1939).
[11] Accordingly, the two relevant certified questions are answered as follows:

1. Does the first sentence of § 315 (a) of the Federal Election Campaign Act, as amended, 2 U. S. C. § 437h (a) (1970 ed., Supp. IV), in the context of this action, require courts of the United States to render advisory opinions in violation of the "case or controversy" requirement of Article III, § 2, of the Constitution of the United States? NO.
2. Has each of the plaintiffs alleged sufficient injury to his constitutional rights enumerated in the following questions to create a constitutional "case or controversy" within the judicial power under Article III? YES.
[12] See 18 U. S. C. §§ 608 (b) (1), (3) (1970 ed., Supp. IV). set forth in the Appendix, infra, at 189. An organization registered as a political committee for not less than six months which has received contributions from at least 50 persons and made contributions to at least five candidates may give up to $5,000 to any candidate for any election. 18 U. S. C. § 608 (b) (2) (1970 ed., Supp. IV), set forth in the Appendix, infra, at 189. Other groups are limited to making contributions of $1,000 per candidate per election.
[13] See 18 U. S. C. § 608 (e) (1970 ed., Supp. IV), set forth in the Appendix, infra, at 193-194.
[14] See 18 U. S. C. § 608 (a) (1970 ed., Supp. IV), set forth in the Appendix, infra, at 187-189.
[15] See 18 U. S. C. § 608 (c) (1970 ed., Supp. IV), set forth in the Appendix, infra, at 190-192.
[16] Article I, § 4, of the Constitution grants Congress the power to regulate elections of members of the Senate and House of Representatives. See Smiley v. Holm, 285 U. S. 355 (1932); Ex parte Yarbrough, 110 U. S. 651 (1884). Although the Court at one time indicated that party primary contests were not "elections" within the meaning of Art. I, § 4, Newberry v. United States, 256 U. S. 232 (1921), it later held that primary elections were within the Constitution's grant of authority to Congress. United States v. Classic, 313 U. S. 299 (1941). The Court has also recognized broad congressional power to legislate in connection with the elections of the president and Vice President. Burroughs v. United States, 290 U. S. 534 (1934). See Part III, infra.
[17] The nongovernmental appellees argue that just as the decibels emitted by a sound truck can be regulated consistently with the First Amendment, Kovacs v. Cooper, 336 U. S. 77 (1949), the Act may restrict the volume of dollars in political campaigns without impermissibly restricting freedom of speech. See Freund, Commentary in A. Rosenthal, Federal Regulation of Campaign Finance: Some Constitutional Questions 72 (1971). This comparison underscores a fundamental misconception. The decibel restriction upheld in Kovacs limited the manner of operating a soundtruck, but not the extent of its proper use. By contrast, the Act's dollar ceilings restrict the extent of the reasonable use of virtually every means of communicating information. As the Kovacs Court emphasized, the nuisance ordinance only barred soundtrucks from broadcasting "in a loud and raucous manner on the streets," 336 U. S., at 89, and imposed "no restriction upon the communication of ideas or discussion of issues by the human voice, by newspapers, by pamphlets, by dodgers," or by soundtrucks operating at a reasonable volume. Ibid. See Saia v. New York, 334 U. S. 558, 561-562 (1948).
[18] Being free to engage in unlimited political expression subject to a ceiling on expenditures is like being free to drive an automobile as far and as often as one desires on a single tank of gasoline.
[19] Political parties that fail to qualify a candidate for a position on the ballot are classified as "persons" and are subject to the $1,000 independent expenditure ceiling. See 18 U. S. C. §§ 591 (g), (i), 608 (e) (1), (f) (1970 ed., Supp. IV). Institutional press facilities owned or controlled by candidates or political parties are also subject to expenditure limits under the Act. See 18 U. S. C. §§ 591 (f) (4) (A), 608 (c) (2) (B), (e) (1) (1970 ed., Supp. IV).

Unless otherwise indicated all subsequent statutory citations in Part I of this opinion are to Title 18 of the United States Code, 1970 edition, Supplement IV.
[20] The record indicates that, as of January 1, 1975, one full-page advertisement in a daily edition of a certain metropolitan newspaper cost $6,971.04almost seven times the annual limit on expenditures "relative to" a particular candidate imposed on the vast majority of individual citizens and associations by § 608 (e) (1)
[21] The statistical findings of fact agreed to by the parties in the District Court indicate that 17 of 65 major-party senatorial candidates in 1974 spent more than the combined primary-election, general-election, and fundraising limitations imposed by the Act. §§ 591 (f) (4) (H), 608 (c) (1) (C), (D). The 1972 senatorial figures showed that 18 of 66 major-party candidates exceeded the Act's limitations. This figure may substantially underestimate the number of candidates who exceeded the limits provided in the Act, since the Act imposes separate ceilings for the primary election, the general election, and fundraising, and does not permit the limits to be aggregated. § 608 (c) (3). The data for House of Representatives elections are also skewed, since statistics reflect a combined $168,000 limit instead of separate $70,000 ceilings for primary and general elections with up to an additional 20% permitted for fundraising. §§ 591 (f) (4) (H), 608 (c) (1) (E). Only 22 of the 810 major-party House candidates in 1974 and 20 of the 816 major-party candidates in 1972 exceeded the $168,000 figure. Both Presidential candidates in 1972 spent in excess of the combined Presidential expenditure ceilings. §§ 608 (c) (1) (A), (B).
[22] Other factors relevant to an assessment of the "intensity" of the support indicated by a contribution include the contributor's financial ability and his past contribution history.
[23] Statistical findings agreed to by the parties reveal that approximately 5.1% of the $73,483,613 raised by the 1,161 candidates for Congress in 1974 was obtained in amounts in excess of $1,000. In 1974, two major-party senatorial candidates, Ramsey Clark and Senator Charles Mathias, Jr., operated large-scale campaigns on contributions raised under a voluntarily imposed $100 contribution limitation.
[24] The Act exempts from the contribution ceiling the value of all volunteer services provided by individuals to a candidate or a political committee and excludes the first $500 spent by volunteers on certain categories of campaign-related activities. §§ 591 (e) (5) (A)-(D). See infra, at 36-37.

The Act does not define the phrase"for the purpose of influencing" an electionthat determines when a gift, loan, or advance constitutes a contribution. Other courts have given that phrase a narrow meaning to alleviate various problems in other contexts. See United States v. National Comm. for Impeachment, 469 F. 2d 1135, 1139-1142 (CA2 1972); American Civil Liberties Union v. Jennings, 366 F. Supp. 1041, 1055-1057 (DC 1973) (three-judge court), vacated as moot sub nom. Staats v. American Civil Liberties Union, 422 U. S. 1030 (1975). The use of the phrase presents fewer problems in connection with the definition of a contribution because of the limiting connotation created by the general understanding of what constitutes a political contribution. Funds provided to a candidate or political party or campaign committee either directly or indirectly through an intermediary constitute a contribution. In addition, dollars given to another person or organization that are earmarked for political purposes are contributions under the Act.
[25] Expenditures by persons and associations that are "authorized or requested" by the candidate or his agents are treated as contributions under the Act. See n. 53, infra.
[26] Contribution limitations alone would not reduce the greater potential voice of affluent persons and well-financed groups, who would remain free to spend unlimited sums directly to promote candidates and policies they favor in an effort to persuade voters.
[27] Yet, a ceiling on the size of contributions would affect only indirectly the costs of political campaigns by making it relatively more difficult for candidates to raise large amounts of money. In 1974, for example, 94.9% of the funds raised by candidates for Congress came from contributions of $1,000 or less, see n. 23, supra. Presumably, some or all of the contributions in excess of $1,000 could have been replaced through efforts to raise additional contributions from persons giving less than $1,000. It is the Act's campaign expenditure limitations, § 608 (c), not the contribution limits, that directly address the overall scope of federal election spending.
[28] The Court of Appeals' opinion in this case discussed a number of the abuses uncovered after the 1972 elections. See 171 U. S. App. D. C., at 190-191, and nn. 36-38, 519 F. 2d, at 839-840, and nn. 36-38.
[29] Although the Court in Letter Carriers found that this interest was constitutionally sufficient to justify legislation prohibiting federal employees from engaging in certain partisan political activities, it was careful to emphasize that the limitations did not restrict an employee's right to express his views on political issues and candidates. 413 U. S., at 561, 568, 575-576, 579. See n. 54, infra.
[30] The Act's disclosure provisions are discussed in Part II, infra.
[31] While providing significant limitations on the ability of all individuals and groups to contribute large amounts of money to candidates, the Act's contribution ceilings do not foreclose the making of substantial contributions to candidates by some major special-interest groups through the combined effect of individual contributions from adherents or the proliferation of political funds each authorized under the Act to contribute to candidates. As a prime example, § 610 permits corporations and labor unions to establish segregated funds to solicit voluntary contributions to be utilized for political purposes. Corporate and union resources without limitation may be employed to administer these funds and to solicit contributions from employees, stockholders, and union members. Each separate fund may contribute up to $5,000 per candidate per election so long as the fund qualifies as a political committee under § 608 (b) (2). See S. Rep. No. 93-1237, pp. 50-52 (1974); Federal Election Commission, Advisory Opinion 1975-23, 40 Fed. Reg. 56584 (1975).

The Act places no limit on the number of funds that may be formed through the use of subsidiaries or divisions of corporations, or of local and regional units of a national labor union. The potential for proliferation of these sources of contributions is not insignificant. In 1972, approximately 1,824,000 active corporations filed federal income tax returns. Internal Revenue Service, Preliminary Statistics of Income 1972, Corporation Income Tax Returns, p. 1 (pub. 159 (11-74)). (It is not clear whether this total includes subsidiary corporations where the parent filed a consolidated return.) In the same year, 71,409 local unions were chartered by national unions. Department of Labor, Bureau of Labor Statistics, Directory of National Unions and Employee Associations 1973, p. 87 (1974).
The Act allows the maximum contribution to be made by each unit's fund provided the decision or judgment to contribute to particular candidates is made by the fund independently of control or direction by the parent corporation or the national or regional union. See S. Rep. No. 93-1237, pp. 51-52 (1974).
[32] The Act's limitations applicable to both campaign expenditures and a candidate's personal expenditures on his own behalf are scaled to take account of the differences in the amounts of money required for congressional and Presidential campaigns. See §§ 608 (a) (1), (c) (1) (A)-(E).
[33] In this discussion, we address only the argument that the contribution limitations alone impressibly discriminate against non-incumbents. We do not address the more serious argument that these limitations, in combination with the limitation on expenditures by individuals and groups, the limitation on a candidate's use of his own personal and family resources, and the overall ceiling on campaign expenditures invidiously discriminate against major-party challengers and minor-party candidates.

Since an incumbent is subject to these limitations to the same degree as his opponent, the Act, on its face, appears to be even-handed. The appearance of fairness, however, may not reflect political reality. Although some incumbents are defeated in every congressional election, it is axiomatic that an incumbent usually begins the race with significant advantages. In addition to the factors of voter recognition and the status accruing to holding federal office, the incumbent has access to substantial resources provided by the Government. These include local and Washington offices, staff support, and the franking privilege. Where the incumbent has the support of major special-interest groups which have the flexibility described in n. 31, supra, and is further supported by the media, the overall effect of the contribution and expenditure limitations enacted by Congress could foreclose any fair opportunity of a successful challenge.
However, since we decide in Part I-C, infra, that the ceilings on independent expenditures, on the candidate's expenditures from his personal funds, and on overall campaign expenditures are unconstitutional under the First Amendment, we need not express any opinion with regard to the alleged invidious discrimination resulting from the full sweep of the legislation as enacted.
[34] In 1974, for example, 40 major-party challengers defeated incumbent members of the House of Representatives in the general election. Four incumbent Senators were defeated by major-party challengers in the 1974 primary and general election campaigns.
[35] In the 1974 races for the House of Representatives, three of the 22 major-party candidates exceeding the combined expenditure limits contained in the Act were challengers to incumbents and nine were candidates in races not involving incumbents. The comparable 1972 statistics indicate that 14 of the 20 major-party candidates exceeding the combined limits were nonincumbents.
[36] In 1974, major-party challengers outspent House incumbents in 22% of the races, and 22 of the 40 challengers who defeated House incumbents outspent their opponents. In 1972, 24% of the major-party challengers in senatorial elections outspent their incumbent opponents. The 1974 statistics for senatorial contests reveal substantially greater financial dominance by incumbents.
[37] Of the $3,781,254 in contributions raised in 1974 by congressional candidates over and above a $1,000-per-contributor limit, almost twice as much money went to incumbents as to major-party challengers.
[38] Appellants contend that the Act discriminates against challengers, because, while it limits contributions to all candidates, the Government makes available other material resources to incumbents. See n. 33, supra. Yet, taking cognizance of the advantages and disadvantages of incumbency, there is little indication that the $1,000 contribution ceiling will consistently harm the prospects of challengers relative to incumbents.
[39] Between September 1, 1973, and December 31, 1974, major-party candidates for the House and Senate raised over $3,725,000 in contributions over and above $1,000 compared to $55,000 raised by minor-party candidates in amounts exceeding the $1,000 contribution limit.
[40] Appellant Libertarian Party, according to estimates of its national chairman, has received only 10 contributions in excess of $1,000 out of a total of 4,000 contributions. Even these 10 contributions would have been permissible under the Act if the donor did not earmark the funds for a particular candidate and did not exceed the overall $25,000 contribution ceiling for the calendar year. See § 608 (b). Similarly, appellants Conservative Victory Fund and American Conservative Union have received only an insignificant portion of their funding through contributions in excess of $1,000. The affidavit of the executive director of the Conservative Victory Fund indicates that in 1974, a typical fundraising year, the Fund received approximately $152,000 through over 9,500 individual contributions. Only one of the 9,500 contributions, an $8,000 contribution earmarked for a particular candidate, exceeded $1,000. In 1972, the Fund received only three contributions in excess of $1,000, all of which might have been legal under the Act if not earmarked. And between April 7, 1972, and February 28, 1975, the American Conservative Union did not receive any aggregate contributions exceeding $1,000. Moreover, the Committee for a Constitutional PresidencyMcCarthy '76, another appellant, engaged in a concerted effort to raise contributions in excess of $1,000 before the effective date of the Act but obtained only five contributions in excess of $1,000.

Although appellants claim that the $1,000 ceiling governing contributions to candidates will prevent the acquisition of seed money necessary to launch campaigns, the absence of experience under the Act prevents us from evaluating this assertion. As appellees note, it is difficult to assess the effect of the contribution ceiling on the acquisition of seed money since candidates have not previously had to make a concerted effort to raise start-up funds in small amounts.
[41] Appellant Buckley was a minor-party candidate in 1970 when he was elected to the United States Senate from the State of New York.
[42] Although expenditures incidental to volunteer services would appear self-limiting, it is possible for a worker in a candidate's campaign to generate substantial travel expenses. An affidavit submitted by Stewart Mott, an appellant, indicates that he "expended some $50,000 for personal expenses" in connection with Senator McGovern's 1972 Presidential campaign.
[43] The Act contains identical, parallel provisions pertaining to incidental volunteer expenses under the definitions of contribution and expenditure. Compare §§ 591 (e) (5) (B)-(D) with §§ 591 (f) (4) (D), (E). The definitions have two effects. First, volunteer expenses that are counted as contributions by the volunteer would also constitute expenditures by the candidate's campaign. Second, some volunteer expenses would qualify as contributions whereas others would constitute independent expenditures. The statute distinguishes between independent expenditures by individuals and campaign expenditures on the basis of whether the candidate, an authorized committee of the candidate, or an agent of the candidate "authorized or requested" the expenditure. See §§ 608 (c) (2) (B) (ii), (e) (1); S. Rep. No. 93-689, p. 18 (1974); H. R. Rep. No. 93-1239, p. 6 (1974). As a result, only travel that is "authorized or requested" by the candidate or his agents would involve incidental expenses chargeable against the volunteer's contribution limit and the candidate's expenditure ceiling. See n. 53, infra. Should a person independently travel across the country to participate in a campaign, any unreimbursed travel expenses would not be treated as a contribution. This interpretation is not only consistent with the statute and the legislative history but is also necessary to avoid the administrative chaos that would be produced if each volunteer and candidate had to keep track of amounts spent on unsolicited travel in order to comply with the Act's contribution and expenditure ceilings and the reporting and disclosure provisions. The distinction between contributions and expenditures is also discussed at n. 53, infra, and in Part II-C-2, infra.
[44] See n. 19, supra.
[45] The same broad definition of "person" applicable to the contribution limitations governs the meaning of "person" in § 608 (e) (1). The statute provides some limited exceptions through various exclusions from the otherwise comprehensive definition of "expenditure." See § 591 (f). The most important exclusions are: (1) "any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate," § 591 (f) (4) (A), and (2) "any communication by any membership organization or corporation to its members or stockholders, if such membership organization or corporation is not organized primarily for the purpose of influencing the nomination for election, or election, of any person to Federal office," § 591 (f) (4) (C). In addition, the Act sets substantially higher limits for personal expenditures by a candidate in connection with his own campaign, § 608 (a), expenditures by national and state committees of political parties that succeed in placing a candidate on the ballot, §§ 591 (i), 608 (f), and total campaign expenditures by candidates, § 608 (c).
[46] Section 608 (i) provides that any person convicted of exceeding any of the contribution or expenditure limitations "shall be fined not more than $25,000 or imprisoned not more than one year, or both."
[47] Several of the parties have suggested that problems of ambiguity regarding the application of § 608 (e) (1) to specific campaign speech could be handled by requesting advisory opinions from the Commission. While a comprehensive series of advisory opinions or a rule delineating what expenditures are "relative to a clearly identified candidate" might alleviate the provision's vagueness problems, reliance on the Commission is unacceptable because the vast majority of individuals and groups subject to criminal sanctions for violating § 608 (e) (1) do not have a right to obtain an advisory opinion from the Commission. See 2 U. S. C. § 437f (1970 ed., Supp. IV). Section 437f (a) of Title 2 accords only candidates, federal officeholders, and political committees the right to request advisory opinions and directs that the Commission "shall render an advisory opinion, in writing, within a reasonable time" concerning specific planned activities or transactions of any such individual or committee. The powers delegated to the Commission thus do not assure that the vagueness concerns will be remedied prior to the chilling of political discussion by individuals and groups in this or future election years.
[48] In such circumstances, vague laws may not only "trap the innocent by not providing fair warning" or foster "arbitrary and discriminatory application" but also operate to inhibit protected expression by inducing "citizens to `steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked.' " Grayned v. City of Rockford, 408 U. S. 104, 108-109 (1972), quoting Baggett v. Bullitt, 377 U. S. 360, 372 (1964), quoting Speiser v. Randall, 357 U. S. 513, 526 (1958). "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." NAACP v. Button, 371 U. S. 415, 433 (1963).
[49] This interpretation of "relative to" a clearly identified candidate is supported by the discussion of § 608 (e) (1) in the Senate Report, S. Rep. No. 93-689, p. 19 (1974), the House Report, H. R. Rep. No. 93-1239, p. 7 (1974), the Conference Report, S. Conf. Rep. No. 93-1237, pp. 56-57 (1974), and the opinion of the Court of Appeals, 171 U. S. App. D. C., at 203-204, 519 F. 2d, at 852-853.
[50] In connection with another provision containing the same advocacy language appearing in § 608 (e) (1), the Court of Appeals concluded:

"Public discussion of public issues which also are campaign issues readily and often unavoidably draws in candidates and their positions, their voting records and other official conduct. Discussions of those issues, and as well more positive efforts to influence public opinion on them, tend naturally and inexorably to exert some influence on voting at elections." 171 U. S. App. D. C., at 226, 519 F. 2d, at 875.
[51] Section 608 (e) (2) defines "clearly identified" to require that the candidate's name, photograph or drawing, or other unambiguous reference to his identity appear as part of the communication. Such other unambiguous reference would include use of the candidate's initials (e. g., FDR), the candidate's nickname (e. g., Ike), his office (e. g., the President or the Governor of Iowa), or his status as a candidate (e. g., the Democratic Presidential nominee, the senatorial candidate of the Republican Party of Georgia).
[52] This construction would restrict the application of § 608 (e) (1) to communications containing express words of advocacy of election or defeat, such as "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," "defeat," "reject."
[53] Section 608 (e) (1) does not apply to expenditures "on behalf of a candidate" within the meaning of § 608 (c) (2) (B). The latter subsection provides that expenditures "authorized or requested by the candidate, an authorized committee of the candidate, or an agent of the candidate" are to be treated as expenditures of the candidate and contributions by the person or group making the expenditure. The House and Senate Reports provide guidance in differentiating individual expenditures that are contributions and candidate expenditures under § 608 (c) (2) (B) from those treated as independent expenditures subject to the § 608 (e) (1) ceiling. The House Report speaks of independent expenditures as costs "incurred without the request or consent of a candidate or his agent." H. R. Rep. No. 93-1239, p. 6 (1974). The Senate Report addresses the issue in greater detail. It provides an example illustrating the distinction between "authorized or requested" expenditures excluded from § 608 (e) (1) and independent expenditures governed by § 608 (e) (1):

"[A] person might purchase billboard advertisements endorsing a candidate. If he does so completely on his own, and not at the request or suggestion of the candidate or his agent's [sic] that would constitute an `independent expenditure on behalf of a candidate' under section 614 (c) of the bill. The person making the expenditure would have to report it as such.
"However, if the advertisement was placed in cooperation with the candidate's campaign organization, then the amount would constitute a gift by the supporter and an expenditure by the candidate just as if there had been a direct contribution enabling the candidate to place the advertisement, himself. It would be so reported by both." S. Rep. No. 93-689, p. 18 (1974).
The Conference substitute adopted the provision of the Senate bill dealing with expenditures by any person "authorized or requested" to make an expenditure by the candidate or his agents. S. Conf. Rep. No. 93-1237, p. 55 (1974). In view of this legislative history and the purposes of the Act, we find that the "authorized or requested" standard of the Act operates to treat all expenditures placed in cooperation with or with the consent of a candidate, his agents, or an authorized committee of the candidate as contributions subject to the limitations set forth in § 608 (b).
[54] Appellees mistakenly rely on this Court's decision in CSC v. Letter Carriers, as supporting § 608 (e) (1)'s restriction on the spending of money to advocate the election or defeat of a particular candidate. In upholding the Hatch Act's broad restrictions on the associational freedoms of federal employees, the Court repeatedly emphasized the statutory provision and corresponding regulation permitting an employee to " `[e]xpress his opinion as an individual privately and publicly on political subjects and candidates.' " 413 U. S., at 579, quoting 5 CFR § 733.111 (a) (2). See 413 U. S., at 561 568, 575-576. Although the Court "unhesitatingly" found that a statute prohibiting federal employees from engaging in a wide variety of "partisan political conduct" would "unquestionably be valid," it carefully declined to endorse provisions threatening political expression. See id., at 556, 579-581. The Court did not rule on the constitutional questions presented by the regulations forbidding partisan campaign endorsements through the media and speechmaking to political gatherings because it found that these restrictions did not "make the statute substantially overbroad and so invalid on its face." Id., at 581.
[55] Neither the voting rights cases nor the Court's decision upholding the Federal Communications Commission's fairness doctrine lends support to appellees' position that the First Amendment permits Congress to abridge the rights of some persons to engage in political expression in order to enhance the relative voice of other segments of our society.

Cases invalidating governmentally imposed wealth restrictions on the right to vote or file as a candidate for public office rest on the conclusion that wealth "is not germane to one's ability to participate intelligently in the electoral process" and is therefore an insufficient basis on which to restrict a citizen's fundamental right to vote. Harper v. Virginia Bd. of Elections, 383 U. S. 663, 668 (1966). See Lubin v. Panish, 415 U. S. 709 (1974); Bullock v. Carter, 405 U. S. 134 (1972); Phoenix v. Kolodziejski, 399 U. S. 204 (1970). These voting cases and the reapportionment decisions serve to assure that citizens are accorded an equal right to vote for their representatives regardless of factors of wealth or geography. But the principles that underlie invalidation of governmentally imposed restrictions on the franchise do not justify governmentally imposed restrictions on political expression. Democracy depends on a well-informed electorate, not a citizenry legislatively limited in its ability to discuss and debate candidates and issues.
In Red Lion Broadcasting Co. v. FCC, 395 U. S. 367 (1969), the Court upheld the political-editorial and personal-attack portions of the Federal Communications Commission's fairness doctrine. That doctrine requires broadcast licensees to devote programing time to the discussion of controversial issues of public importance and to present both sides of such issues. Red Lion "makes clear that the broadcast media pose unique and special problems not present in the traditional free speech case," by demonstrating that " `it is idle to posit an unbridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish.' " Columbia Broadcasting v. Democratic Comm., 412 U. S. 94, 101 (1973), quoting Red Lion Broadcasting Co., supra, at 388. Red Lion therefore undercuts appellees' claim that § 608 (e) (1)'s limitations may permissibly restrict the First Amendment rights of individuals in this "traditional free speech case." Moreover, in contrast to the undeniable effect of § 608 (e) (1), the presumed effect of the fairness doctrine is one of "enhancing the volume and quality of coverage" of public issues. 395 U. S., at 393.
[56] The Act exempts most elements of the institutional press, limiting only expenditures by institutional press facilities that are owned or controlled by candidates and political parties. See § 591 (f) (4) (A). But, whatever differences there may be between the constitutional guarantees of a free press and of free speech, it is difficult to conceive of any principled basis upon which to distinguish § 608 (e) (1)'s limitations upon the public at large and similar limitations imposed upon the press specifically.
[57] The $35,000 ceiling on expenditures by candidates for the Senate also applies to candidates for the House of Representatives from States entitled to only one Representative. § 608 (a) (1) (B).

The Court of Appeals treated § 608 (a) as relaxing the $1,000-per-candidate contribution limitation imposed by § 608 (b) (1) so as to permit any member of the candidate's immediate familyspouse, child, grandparent, brother, sister, or spouse of such personsto contribute up to the $25,000 overall annual contribution ceiling to the candidate. See 171 U. S. App. D. C., at 205, 519 F. 2d, at 854. The Commission has recently adopted a similar interpretation of the provision. See Federal Election Commission, Advisory Opinion 1975-65 (Dec. 5, 1975), 40 Fed. Reg. 58393. However, both the Court of Appeals and the Commission apparently overlooked the Conference Report accompanying the final version of the Act which expressly provides for a contrary interpretation of § 608 (a):
"It is the intent of the conferees that members of the immediate family of any candidate shall be subject to the contribution limitations established by this legislation. If a candidate for the office of Senator, for example, already is in a position to exercise control over funds of a member of his immediate family before he becomes a candidate, then he could draw upon these funds up to the limit of $35,000. If, however, the candidate did not have access to or control over such funds at the time he became a candidate, the immediate family member would not be permitted to grant access or control to the candidate in amounts up to $35,000, if the immediate family member intends that such amounts are to be used in the campaign of the candidate. The immediate family member would be permitted merely to make contributions to the candidate in amounts not greater than $1,000 for each election involved." S. Conf. Rep. No. 93-1237, p. 58 (1974).
[58] The Court of Appeals evidently considered the personal funds expended by the candidate on his own behalf as a contribution rather than an expenditure. See 171 U. S. App. D. C., at 205, 519 F. 2d, at 854. However, unlike a person's contribution to a candidate, a candidate's expenditure of his personal funds directly facilitates his own political speech.
[59] The legislative history of the Act clearly indicates that § 608 (a) was not intended to suspend the application of the $1,000 contribution limitation of § 608 (b) (1) for members of the candidate's immediate family. See n. 57, supra. Although the risk of improper influence is somewhat diminished in the case of large contributions from immediate family members, we cannot say that the danger is sufficiently reduced to bar Congress from subjecting family members to the same limitations as nonfamily contributors.

The limitation on a candidate's expenditure of his own funds differs markedly from a limitation on family contributions both in the absence of any threat of corruption and the presence of a legislative restriction on the candidate's ability to fund his own communication with the voters.
[60] Expenditures made by an authorized committee of the candidate or any other agent of the candidate as well as any expenditure by any other person that is "authorized or requested" by the candidate or his agent are charged against the candidate's spending ceiling. § 608 (c) (2) (B).
[61] Expenditures made by or on behalf of a Vice Presidential candidate of a political party are considered to have been made by or on behalf of the party's Presidential candidate. § 608 (c) (2) (A).
[62] The campaign ceilings contained in § 608 (c) would have required a reduction in the scope of a number of previous congressional campaigns and substantially limited the overall expenditures of the two major-party Presidential candidates in 1972. See n. 21, supra.
[63] This normal relationship may not apply where the candidate devotes a large amount of his personal resources to his campaign.
[64] As an opinion dissenting in part from the decision below noted: "If a senatorial candidate can raise $1 from each voter, what evil is exacerbated by allowing that candidate to use all that money for political communication? I know of none." 171 U. S. App. D. C., at 268, 519 F. 2d, at 917 (Tamm, J.).
[65] For the reasons discussed in Part III, infra, Congress may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations. Just as a candidate may voluntarily limit the size of the contributions he chooses to accept, he may decide to forgo private fundraising and accept public funding.
[66] Subtitle H of the Internal Revenue Code also established separate limitations for general election expenditures by national and state committees of political parties, § 608 (f), and for national political party conventions for the nomination of Presidential candidates. 26 U. S. C. § 9008 (d) (1970 ed., Supp. IV). Appellants do not challenge these ceilings on First Amendment grounds. Instead, they contend that the provisions discriminate against independent candidates and regional political parties without national committees because they permit additional spending by political parties with national committees. Our decision today holding § 608 (e) (1)'s independent expenditure limitation unconstitutional and § 608 (c)'s campaign expenditure ceilings unconstitutional removes the predicate for appellants' discrimination claim by eliminating any alleged advantage to political parties with national committees.
[67] Accordingly, the answers to the certified constitutional questions pertaining to the Act's contribution and expenditure limitations are as follows:

3. Does any statutory limitation, or do the particular limitations in the challenged statutes, on the amounts that individuals or organizations may contribute or expend in connection with elections for federal office violate the rights of one or more of the plaintiffs under the First, Fifth, or Ninth Amendment or the Due Process Clause of the Fifth Amendment of the Constitution of the United States?
(a) Does 18 U. S. C. § 608 (a) (1970 ed., Supp. IV) violate such rights, in that it forbids a candidate or the members of his immediate family from expending personal funds in excess of the amounts specified in 18 U. S. C. § 608 (a) (1) (1970 ed., Supp. IV)?
Answer: YES.
(b) Does 18 U. S. C. § 608 (b) (1970 ed., Supp. IV) violate such rights, in that it forbids the solicitation, receipt or making of contributions on behalf of political candidates in excess of the amounts specified in 18 U. S. C. § 608 (b) (1970 ed., Supp. IV)?
Answer: NO.
(c) Do 18 U. S. C. §§ 591 (e) and 608 (b) (1970 ed., Supp. IV) violate such rights, in that they limit the incidental expenses which volunteers working on behalf of political candidates may incur to the amounts specified in 18 U. S. C. §§ 591 (e) and 608 (b) (1970 ed., Supp. IV)?
Answer: NO.
(d) Does 18 U. S. C. § 608 (e) (1970 ed., Supp. IV) violate such rights, in that it limits to $1,000 the independent (not on behalf of a candidate) expenditures of any person relative to an identified candidate?
Answer: YES.
(e) Does 18 U. S. C. § 608 (f) (1970 ed., Supp. IV) violate such rights, in that it limits the expenditures of national or state committees of political parties in connection with general election campaigns for federal office?
Answer: NO, as to the Fifth Amendment challenge advanced by appellants.
(f) Does § 9008 of the Internal Revenue Code of 1954 violate such rights, in that it limits the expenditures of the national committee of a party with respect to presidential nominating conventions?
Answer: NO, as to the Fifth Amendment challenge advanced by appellants.
(h) Does 18 U. S. C. § 608 (b) (2) (1970 ed., Supp. IV) violate such rights, in that it excludes from the definition of "political committee" committees registered for less than the period of time prescribed in the statute?
Answer: NO.
4. Does any statutory limitation, or do the particular limitations in the challenged statutes, on the amounts that candidates for elected federal office may expend in their campaigns violate the rights of one or more of the plaintiffs under the First or Ninth Amendment or the Due Process Clause of the Fifth Amendment?
(a) Does 18 U. S. C. § 608 (c) (1970 ed., Supp. IV) violate such rights, in that it forbids expenditures by candidates for federal office in excess of the amounts specified in 18 U. S. C. § 608 (c) (1970 ed., Supp. IV)?
Answer: YES.
[68] Unless otherwise indicated, all statutory citations in Part II of this opinion are to Title 2 of the United States Code, 1970 edition, Supplement IV.
[69] Appellants do contend that there should be a blanket exemption from the disclosure provisions for minor parties. See Part II-B-2, infra.
[70] The Court of Appeals' ruling that § 437a is unconstitutional was not appealed. See n. 7, supra.
[71] Past disclosure laws were relatively easy to circumvent because candidates were required to report only contributions that they had received themselves or that were received by others for them with their knowledge or consent. § 307, 43 Stat. 1072. The data that were reported were virtually impossible to use because there were no uniform rules for the compiling of reports or provisions for requiring corrections and additions. See Redish, Campaign Spending Laws and the First Amendment, 46 N. Y. U. L. Rev. 900, 905 (1971).
[72] See Part I, supra. The relevant provisions of Title 2 are set forth in the Appendix to this opinion, infra, at 144 et seq.
[73] NAACP v. Alabama, 357 U. S., at 463. See also Gibson v. Florida Legislative Comm., 372 U. S. 539, 546 (1963); NAACP v. Button, 371 U. S., at 438; Bates v. Little Rock, 361 U. S., at 524.
[74] Id., at 525.
[75] Gibson v. Florida Legislative Comm., supra, at 546.
[76] The Court of Appeals held that the applicable test for evaluating the Act's disclosure requirements is that adopted in United States v. O'Brien, 391 U. S. 367 (1968), in which " `speech' and `non-speech' elements [were] combined in the same course of conduct." Id., at 376. O'Brien is appropriate, the Court of Appeals found, because the Act is directed toward the spending of money, and money introduces a nonspeech element. As the discussion in Part I-A, supra, indicates, O'Brien is inapposite, for money is a neutral element not always associated with speech but a necessary and integral part of many, perhaps most, forms of communication. Moreover, the O'Brien test would not be met, even if it were applicable. O'Brien requires that "the governmental interest [be] unrelated to the suppression of free expression." Id., at 377. The governmental interest furthered by the disclosure requirements is not unrelated to the "suppression" of speech insofar as the requirements are designed to facilitate the detection of violations of the contribution and expenditure limitations set out in 18 U. S. C. § 608 (1970 ed., Supp. IV).
[77] H. R. Rep. No. 92-564, p. 4 (1971).
[78] Ibid.; S. Rep. No. 93-689, p. 2 (1974).
[79] We have said elsewhere that "informed public opinion is the most potent of all restraints upon misgovernment." Grosjean v. American Press Co., 297 U. S. 233, 250 (1936). Cf. United States v. Harriss, 347 U. S. 612, 625 (1954) (upholding disclosure requirements imposed on lobbyists by the Federal Regulation of Lobbying Act, Title III of the Legislative Reorganization Act of 1946, 60 Stat. 839).
[80] L. Brandeis, Other People's Money 62 (National Home Library Foundation ed. 1933).
[81] See supra, at 60.
[82] Post-election disclosure by successful candidates is suggested as a less restrictive way of preventing corrupt pressures on office-holders. Delayed disclosure of this sort would not serve the equally important informational function played by pre-election reporting. Moreover, the public interest in sources of campaign funds is likely to be at its peak during the campaign period; that is the time when improper influences are most likely to be brought to light.
[83] Nor is this a case comparable to Pollard v. Roberts, 283 F. Supp. 248 (ED Ark.) (three-judge court), aff'd, 393 U. S. 14 (1968), in which an Arkansas prosecuting attorney sought to obtain, by a subpoena duces tecum, the records of a checking account (including names of individual contributors) established by a specific party, the Republican Party of Arkansas.
[84] See Developments in the LawElections, 88 Harv. L. Rev. 1111, 1247 n. 75 (1975).
[85] See Williams v. Rhodes, 393 U. S. 23, 32 (1968) ("There is, of course, no reason why two parties should retain a permanent monopoly on the right to have people vote for or against them. Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms"); Sweezy v. New Hampshire, 354 U. S. 234, 250-251 (1957) (plurality opinion).
[86] Cf. Talley v. California, 362 U. S. 60, 64-65 (1960).
[87] Allegations made by a branch of the Socialist Workers Party in a civil action seeking to declare the District of Columbia disclosure and filing requirements unconstitutional as applied to its records were held to be sufficient to withstand a motion to dismiss in Doe v. Martin, 404 F. Supp. 753 (1975) (three-judge court). The District of Columbia provisions require every political committee to keep records of contributions of $10 or more and to report contributors of $50 or more.
[88] For example, a campaign worker who had solicited campaign funds for the Libertarian Party in New York testified that two persons solicited in a Party campaign "refused to contribute because they were unwilling for their names to be disclosed or published." None of the appellants offers stronger evidence of threats or harassment.
[89] These criteria were suggested in an opinion concurring in part and dissenting in part from the decision below. 171 U. S. App. D. C., at 258 n. 1, 519 F. 2d, at 907 n. 1 (Bazelon, C. J.).
[90] Age is also underinclusive in that it would presumably leave long-established but unpopular parties subject to the disclosure requirements. The Socialist Labor Party, which is not a party to this litigation but which has filed an amicus brief in support of appellants, claims to be able to offer evidence of "direct suppression, intimidation, harassment, physical abuse, and loss of economic sustenance" relating to its contributors. Brief for Socialist Labor Party as Amicus Curiae 6. The Party has been in existence since 1877.
[91] 171 U. S. App. D. C., at 258, 519 F. 2d, at 907 n. 1 (Bazelon C. J.).
[92] Id., at 260, 519 F. 2d, at 909. See also Developments in the LawElections, 88 Harv. L. Rev. 1111, 1247-1249 (1975).
[93] See Appendix to this opinion, infra, at 160.
[94] See Part I-C-1, supra.
[95] § 305, 86 Stat. 16.
[96] 88 Stat. 1265.
[97] S. Rep. No. 92-229, p. 57 (1971).
[98] See n. 71, supra.
[99] Section 441 (a) provides: "Any person who violates any of the provisions of this subchapter shall be fined not more than $1,000 or imprisoned not more than one year, or both."
[100] §§ 431 (e), (f). See Appendix to this opinion, infra, at 145-149.
[101] See supra, at 61-63.
[102] S. Rep. No. 92-96, p. 33 (1971); S. Rep. No. 93-689, pp. 1-2 (1974).
[103] See n. 53, supra.
[104] See Part I-C-1, supra.
[105] Section 431 (d) defines "political committee" as "any committee, club, association, or other group of persons which receives contributions or makes expenditures during a calendar year in an aggregate amount exceeding $1,000."
[106] At least two lower courts, seeking to avoid questions of unconstitutionality, have construed the disclosure requirements imposed on "political committees" by § 434 (a) to be nonapplicable to non-partisan organizations. United States v. National Comm. for Impeachment, 469 F. 2d, at 1139-1142; American Civil Liberties Union v. Jennings, 366 F. Supp., at 1055-1057. See also 171 U. S. App. D. C., at 214 n. 112, 519 F. 2d, at 863 n. 112.
[107] Some partisan committeesgroups within the control of the candidate or primarily organized for political activitieswill fall within § 434 (e) because their contributions and expenditures fall in the $100-to-$1,000 range. Groups of this sort that do not have contributions and expenditures over $1,000 are not "political committees" within the definition in § 431 (d); those whose transactions are not as great as $100 are not required to file statements under § 434 (e).
[108] See n. 52, supra.
[109] Of course, independent contributions and expenditures made in support of the campaigns of candidates of parties that have been found to be exempt from the general disclosure requirements because of the possibility of consequent chill and harassment would be exempt from the requirements of § 434 (e).
[110] See supra, at 61-63.
[111] "Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark." Louisville Gas Co. v. Coleman, 277 U. S. 32, 41 (1928) (Holmes, J., dissenting).
[112] Appellants' final argument is directed against § 434 (d), which exempts from the reporting requirements certain "photographic, matting, or recording services" furnished to Congressmen in nonelection years. See Appendix to this opinion, infra, at 159. Although we are troubled by the considerable advantages that this exemption appears to give to incumbents, we agree with the Court of Appeals that, in the absence of record evidence of misuse or undue discriminatory impact, this provision represents a reasonable accommodation between the legitimate and necessary efforts of legislators to communicate with their constituents and activities designed to win elections by legislators in their other role as politicians.
[113] Accordingly, we respond to the certified questions, as follows:

7. Do the particular requirements in the challenged statutes that persons disclose the amounts that they contribute or expend in connection with elections for federal office or that candidates for such office disclose the amounts that they expend in their campaigns violate the rights of one or more of the plaintiffs under the First, Fourth, or Ninth Amendment or the Due Process Clause of the Fifth Amendment?
(a) Do 2 U. S. C. §§ 432 (b), (c), and (d) and 438 (a) (8) (1970 ed., Supp. IV) violate such rights, in that they provide, through auditing procedures, for the Federal Election Commission to inspect lists and records required to be kept by political committees of individuals who contribute more than $10?
Answer: NO.
(b) Does 2 U. S. C. §§ 434 (b) (1)-(8) (1970 ed., Supp. IV) violate such rights, in that it requires political committees to register and disclose the names, occupations, and principal places of business (if any) of those of their contributors who contribute in excess of $100?
Answer: NO.
(c) Does 2 U. S. C. § 434 (d) (1970 ed., Supp. IV) violate such rights, in that it neither requires disclosure of nor treats as contribution to or expenditure by incumbent officeholders the resources enumerated in 2 U. S. C. § 434 (d) (1970 ed., Supp. IV)?
Answer: NO.
(d) Does 2 U. S. C. § 434 (e) (1970 ed., Supp. IV) violate such rights, in that it provides that every person contributing or expending more than $100 other than by contribution to a political committee or candidate (including volunteers with incidental expenses in excess of $600) must make disclosure to the Federal Election Commission?
Answer: NO.
[114] The Presidential Election Campaign Fund Act of 1966, Title IV of Pub. L. 89-909, §§ 301-305, 80 Stat. 1587, was the first such provision. This Act also initiated the dollar check-off provision now contained in 26 U. S. C. § 6096 (1970 ed., Supp. IV). The Act was suspended, however, by a 1967 provision barring any appropriations until Congress adopted guidelines for the distribution of money from the Fund. Pub. L. 90-26, § 5, 81 Stat. 58. In 1971 Congress added Subtitle H to the Internal Revenue Code. Pub. L. 92-178, § 801, 85 Stat. 562. Chapter 95 thereof provided public financing of general election campaigns for President; this legislation was to become effective for the 1976 election and is substantially the same as the present scheme. Congress later amended the dollar check-off provision, deleting the taxpayers' option to designate specific parties as recipients of their money. Pub. L. 93-53, § 6, 87 Stat. 138. Finally, the 1974 amendments added to Chapter 95 provisions for financing nominating conventions and enacted a new Chapter 96 providing matching funds for campaigns in Presidential primaries. Pub. L. 93-443, §§ 403-408, 88 Stat. 1291.
[115] Unless otherwise indicated all statutory citations in this Part III are to the Internal Revenue Code of 1954, Title 26 of the United States Code, 1970 edition, Supplement IV.
[116] See n. 6, supra.
[117] Priorities are established when the Fund is insufficient to satisfy all entitlements in any election year: the amount in the Fund is first allocated to convention funding, then to financing the general election, and finally to primary matching assistance. See §§ 9008 (a), 9037 (a). But the law does not specify how funds are to be allocated among recipients within these categories. Cf. § 9006 (d).
[118] Independent candidates might be excluded from general election funding by Chapter 95. See §§ 9002 (2) (B), 9003 (a), (c), 9004 (a) (2), (c), 9005 (a), 9006 (c). Serious questions might arise as to the constitutionality of excluding from free annual assistance candidates not affiliated with a "political party" solely because they lack such affiliation. Storer v. Brown, 415 U. S. 724, 745-746 (1974). But we have no occasion to address that question in this case. The possibility of construing Chapter 95 as affording financial assistance to independent candidates was remarked by the Court of Appeals. 171 U. S. App. D. C., at 238, 519 F. 2d, at 887. The only announced independent candidate for President before the Court former Senator McCarthyhas publicly announced that he will refuse any public assistance. Moreover, he is affiliated with the Committee for a Constitutional PresidencyMcCarthy '76, and there is open the question whether it would qualify as a "political party" under Subtitle H.
[119] No party to this case has challenged the constitutionality of this expenditure limit.
[120] This amount is the same as the expenditure limit provided in 18 U. S. C. § 608 (c) (1) (B) (1970 ed., Supp. IV). The Court of Appeals viewed the provisions as "complementary stratagems." 171 U. S. App. D. C., at 201, 519 F. 2d, at 850. Since the Court today hold § 608 (c) (1) to be unconstitutional, the question of the severability of general election funding as now constituted arises. We hold that the provisions are severable for the reasons stated in Part III-C, infra.
[121] No separate pledge is required from the candidate's party, but if the party organization is an "authorized committee" or "agent," expenditures by the party may be attributed to the candidate. 18 U. S. C. § 608 (c) (2) (B) (1970 ed., Supp. IV). See § 608 (b) (4) (A).
[122] As with Chapter 95, any constitutional question that may arise from the exclusion of independent candidates from any assistance, such as funds to defray expenses of getting on state ballots by petition drives, need not be addressed in this case. See n. 118, supra.
[123] As with general election funding, this limit is the same as the candidate expenditure limit of 18 U. S. C. § 608 (c) (1) (1970 ed., Supp. IV). See n. 120, supra, and Part III-C, infra.
[124] The scheme involves no compulsion upon individuals to finance the dissemination of ideas with which they disagree, Lathrop v. Donohue, 367 U. S. 820, 871 (1961) (Black, J., dissenting); id., at 882 (Douglas, J., dissenting); Machinists v. Street, 367 U. S. 740, 778 (1961) (Douglas, J., concurring); id., at 788-792 (Black, J., dissenting). The § 6096 check-off is simply the means by which Congress determines the amount of its appropriation.
[125] Some proposals for public financing would give taxpayers the opportunity to designate the candidate or party to receive the dollar, and § 6096 initially offered this choice. See n. 114, supra. The voucher system proposed by Senator Metcalf, as amicus curiae here, also allows taxpayers this option. But Congress need not provide a mechanism for allowing taxpayers to designate the means in which their particular tax dollars are spent. See n. 124, supra. Further, insofar as these proposals are offered as less restrictive means, Congress had legitimate reasons for rejecting both. The designation option was criticized on privacy grounds, 119 Cong. Rec. 22598, 22396 (1973), and also because the identity of all candidates would not be known by April 15, the filing day for annual individual and joint tax returns. Senator Metcalf's proposal has also been criticized as possibly leading to black markets and to coercion to obtain vouchers and as administratively impractical.
[126] Appellants voice concern that public funding will lead to governmental control of the internal affairs of political parties, and thus to a significant loss of political freedom. The concern is necessarily wholly speculative and hardly a basis for invalidation of the public financing scheme on its face. Congress has expressed its determination to avoid the possibility. S. Rep. No. 93-689, pp. 9-10 (1974).
[127] The historical bases of the Religion and Speech Clauses are markedly different. Intolerable persecutions throughout history led to the Framers' firm determination that religious worshipboth in method and beliefmust be strictly protected from government intervention. "Another purpose of the Establishment Clause rested upon an awareness of the historical fact that governmentally established religions and religious persecutions go hand in hand." Engel v. Vitale, 370 U. S. 421, 432 (1962) (footnote omitted). See Everson v. Board of Education, 330 U. S. 1, 8-15 (1947). But the central purpose of the Speech and Press Clauses was to assure a society in which "uninhibited, robust, and wide-open" public debate concerning matters of public interest would thrive, for only in such a society can a healthy representative democracy flourish. New York Times Co. v. Sullivan, 376 U. S. 254, 270 (1964). Legislation to enhance these First Amendment values is the rule, not the exception. Our statute books are replete with laws providing financial assistance to the exercise of free speech, such as aid to public broadcasting and other forms of educational media, 47 U. S. C. §§ 390-399, and preferential postal rates and antitrust exemptions for newspapers, 39 CFR § 132.2 (1975); 15 U. S. C. §§ 1801-1804.
[128] Appellants maintain that denial of funding is a more severe restriction than denial of access to the ballot, because write-in candidates can win elections, but candidates without funds cannot. New parties will be unfinanced, however, only if they are unable to get private financial support, which presumably reflects a general lack of public support for the party. Public financing of some candidates does not make private fundraising for others any more difficult; indeed, the elimination of private contributions to major-party Presidential candidates might make more private money available to minority candidates.
[129] Appellants dispute the relevance of this answer to their argument on the ground that they will not be able to raise money to equal major-party spending. As a practical matter, however, Subtitle H does not enhance the major parties' ability to campaign; it substitutes public funding for what the parties would raise privately and additionally imposes an expenditure limit. If a party cannot raise funds privately, there are legitimate reasons not to provide public funding, which would effectively facilitate hopeless candidacies.
[130] Our only prior decision dealing with a system of public financing, American Party of Texas v. White, 415 U. S. 767 (1974), also recognized that such provisions are less restrictive than regulation of ballot access. Texas required major partiesthere called "political parties"to nominate candidates by primaries, and the State reimbursed the parties for some of the expenses incurred in holding the primaries. But Texas did not subsidize other parties for the expenses involved in qualifying for the ballot, and this denial was claimed to be a denial of equal protection of the laws. We said that we were "unconvinced . . . that this financing law is an `exclusionary mechanism' which `tends to deny some voters the opportunity to vote for a candidate of their choosing' or that it has `a real and appreciable impact on the exercise of the franchise.' " Id., at 794, quoting from Bullock v. Carter, 405 U. S., at 144. That the aid in American Party was provided to parties and not to candidates, as is most of the Subtitle H funding, is immaterial.
[131] The allegations of invidious discrimination are based on the claim that Subtitle H is facially invalid; since the public financing provisions have never been in operation, appellants are unable to offer factual proof that the scheme is discriminatory in its effect. In rejecting appellants' arguments, we of course do not rule out the possibility of concluding in some future case, upon an appropriate factual demonstration, that the public financing system invidiously discriminates against nonmajor parties.
[132] In 1912 Theodore Roosevelt ran as the candidate of the Progressive Party, which had split off from the Republican Party, and he received more votes than William H. Taft, the Republican candidate. But this third-party "threat" was short-lived; in 1916 the Progressive came back into the Republican Party when the party nominated Charles Evans Hughes as its candidate for the Presidency. With the exception of 1912, the major-party candidates have outpolled all others in every Presidential election since 1856.
[133] Appellants suggest that a less discriminatory formula would be to grant full funding to the candidate of the party getting the most votes in the last election and then give money to candidates of other parties based on their showing in the last election relative to the "leading" party. That formula, however, might unfairly favor incumbents, since their major-party challengers would receive less financial assistance. See S. Rep. No. 93-689, p. 10 (1974).
[134] Appellants argue that this effort to "catch up" is hindered by the contribution limits in 18 U. S. C. § 608 (b) (1970 ed., Supp. IV) and that therefore the public financing provisions are unconstitutional. Whatever merit the point may have, which is questionable on the basis of the record before the Court, it is answered in our treatment of the contribution limits. See Part I-B, supra.
[135] There will, however, be no minor-party candidates in the 1976 Presidential election, since no 1972 candidate other than those of the major parties received 5% of the popular vote.
[136] Another suggested alternative is Senator Metcalf's voucher scheme, but we have previously mentioned problems presented by that device. See n. 125, supra. The United States suggests that a matching formula could be used for general election funding, as it is for funding primary campaigns, in order to relate current funding to current support more closely. Congress could readily have concluded, however, that the matching formula was inappropriate for the general election. The problems in determining the relative strength of candidates at the primaries stage of the campaign are far greater than after a candidate has obtained the nomination of a major party. See S. Rep. No. 93-689, p. 6 (1974). It might be eminently reasonable, therefore, to employ a matching formula for primary elections related to popular support evidenced by numerous smaller contributions, yet inappropriate for general election financing as inconsistent with the congressional effort to remove the influence of private contributions and to relieve candidates of the burden of fundraising. Ibid.
[137] Williams v. Rhodes, 393 U. S. 23, 31-32 (1968); Sweezy v. New Hampshire, 354 U. S. 234, 250-251 (1957) (plurality opinion). Cf. Talley v. California, 362 U. S. 60, 64 (1960).
[138] Apart from the adjustment for inflation, and assuming a major-party entitlement of $20,000,000, a candidate getting 5% of the popular vote, when the balance is divided between two major parties, would be entitled to a post-election payment of more than $2,100,000 if that sum remains after priority allocations from the fund.
[139] It is also argued that Storer v. Brown, 415 U. S. 724 (1974), is a better analogy than Jenness. In Storer a candidate could qualify for the ballot by obtaining the signatures of 5% of the voters, but the signatures could not include any voters who voted for another candidate at the primary election. 415 U. S., at 739. The analogy, however, is no better than Jenness. The Chapter 95 formula is not more restrictive than that sustained in the two cases, since for the reasons stated earlier, supra, at 94-95, it burdens minority interests less than ballot-access regulations.
[140] On similar grounds we sustain the 10-state requirement in § 9002 (2). Success in Presidential elections depends on winning electoral votes in States, not solely popular votes, and the requirement is plainly not unreasonable in light of that fact.
[141] As with primary campaigns, Congress could reasonably determine that there was no need for reforms as to minor-party conventions. See infra, at 105-106. This contribution limit applies to "contributions to any candidate," 18 U. S. C. § 608 (b) (1) (1970 ed., Supp. IV), and thus would not govern gifts to a party for general purposes, such as convention funding. Although "contributions to a named candidate made to any political committee" are within § 608 (b) (1) if the committee is authorized in writing by a candidate to accept contributions, § 608 (b) (4) (A), contributions to a party not for the benefit of any specific candidate would apparently not be subject to the $1,000 ceiling. Moreover, § 608 (b) (4) (A) governs only party organizations authorized by a candidate in writing to accept contributions.
[142] With respect to the denial of funds to candidates who may not be affiliated with a "political party" for the purposes of public financing, see n. 118, supra.
[143] Appellants argue that this reasoning from Katzenbach v. Morgan, is inapplicable to this case involving First Amendment guarantees. But the argument as to the denial of funds to certain candidates primarily claims invidious discrimination and hence presents Fifth Amendment questions, though with First Amendment overtones, as in Katzenbach v. Morgan.
[144] Appellants contend that the 20-state requirement directly conflicts with Moore v. Ogilvie, 394 U. S. 814 (1969), but that case is distinguishable. Only 7% of the Illinois voters could have blocked a candidate from qualifying for the ballot, even though the statewide elections were decided by straight majority vote. The clear purpose was to keep any person from being nominated without support in downstate counties making up only 7% of the vote, but those same voters could not come close to defeating a candidate in the general election. There is no similar restriction here on the opportunity to vote for any candidate, and the 20-state requirement is not an unreasonable method of measuring a candidate's breadth of support. See supra, at 103-105.
[145] The fear that barriers would be reduced too much was one reason for rejecting a matching formula for the general election financing system. See n. 136, supra.
[146] By offering a single hypothetical situation, appellants try to prove that the matching formula gives wealthy contributors an advantage. Taxpayers are entitled to a deduction from ordinary income for political contributions up to $100, or $200 on a joint return. § 218. Appellants note that a married couple in the 70% tax bracket could give $500 to a candidate and claim the full deduction allowed by § 218, thus reducing their tax liability by $140. The matching funds increase the effective contribution to $1,000, and the total cost to the contributors is $360. But the appellants have disregarded a myriad of other possibilities. For example, taxpayers also have the option of claiming a tax credit up to $25, or $50 on a joint return, for one-half of their political contributions. § 41. Any married couple could give $100 to a candidate, claim the full $50 credit, and matching thus allows a contribution of $200 at a cost of only $50 to the contributors. Because this example and others involve greater subsidization75% against 64%of smaller contributions than is involved in appellants' hypothesis, one cannot say that the matching formula unfairly favors wealthy interests or large contributors. Moreover, the effect noted by appellants diminishes as the size of individual contributions approaches $1,000.

Finally, these examples clearly reveal that §§ 41 and 218 afford public subsidies for candidates, but appellants have raised no constitutional challenge to the provisions, either on First or Fifth Amendment grounds.
[147] Our responses to the certified constitutional questions pertaining to public financing of Presidential election campaigns are:

5. Does any statutory provision for the public financing of political conventions or campaigns for nomination or election to the Presidency or Vice Presidency violate the rights of one or more of the plaintiffs under the First or Ninth Amendment, the Due Process Clause of the Fifth Amendment, or Article I, Section 8, Clause 1, of the Constitution of the United States?
Answer: NO.
6. Do the particular provisions of Subtitle H and § 6096 of the Internal Revenue Code of 1954 deprive one or more of the plaintiffs of such rights under the First or Ninth Amendment or Article 1, Section 8, Clause 1, in that they provide federal tax money to support certain political candidates, parties, movements, and organizations or in the manner that they so provide such federal tax money?
Answer: NO.
[148] Unless otherwise indicated, all statutory citations in Part IV are to Title 2 of the United States Code, 1970 edition, Supplement IV, the relevant provisions of which are set forth in the Appendix to this opinion, infra, at 144-180.
[149] In administering Chapters 95 and 96 of Title 26, which provide for funding of Presidential election and primary campaigns, respectively, the Commission is empowered, inter alia, "to prescribe such rules and regulations . . . as it deems necessary to carry out the functions and duties imposed on it" by each chapter. 26 U. S. C. § 9009 (b) (1970 ed., Supp. IV). See also 26 U. S. C. § 9039 (b) (1970 ed., Supp. IV).
[150] The sections from Title 18, incorporated by reference into several of the provisions relating to the Commission's powers, were either enacted or amended by the 1971 Act or the 1974 amendments. They are codified at 18 U. S. C. §§ 608, 610, 611, 613, 614, 615, 616, and 617 (1970 ed., Supp. IV) (hereinafter referred to as Title 18 sections).
[151] Section 437c (b) also provides, somewhat redundantly, that the Commission "shall administer, seek to obtain compliance with, and formulate policy with respect to this Act" and the Title 18 sections.
[152] The Commission is charged with the duty under each Act to receive and pass upon requests by eligible candidates for campaign money and certify them to the Secretary of the Treasury for the latter's disbursement from the Fund. See 26 U. S. C. §§ 9003-9007, 9033-9038 (1970 ed., Supp. IV).
[153] This conclusion seems to follow from the manner in which the subsections of § 437g interrelate. Any person may file, and the Clerk of the House or the Secretary of the Senate shall refer, believed or apparent civil or criminal violations to the Commission. Upon receipt of a complaint or referral, as the case may be, the Commission is directed to notify the person involved and to report the violation to the Attorney General or to make an investigation. § 437g (a) (2). The Commission shall conduct a hearing at that person's request. § 437g (a) (4). If after its investigation the Commission "determines . . . that there is reason to believe" that a "violation of this Act," i. e., a civil violation, has occurred or is about to occur, it "may endeavor to correct such violation by informal methods," failing which, the Commission "may institute a civil action for relief." § 437g (a) (5). Finally, paragraph (6) provides as follows:

"The Commission shall refer apparent violations to the appropriate law enforcement authorities to the extent that violations of provisions of chapter 29 of Title 18 are involved, or if the Commission is unable to correct apparent violations of this Act under the authority given it by paragraph (5), or if the Commission determines that any such referral is appropriate." § 437g (a) (6) (emphasis added). While it is clear that the Commission has a duty to refer apparent criminal violations either upon their initial receipt or after an investigation, it would appear at the very least that the Commission, which has "primary jurisdiction" with respect to civil enforcement, § 437c (b), has the sole discretionary power "to determine" whether or not a civil violation has occurred or is about to occur, and consequently whether or not informal or judicial remedies will be pursued.
[154] Such a finding is subject to judicial review under the Administrative Procedure Act, 5 U. S. C. § 701 et seq.
[155] § 437c (a) (1), set forth in the Appendix to this opinion, infra, at 161-162.
[156] § 437c (a) (1) (A).
[157] The Court of Appeals, following the sequence of the certified questions, adopted a piecemeal approach to the six questions, reproduced below, concerning the method of appointment and powers of the Commission. Its basic holding, in answer to question 8 (a), was that "Congress has the constitutional authority to establish and appoint [the Commission] to carry out appropriate legislative functions." 171 U. S. App. D. C., at 244, 519 F. 2d, at 890. Appellants' claim, embodied in questions 8 (b) through 8 (f), that the Commission's powers go well beyond "legislative functions" and are facially invalid was in an overarching sense not ripe, since "[w]hether particular powers are predominantly executive or judicial, or insufficiently related to the exercise of appropriate legislative power is an abstract question . . . better decided in the context of a particular factual controversy." Id., at 243, 519 F. 2d, at 892. While some of the statutory grants such as civil enforcement and candidate disqualification powers (questions 8 (c) and 8 (e)) raised, in the court's view, "very serious constitutional questions," only the power of the Commission to issue advisory opinions under § 437f (a) was ripe in the context of an attack on Congress' method of appointment. Even then, beyond the Commission's power to inform the public of its interpretations, the question whether Congress under § 437f (b) could validly give substantive effect to the Commission's opinions in later civil and criminal enforcement proceedings should, the Court of Appeals held, await a case in which a defense based on § 437f (b) was asserted. Finally, the question of the Commission's power under 26 U. S. C. § 9008 (d) (3) (1970 ed., Supp. IV) to authorize nominating convention expenditures in excess of the statutory limits (question 8 (f)) was found ripe because appellants had not challenged it in relation to the method of appointment but had asserted only that 26 U. S. C. § 9008 (d) (3) (1970 ed., Supp. IV) vested excessive discretion in the Commission. The Court of Appeals found that Congress had provided sufficient guidelines to withstand that attack.

The Court of Appeals accordingly answered the six certified questions as follows:
"8. Do the provisions in the challenged statutes concerning the powers and method of appointment of the Federal Election Commission violate the rights of one or more of the plaintiffs under the constitutional separation of powers, the First, Fourth, Fifth, Sixth, or Ninth Amendment, Article I, Section 2, Clause 6, Article I, Section 5, Clause 1, or Article III?
"(a) Does 2 U. S. C. § 437c (a) violate such rights by the method of appointment of the Federal Election Commission? . . .
"Answer: NO
"(b) Do 2 U. S. C. §§ 437d and 437g violate such rights, in that they entrust administration and enforcement of the FECA to the Federal Election Commission? . . .
"Answer: NO as to the power to issue advisory opinions; UNRIPE as to all else.
"(c) Does 2 U. S. C. § 437g (a) violate such rights, in that it empowers the Federal Election Commission and the Attorney General to bring civil actions (including proceedings for injunctions) against any person who has engaged or who may engage in acts or practices which violate the Federal Election Campaign Act, as amended, or §§ 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18? . . .
"Answer: UNRIPE FOR RESOLUTION
"(d) Does 2 U. S. C. § 438 (c) violate such rights, in that it empowers the Federal Election Commission to make rules under the FECA in the manner specified therein? . . .
"Answer: UNRIPE FOR RESOLUTION
"(e) Does 2 U. S. C. § 456 violate such rights, in that it imposes a temporary disqualification on any candidate for election to federal office who is found by the Federal Election Commission to have failed to file a report required by Title III of the Federal Election Campaign Act, as amended? . . .
"Answer: UNRIPE FOR RESOLUTION
"(f) Does § 9008 of the Internal Revenue Code of 1954 violate such rights, in that it empowers the Federal Election Commission to authorize expenditures of the national committee of a party with respect to presidential nominating conventions in excess of the limits enumerated therein? . . .
"Answer: NO"
[158] With respect to the Commission's power under 26 U. S. C. § 9008 (d) (3) (1970 ed., Supp. IV) to authorize excessive convention expenditures (question 8 (f)), the fact that appellants in the Court of Appeals may have focused their attack primarily or even exclusively upon the asserted lack of standards attendant to that power, see n. 157, supra, does not foreclose them from challenging that power in relation to Congress' method of appointment of the Commission's members. Question 8 (f) asks whether vesting the Commission with this power under 26 U. S. C. § 9008 (1970 ed., Supp. IV) violates "such rights," which by reference to question 8 includes "the rights of [appellants] under the constitutional separation of powers." Since the certified questions themselves provide our jurisdictional framework, § 437h (b), the separation-of-powers aspect of appellants' attack on 26 U. S. C. § 9008 (d) (3) (1970 ed., Supp. IV) is properly before this Court.
[159] The Federalist No. 47, p. 299 (G. P. Putnam's Sons ed. 1908).
[160] Id., at 302-303 (emphasis in original).
[161] The Federalist No. 51, pp. 323-324 (G. P. Putnam's Sons ed. 1908).
[162] "Officers of the United States" does not include all employees of the United States, but there is no claim made that the Commissioners are employees of the United States rather than officers. Employees are lesser functionaries subordinate to officers of the United States, see Auffmordt v. Hedden, 137 U. S. 310, 327 (1890); United States v. Germaine, 99 U. S. 508 (1879), whereas the Commissioners, appointed for a statutory term, are not subject to the control or direction of any other executive, judicial, or legislative authority.
[163] Rule II of the Rules of the House of Representatives, the earliest form of which was adopted in 1789, provides for the election by the House, at the commencement of each Congress, of a Clerk, Sergeant at Arms, Doorkeeper, Postmaster, and Chaplain, each of whom in turn is given appointment power over the employees of his department. Jefferson's Manual and Rules of the House of Representatives §§ 635-636. While there is apparently no equivalent rule on the Senate side, one of the first orders of business at the first session of the Senate, April 1789, was to elect a Secretary and a Doorkeeper. Senate Journal 10 (1st & 2d Congress 1789-1793).
[164] 2 U. S. C. § 60-1 (b).
[165] Appellee Commission has relied for analogous support on the existence of the Comptroller General, who as a "legislative officer" had significant duties under the 1971 Act. § 308, 86 Stat. 16. But irrespective of Congress' designation, cf. 31 U. S. C. § 65 (d), the Comptroller General is appointed by the President in conformity with the Appointments Clause. 31 U. S. C. § 42.
[166] 2 M. Farrand, The Records of the Federal Convention of 1787, pp. 74, 76 (1911); The Federalist No. 48, pp. 308-310 (G. P. Putnam's Sons ed. 1908) (J. Madison); The Federalist No. 71, pp. 447-448 (G. P. Putnam's Sons ed. 1908) (A. Hamilton). See generally Watson, Congress Steps Out: A Look at Congressional Control of the Executive, 63 Calif. L. Rev. 983, 1029-1048 (1975).
[167] J. Madison, Notes of Debates in the Federal Convention of 1787, p. 385 (Ohio Univ. Press ed. 1966).
[168] Id., at 472 (emphasis added).
[169] "Col. Mason in opposition to Mr. Read's motion desired it might be considered to whom the money would belong; if to the people, the legislature representing the people ought to appoint the keepers of it." Ibid.
[170] Id., at 521.
[171] Id., at 527.
[172] Id., at 571-573.
[173] Id., at 575.
[174] "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."
[175] Since in future legislation that may be enacted in response to today's decision Congress might choose not to confer one or more of the powers under discussion to a properly appointed agency, our assumption is arguendo only. Considerations of ripeness prevent us from deciding, for example, whether such an agency could under § 456 disqualify a candidate for federal election consistently with Art. I, § 5, cl. 1. With respect to this and other powers discussed infra, this page and 138-141, we need pass only upon their nature in relation to the Appointments Clause, and not upon their validity vel non.
[176] Before a rule or regulation promulgated by the Commission under § 438 (a) (10) may go into effect, it must be transmitted either to the Senate or House of Representatives together with "a detailed explanation and justification of such rule or regulation." § 438 (c) (1). If the House of Congress to which the rule is required to be transmitted disapproves the proposed regulation within the specified period of time, it may not be promulgated by the Commission. Appellants make a separate attack on this qualification of the Commission's rulemaking authority, which is but the most recent episode in a long tug of war between the Executive and Legislative Branches of the Federal Government respecting the permissible extent of legislative involvement in rulemaking under statutes which have already been enacted. The history of these episodes is described in Ginnane, The Control of Federal Administration by Congressional Resolutions and Committees, 66 Harv. L. Rev. 569 (1953); in Newman & Keaton, Congress and the Faithful Execution of LawsShould Legislators Supervise Administrators?, 41 Calif. L. Rev. 565 (1953); and in Watson, supra, n. 166. Because of our holding that the manner of appointment of the members of the Commission precludes them from exercising the rulemaking powers in question, we have no occasion to address this separate challenge of appellants.
[177] The subsidiary questions certified by the District Court relating to the composition of the Federal Election Commission, together with our answers thereto, are as follows:

Question 8 (a). Does 2 U. S. C. § 437c (a) (1970 ed., Supp. IV) violate [the rights of one or more of the plaintiffs under the constitutional separation of powers, the First, Fourth, Fifth, Sixth, or Ninth Amendment, Art. I, § 2, cl. 6, Art. I, § 5, cl. 1, or Art. III] by the method of appointment of the Federal Election Commission?
With respect to the powers referred to in Questions 8 (b)-8 (f), the method of appointment violates Art. II, § 2, cl. 2, of the Constitution.
Question 8 (b). Do 2 U. S. C. §§ 437d and 437g (1970 ed., Supp. IV) violate such rights, in that they entrust administration and enforcement of the FECA to the Federal Election Commission?
Question 8 (c). Does 2 U. S. C. § 437g (a) (1970 ed., Supp. IV) violate such rights, in that it empowers the Federal Election Commission and the Attorney General to bring civil action (including proceedings for injunctions) against any person who has engaged or who may engage in acts or practices which violate the Federal Election Campaign Act, as amended, or §§ 608, 610, 611, 613, 614, 615, 616, or 617 of Title 18 (1970 ed., Supp. IV)?
Question 8 (d). Does 2 U. S. C. § 438 (c) (1970 ed., Supp. IV) violate such rights in that it empowers the Federal Election Commission to make rules under the FECA in the manner specified therein?
Question 8 (e). Does 2 U. S. C. § 456 (1970 ed., Supp. IV) violate such rights, in that it imposes a temporary disqualification on any candidate for election to federal office who is found by the Federal Election Commission to have failed to file a report required by Title III of the Federal Election Campaign Act, as amended?
Question 8 (f). Does § 9008 of the Internal Revenue Code of 1954 violate such rights, in that it empowers the Federal Election Commission to authorize expenditures of the national committee of a party with respect to Presidential nominating conventions in excess of the limits enumerated therein?
The Federal Election Commission as presently constituted may not under Art. II, § 2, cl. 2, of the Constitution exercise the powers referred to in Questions 8 (b)-8 (f).
[178] We have not set forth specific answers to some of the certified questions. Question 9, dealing with alleged vagueness in several provisions, 171 U. S. App. D. C., at 252, 519 F. 2d, at 901 (Appendix A), is resolved in the opinion to the extent urged by the parties. We need not respond to questions 3 (g), 3 (i), 4 (b), and 7 (f), id., at 250-251, 519 F. 2d, at 899-900 (Appendix A), to resolve the issues presented.
[*] Based upon Federal Election Campaign Laws, compiled by the Senate Library for the Subcommittee on Privileges and Elections of the Senate Committee on Rules and Administration (1975).
[1] So in original.
[1] The particular verbalization has varied from case to case. First Amendment analysis defies capture in a single, easy phrase. The basic point of our inquiry, however expressed, is to determine whether the Government has sought to achieve admittedly important goals by means which demonstrably curtail our liberties to an unnecessary extent.
[2] The 1910 legislation required disclosure of the names of recipients of expenditures in excess of $10.
[3] Ironically, the Court seems to recognize this principle when dealing with the limitations on contributions. Ante, at 25.
[4] The record does not show systematic harassment of the sort involved in NAACP v. Alabama, 357 U. S. 449 (1958). But uncontradicted evidence was adduced with respect to actual experiences of minor parties indicating a sensitivity on the part of potential contributors to the prospect of disclosure. See, e. g., District Court findings of fact, affidavits of Wertheimer (¶ 6) and Reed (¶ 8), 2B App. 736, 742. This evidence suffices when the governmental interest in putting the spotlight on the sources of support for minor parties or splinter groups is so tenuous.
[5] The Court notes that 94.9% of the funds raised by congressional candidates in 1974 came in contributions of less than $1,000, ante, at 26 n. 27, and suggests that the effect of the contribution limitations will be minimal. This logic ignores the disproportionate influence large contributions may have when they are made early in a campaign; "seed money" can be essential, and the inability to obtain it may effectively end some candidacies before they begin. Appellants have excerpted from the record data on nine campaigns to which large, initial contributions were critical. Brief for Appellants 132-138. Campaigns such as these will be much harder, and perhaps impossible, to mount under the Act.
[6] Whatever the effect of the limitation, it is clearly arbitrary Congress has imposed the same ceiling on contributions to a New York or California senatorial campaign that it has put on House races in Alaska or Wyoming. Both the strength of support conveyed by the gift of $1,000 and the gift's potential for corruptly influencing the recipient will vary enormously from place to place. Seven Senators each spent from $1,000,000 to $1,300,000 in their successful 1974 election campaigns. A great many congressional candidates spent less than $25,000. 33 Cong. Quarterly 789-790 (1975). The same contribution ceiling would seem to apply to each of these campaigns. Congress accounted for these tremendous variations when it geared the expenditure limits to voting population; but it imposed a flat ceiling on contributions without focusing on the actual evil attacked or the actual harm the restrictions will work.
[7] Suppose, for example, that a candidate's committee authorizes a celebrity or elder statesman to make a radio or television address on the candidate's behalf, for which the speaker himself plans to pay. As the Court recognizes, ante, at 24 n. 25, the Act defines this activity as a contribution and subjects it to the $1,000 limit on individual contributions and the $5,000 limit on contributions by political committees effectively preventing the speech over any substantial radio or television station. Whether the speech is considered an impermissible "contribution" or an allowable "expenditure" turns, not on whether speech by "someone other than the contributor" is involved, but on whether the speech is "authorized" or not. The contribution limitations directly restrict speech by the contributor himself. Of course, this restraint can be avoided if the speaker makes his address without consulting the candidate or his agents. Elsewhere I suggest that the distinction between "independent" and "authorized" political activity is unrealistic and simply cannot be maintained. For present purposes I wish only to emphasize that the Act directly restricts, as a "contribution," what is clearly speech by the "contributor" himself.
[8] The Court treats the Act's provisions limiting a candidate's spending from his personal resources as expenditure limits, as indeed the Act characterizes them, and holds them unconstitutional. As MR. JUSTICE MARSHALL points out, post, at 287, by the Court's logic these provisions could as easily be treated as limits on contributions, since they limit what the candidate can give to his own campaign.
[9] Candidates who must raise large initial contributions in order to appeal for more funds to a broader audience will be handicapped. See n. 5, supra. It is not enough to say that the contribution ceilings "merely . . . require candidates . . . to raise funds from a greater number of persons," ante, at 22, where the limitations will effectively prevent candidates without substantial personal resources from doing just that.
[10] Under the Court's holding, candidates with personal fortunes will be free to contribute to their own campaigns as much as they like, since the Court chooses to view the Act's provisions in this regard as unconstitutional "expenditure" limitations rather than "contribution" limitations. See n. 8, supra.
[11] 113 Cong. Rec. 12165 (1967).
[12] Brief for Appellee Attorney General and for United States as Amicus Curiae 93.
[13] Id., at 94.
[14] Id., at 93.
[15] Such considerations have never before influenced the Court's evaluation of the risks of restraints on expression.
[16] The Court's opinion demonstrates one such intrusion. While the Court finds that the Act's expenditure limitations unconstitutionally inhibit a candidate's or a party's First Amendment rights, it imposes, by invoking the severability clause of Subtitle H, such limitations on qualifying for public funds.
[17] See, e. g., 26 U. S. C. §§ 9003, 9007, 9033, 9038 (1970 ed., Supp. IV).
[18] Cf. Terry v. Adams, 345 U. S. 461 (1953); Smith v. Allwright, 321 U. S. 649 (1944).
[19] See generally remarks of Senator Gore, 112 Cong. Rec. 28783 (1966).
[20] The problem is considered only in the limited context of Subtitle H.
[21] Section 454 provides that if a "provision" is invalid, the entire Act will not be deemed invalid. More than a provision, more than a few provisions, have been held invalid today. Section 454 probably does not even reach such extensive invalidation.
[1] That is, if the FEC were properly constituted, I would answer questions 8 (b), 8 (c), 8 (d) (see infra, at 282-286), and 8 (f) in the negative. With respect to question 8 (e), I reserve judgment on the validity of 2 U. S. C. § 456 (1970 ed., Supp. IV) which empowers the FEC to disqualify a candidate for failure to file certain reports. Of course, to the extent that the Court invalidates the expenditure limitations of the FECA, Part I-C, ante, at 39-59, the FEC, however appointed, would be powerless to enforce those provisions.

Unless otherwise indicated, all statutory citations in this part of the opinion are to the Federal Election Campaign Act of 1971, §§ 301-311, 86 Stat. 11, as amended by the Federal Election Campaign Act Amendments of 1974, §§ 201-407, 88 Stat. 1272, 2 U. S. C. § 431 et seq. (1970 ed., Supp. IV).
[2] References to the "Commissioners," the "FEC," or its "members" do not include these two ex officio members.
[3] U. S. Const., Art. II, § 2, cl. 2.
[4] Id., Art. I, §§ 2, 3, and the Seventeenth Amendment.
[5] "The House of Representatives shall chuse their Speaker and other Officers . . . ." U. S. Const., Art. I, § 2, cl. 5.

"The Vice President of the United States shall be President of the Senate, but . . . [t]he Senate shall chuse their other Officers, and also a President pro tempore, in the Absence of the Vice President, or when he shall exercise the Office of President of the United States." § 3, cls. 4, 5.
[6] The distinction appears ante, at 126 n. 162.
[7] Indeed the FEC attacks as "erroneous" appellants' statement that the Court of Appeals ruled that "the FEC commissioners are not officers of the United States. Rather, it held that the grant of power to the President to appoint civil officers of the United States is not to be read as preclusive of Congressional authority to appoint such officers to aid in the discharge of Congressional responsibilities." Brief for Appellee Federal Election Commission 16 n. 19 (hereafter FEC Brief).
[8] How Congress may both appoint officers itself and condition appointment of the President's nominees on confirmation by a majority of both Houses of Congress is not explained.
[9] Watson, Congress Steps Out: A Look at Congressional Control of the Executive, 63 Calif. L. Rev. 983, 1042-1043 (1975).
[10] U. S. Const., Art. I, § 6, cl. 2, provides in part:

"[N]o Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office."
See 1 M. Farrand, The Records of the Federal Convention of 1787, pp. 379-382 (1911) (hereafter Farrand); 2 Farrand 483.
[11] 1 Farrand 20.
[12] Id., at 210-211, 217, 219, 221, 222, 370, 375-377, 379-382, 383, 384, 419, 429, 435; 2 Farrand 180.
[13] Id., at 487. As ratified, the Ineligibility Clause provides:

"No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time . . . ." U. S. Const., Art. I, § 6, cl. 2.
[14] 1 Farrand 116, 120, 224, 233; 2 Farrand 37-38, 41-44, 71-72, 116, 138.
[15] 1 Farrand 63, 67.
[16] Id., at 21-22.
[17] Id., at 224, 233.
[18] 2 Farrand 183, 383, 394.
[19] Id., at 533.
[20] Id., at 627.
[21] C. Warren, The Making of the Constitution 641-642 (1947).
[22] § 437d (a) (9).
[23] § 437c (b).
[24] Section 437g (a) (7) provides:

"Whenever in the judgment of the Commission, after affording due notice and an opportunity for a hearing, any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any [relevant] provision . . . upon request by the Commission the Attorney General on behalf of the United States shall institute a civil action for relief . . . ." (Emphasis supplied.)
The FEC argues that " `there is no showing in this case of a convincing legislative history that would enable us to conclude that "shall" was intended to be the "language of command." ' " FEC Brief 62 n. 52, quoting 171 U. S. App. D. C. 172, 244 n. 191, 519 F. 2d 821, 893 n. 191 (1975). The contention is that the FEC's enforcement power is not exclusive, because the Attorney General retains the traditional discretion to decline to institute legal proceedings. However this may be, the FEC's civil enforcement responsibilities are substantial. Moreover it is authorized under 26 U. S. C. §§ 9010, 9040 (1970 ed., Supp. IV), to appear in and to defend actions brought in the Court of Appeals for the District of Columbia Circuit under §§ 9011, 9041, to review the FEC's actions under Chapters 95 and 96 of Title 26, and to appear in district court to seek recovery of amounts repayable to the Treasury under §§ 9007, 9008, 9038.
[25] Although the FEC resists appellants' attack on its position that it has "no general substantive rulemaking authority with regard to Title 18 spending and contribution limitations" (FEC Brief 49), it agrees "that there is inevitably some interplay between Title 2 and Title 18." (Id., at 55.) It seeks to minimize the importance of the interplay by noting that its definitions of what is to be disclosed and reported would not be binding in judicial proceedings to determine whether substantive provisions of the Act had been violated, but would simply be extended a measure of deference as administrative interpretations. Appellants' reply is the practical one that, whether the FEC's power is substantive or not, persons violating its regulations do so at their peril. To illustrate the extent to which the FEC's regulations implicate the provisions of Title 18, appellants point to the FEC's interim guidelines for the New Hampshire and Tennessee special elections, 40 Fed. Reg. 40668, 43660 (1975), and its regulations, rejected by the Senate, providing that funds contributed to and expended from the "office accounts" of Members of Congress were contributions or expenditures "subject to the limitations of 18 U. S. C. §§ 608, 610, 611, 613, 614 and 615." See notice of proposed rulemaking, id., at 32951. Unless the FEC's regulations are to be given no weight in criminal proceedings, it seems plain that through those regulations the FEC will have a significant role in the implementation and enforcement of criminal statutes.
[26] The FEC itself cannot fashion coercive relief by, for example, issuing cease-and-desist orders. To obtain such relief it must apply to the courts itself or through the Attorney General.
[27] The same preconditions are imposed with respect to regulations issued under the public financing provisions of the election laws. 26 U. S. C. §§ 9009 and 9039 (1970 ed., Supp. IV). No such requirement appears to exist with respect to the FEC's power to make "policy" with respect to the enforcement of the criminal provisions in Title 18 or with respect to any power it may have to issue rules and regulations dealing with the civil enforcement of those provisions. See also § 439a.
[28] Section 438 (c) (4) defines "legislative day." See also 26 U. S. C. §§ 9009 (c) (3), 9039 (c) (3) (1970 ed., Supp. IV).
[29] U. S. Const., Art. I, § 7, cl. 3.
[30] Surely the challengers to the provision for congressional disapproval do not mean to suggest that the FEC's regulations must become effective despite the disapproval of one House or the other. Disapproval nullifies the suggested regulation and prevents the occurrence of any change in the law. The regulation is void. Nothing remains on which the veto power could operate. It is as though a bill passed in one House and failed in another.
[31] The Federalist No. 73, pp. 468-469 (Wright ed. 1961).
[1] "In the Nation's seven largest States in 1970, 11 of the 15 major senatorial candidates were millionaires. The four who were not millionaires lost their bid for election." 117 Cong. Rec. 42065 (1971) (remarks of Rep. Macdonald).
[2] Of course, § 608 (b)'s enhancement of the wealthy candidate's natural advantage does not require its invalidation. As the Court demonstrates, § 608 (b) is fully justified by the governmental interest in limiting the reality and appearance of corruption. Ante, at 26-29.

In addition to § 608 (a), § 608 (c), which limits overall candidate expenditures in a campaign, also provides a check on the advantage of the wealthy candidate. But we today invalidate that section, which unlike § 608 (a) imposes a flat prohibition on candidate expenditures above a certain level, and which is less tailored to the interest in equalizing access than § 608 (a). The effect of invalidating both § 608 (c) and § 608 (a) is to enable the wealthy candidate to spend his personal resources without limit, while his less wealthy opponent is forced to make do with whatever amount he can accumulate through relatively small contributions.